UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| VOTO LATINO, THE WATAUGA COUNTY VOTING RIGHTS TASK FORCE, DOWN HOME NORTH CAROLINA, SOPHIE JAE MEAD, and CHRISTINA BARROW,<br><br>      Plaintiffs,<br><br>      v.<br><br>ALAN HIRSCH, in his official capacity as Chair of the State Board of Elections, JEFF CARMON, in his official capacity as Secretary of the State Board of Elections, STACY EGGERS IV, in his official capacity as Member of the State Board of Elections, KEVIN N. LEWIS, in his official capacity as Member of the State Board of Elections, SIOBHAN O'DUFFY MILLEN, in her official capacity as Member of the State Board of Elections, KAREN BRINSON BELL, in her official capacity as Executive Director of the State Board of Elections, DAWN Y. BAXTON, in her official capacity as Chair of the Durham County Board of Elections, DAVID K. BOONE, in his official capacity as Secretary of the Durham County Board of Elections, DR. JAMES P. WEAVER, in his official capacity as Member of the Durham County Board of Elections, PAMELA A. OXENDINE, in her official capacity as Member of the Durham County Board of Elections, DONALD H. BESKIND, in his official capacity as Member of the Durham County Board of Elections, MICHAEL BEHRENT, in his | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Case No. 1:23-cv-861 |

official capacity as Chair of the Watauga County Board of Elections, ERIC ELLER, in his official capacity as Member of the Watauga County Board of Elections, MATT WALPOLE, in his official capacity as Member of the Watauga County Board of Elections, LETA COUNCILL, in her official capacity as Member of the Watauga County Board of Elections, ELAINE ROTHENBERG, in her official capacity as Member of the Watauga County Board of Elections,

        Defendants.

Plaintiffs Voto Latino, The Watauga County Voting Rights Task Force, Down Home North Carolina, Sophie Jae Mead, and Christina Barrow (collectively, "Plaintiffs"), by and through their undersigned counsel, file this Complaint for Declaratory and Injunctive Relief against Defendants, the members and executive director of the North Carolina State Board of Elections ("NCSBE") and the members of both the Durham County Board of Elections and the Watauga County Board of Elections (collectively, "Defendants"). In support of their Complaint, Plaintiffs allege as follows:

<u>**NATURE OF THE CASE**</u>

1.      "There is more to the right to vote than the right to mark a piece of paper and drop it in a box or the right to pull a lever in a voting booth. The right to vote includes the right to have the ballot counted." *Reynolds v. Sims*, 377 U.S. 533,

555 n.29 (1964) (citation and quotation marks omitted). Plaintiffs seek declaratory and injunctive relief to protect that right, which is under threat in North Carolina as a result of Section 10.(a), subsection (d) of the newly enacted Senate Bill 747 ("S 747") (the "Undeliverable Mail Provision"). This harmful provision threatens to disenfranchise eligible voters without due process of law and, in some cases, based on mistakes made by third-parties over which the voter has no control.

2.     Prior to the passage of S 747, North Carolina's same-day registrants' votes were counted unless the post office returned two pieces of "undeliverable" mail. At worst, two undeliverable notices *might* result in a public challenge to the same-day registrants' vote being counted, *if* a challenge was received by 5 p.m. on the day of the election. But even *if* a same-day registrants' ballot was challenged, the registrant was entitled to notice and a hearing to defend their vote in the face of such a challenge.

3.     The Undeliverable Mail Provision of S 747 prohibits Defendants from registering a same-day voter and counting that voter's ballot if the United States Postal Service ("USPS") returns as "undeliverable" a *single* notice sent to that voter (the "Address Verification Notice") before the close of business on the business day before the canvass. Now, these voters do not receive any notice that their ballot was removed from the official count, let alone an opportunity to be heard in defense of their vote counting. Nor are they made aware that their registration was not

- 3 -

effectuated. Instead, they are automatically disenfranchised and not registered to vote—all without being afforded *any process* to contest the removal of their votes from the count or their exclusion from the voter rolls.

4.      This provision undermines North Carolina's long-standing same-day registration process, wherein eligible North Carolinians may both register to vote and cast their ballots on the same day during the early voting period. Same-day registration has long been a popular and important way for new registrants to access the franchise. In the 2022 general election alone, 104,336 voters relied on it to exercise their right to vote. Those numbers were even higher for the most recent presidential election: in the 2020 general election, 116,065 North Carolinians voted using same-day registration.

5.      Same-day registration has been particularly critical to North Carolinians who have historically been excluded from voting, including Black, Latinx, and young voters—and is disproportionately used by them.

6.      Despite (or perhaps because of) same-day registration's outsized role in expanding access to the franchise, in recent years, the General Assembly has sought to make it harder to access same-day registration, or even to eliminate it altogether. In 2013, the U.S. Court of Appeals for the Fourth Circuit invalidated an effort to repeal same-day registration, finding that it intentionally targeted African Americans with "surgical precision." *N. Carolina State Conf. of NAACP v. McCrory*,

Case 1:23-cv-00861   Document 1   Filed 10/10/23   Page 4 of 36

831 F.3d 204, 214, 237 (4th Cir. 2016) (finding "the General Assembly would not have eliminated same-day registration entirely but-for its disproportionate impact on African Americans").

7.    S 747 represents the General Assembly's most recent unjustifiable attack on same-day registration. And, unless enjoined, it will become far more likely that qualified North Carolina citizens will be shut out of the state's elections without any notice or opportunity to contest their exclusion.

8.    The Undeliverable Mail Provision risks disenfranchising same-day registrants even if they are eligible to register and vote and have taken all the necessary steps to do so. That is because studies have shown that up to 23% of all undeliverable mail is the result of USPS error rather than a faulty address. Compounding the problem, poll workers often complete registration applications electronically for same-day registrants and have been known to make mistakes in recording the voter's address. And historically disenfranchised groups are uniquely susceptible to having their mail erroneously returned as "undeliverable." This is because Black, Latinx, and young North Carolinians are more likely than their white, non-Latinx, and older counterparts to experience poverty and resultant housing insecurity, move more frequently, have mailing addresses (including on-campus addresses) that differ from their physical addresses, and live in shared multi-unit housing and multigenerational households.

- 5 -

9.     But even if the risks of disenfranchisement and failed registration that flow from the Undeliverable Mail Provision stemmed exclusively from a registrant's own errors, they would offend the guarantee of due process because voters have no notice or opportunity to remedy an error. Tens of thousands (and possibly hundreds of thousands) of eligible North Carolinians will rely on same-day registration in the 2024 elections, but their right to vote is now threatened by the Undeliverable Mail Provision.

10.     The General Assembly was necessarily aware of the outsized risks to young voters and voters of color when it enacted S 747 over Governor Cooper's veto on October 10, 2023. Governor Cooper vetoed the legislation on the grounds that the law has "nothing to do with election security" and instead just "erect[s] new barriers for younger, non-white voters" that make it harder to vote. Now, S 747 will go into effect on January 1, 2024.

11.     In order to ensure that North Carolina voters, including the individual Plaintiffs and the members and constituents of the Plaintiff organizations, will not be unconstitutionally denied their right to vote or have that right unduly burdened, Plaintiffs seek an order from this Court enjoining the Undeliverable Mail Provision as a denial of procedural due process in violation of the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution and an undue burden on the right to vote enshrined in the First and Fourteenth Amendments.

- 6 -

## JURISDICTION AND VENUE

12.    Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by federal law and the U.S. Constitution.

13.    This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States.

14.    This Court has personal jurisdiction over Defendants, who are sued in their official capacities only.

15.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because (1) all Defendants are residents of North Carolina, in which this judicial district is located, (2) several defendants are residents of this judicial district, and (3) a substantial part of the events that gave rise to Plaintiffs' claims occurred in this judicial district.

16.    This Court has the authority to enter a declaratory judgment and provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201–2202.

## PARTIES

17.    Plaintiff VOTO LATINO brings this action on its own and on behalf of its constituents and supporters. Voto Latino is a Section 501(c)(4) nonprofit, social welfare organization that engages, empowers, and educates its core constituency of

- 7 -

Latinx communities throughout the country to ensure they are enfranchised and included in the democratic process. Since 2012, Voto Latino has expended significant resources in North Carolina, and has registered 53,376 voters. Voto Latino also educates its constituency on issues in key policy areas such as immigration, healthcare reform, police brutality, and paid sick leave.

18.     Voto Latino serves eligible voter constituents throughout North Carolina, including but not limited to the large number of eligible Latinx voters who live in Durham County. During the 2024 election cycle, Voto Latino anticipates spending upwards of $1 million on direct mail, digital outreach, Spanish language radio, and peer-to-peer text messaging, with the goal of registering 15,000 new North Carolina voters and turning out another 100,000 already registered voters throughout the State. As part of those efforts, Voto Latino educates Latinx voters about same-day registration, and it encourages voters to use same-day registration because it has been an effective way for its constituency to vote. For Voto Latino, same-day registration has been integral to its mission of ensuring as many eligible Hispanic and Latinx voters who wish to vote have access to the franchise.

19.     The Undeliverable Mail Provision directly harms Voto Latino by frustrating its mission of educating, enfranchising and turning out Latinx voters in North Carolina. In previous election cycles, because of same-day registration, Voto Latino has been able to concentrate much of the resources it expends early in the

election cycle in North Carolina on issue advocacy, which is a mission-critical expenditure. But because of the Undeliverable Mail Provision, Voto Latino will have to divert resources it would otherwise spend on issue advocacy in North Carolina and programming in other states to instead encourage eligible constituents to register prior to the registration deadline instead of relying on same-day registration. In addition, Voto Latino will have to spend resources to educate its constituents about the new risks they will face if they rely on same-day registration, including ways to mitigate those risks. The time and resources diverted to these efforts are resources that Voto Latino would otherwise spend on its issue advocacy, digital advertisement, and GOTV programs, both of which are important components in how the organization accomplishes its mission.

20.    Voto Latino's thousands of constituents of eligible Latinx voters who are either not yet registered or who are less likely to turn out to vote without education and encouragement from Voto Latino will also be directly harmed. There are over one million eligible Latinx voters in North Carolina, yet fewer than one-third of them are currently registered to vote. Voto Latino is committed to registering as many eligible Latinx voters as possible. The accessibility of same-day registration is critical to ensuring that every eligible and interested member of Voto Latino's constituency has an opportunity to register in time to vote. Latinx voters have long relied on same-day registration at higher rates than their non-Latinx counterparts.

This is because same-day registration considerably lowers the cost of voting, allowing voters to register and vote at the same time, and because same-day registration during the early voting period is available on weekends when eligible voters may not have to miss work to exercise their right to vote.

21.     Given the new risks to same-day registrants under the Undeliverable Mail Provision and the thousands of eligible voter constituents that Voto Latino plans to assist in 2024, there is an extremely high risk that at least some of Voto Latino's constituents will be disenfranchised because of the Undeliverable Mail Provision. This risk is exacerbated by the fact that Voto Latino's constituents are more likely to live in poverty, move frequently, and live in shared and multi-generational housing than their non-Latinx counterparts, which increases the likelihood that their mail will be erroneously returned as undeliverable.

22.     THE WATAUGA COUNTY VOTING RIGHTS TASKFORCE (the "Taskforce") brings this action on its own and on behalf of its constituents. The Taskforce is a volunteer organization that has engaged in nonpartisan voting rights advocacy work, voter registration drives, voter education outreach initiatives, and defending voting rights since 2014. The Taskforce's mission is simple: Everyone deserves to exercise their right to vote. The Taskforce is committed to ensuring that voting is accessible to every eligible voter who wishes to participate in our democracy. Because Watauga County has the second highest rate of eligible voters

under age 25 per capita in North Carolina and is home to Appalachian State University, a central component of the Taskforce's work is providing crucial information to young and first-time voters.

23. The Taskforce was organized in response to the Watauga County Board of Elections' attempt to eliminate a crucial early voting location, which thousands of student voters relied on for the 2014 general election. Leaders of the Taskforce challenged the early voting plan in Wake County Superior Court and prevailed. *See Anderson v. The North Carolina State Bd. of Elections*, No. 14CVS12648, 2014 WL 6771270, at *1 (N.C. Super. Oct. 13, 2014).

24. The Taskforce primarily accomplishes its mission through volunteer-run voter registration drives, voter education and information sessions, volunteer training, community and Appalachian State University outreach, and a voter information texting service. Through these efforts, the Taskforce's volunteers regularly answer questions about where to vote, what is required, and how to take advantage of early voting opportunities.

25. The Taskforce has long been aware of the issues that arise for voters, often through no fault of their own, because of election mail being returned to the county board as undeliverable. In the 2022 general election, the Taskforce represented and defended 21 voters, many of whom were same-day registrants, whose votes had been challenged, including on the grounds that two notices sent by

election officials had been returned as undeliverable. The Taskforce's dedicated volunteers located each of these voters and notified them that their ballots were in jeopardy, informed them of their rights, and offered them representation at the challenge hearing at no cost. This work was only possible because, prior to the Undeliverable Mail Provision, same-day registrants were given notice and an opportunity to defend their registration and ballots from rejection. The Undeliverable Mail Provision allows same-day registrants no such recourse and affords the Taskforce no time or opportunity to locate voters whose ballots and registration are in jeopardy. Instead, same-day registrants' registration applications will be automatically discarded, and they will be disenfranchised.

26. The Undeliverable Mail Provision directly harms the Taskforce's mission of ensuring that all eligible voters have fair and reliable access to the franchise by arbitrarily disenfranchising the very voters that the Taskforce seeks to engage and support in the elections process. The Taskforce runs on a limited budget of volunteer contributions and volunteer time. The Taskforce will have to divert and expend significant resources it would otherwise spend on voter education and GOTV to fight back against the risks and detrimental effects of the Undeliverable Mail Provision on its constituency. Moreover, the Undeliverable Mail Provision will specifically frustrate the Taskforce's core work of championing the voting rights of the many young people in Watauga County, as these same students are likely to be

disproportionately burdened and disenfranchised if they register same day. *See infra* at ¶ 65.

27.     Finally, the Undeliverable Mail Provision harms the Taskforce's constituents directly. A large part of the Taskforce's constituency is young voters and student voters, including the large population of student voters at Appalachian State University. These voters are more likely to be disenfranchised because of the Undeliverable Mail Provision. Not only are students more likely to be same-day registrants, but they are more likely to have mail returned as undeliverable because they move frequently and have different physical and mailing addresses, which can increase the likelihood that election officials make errors on their registration forms.

28.     Plaintiff DOWN HOME NORTH CAROLINA brings this action on its own and on behalf of its members and constituents. Down Home North Carolina's primary office is in Greensboro, but the organization has hundreds of members all over the state, including in Watauga and Durham counties. Down Home North Carolina is a Section 501(c)(4) nonprofit social welfare organization that was formed in 2020 to build power with rural, working people in North Carolina's small towns and rural communities to ensure that they can live with dignity, security and inclusion. A significant part of Down Home North Carolina's mission to protect democracy and to ensure that working class people in North Carolina have access to the franchise. Same-day registration has long been integral to Down Home North

Carolina's mission of ensuring that eligible, rural, working voters can cast their ballots and have those ballots counted.

29.    In previous election cycles, because of same-day registration, Down Home North Carolina has been able to concentrate much of its limited resources on grassroots community organizing, which are mission-critical expenditures. But because of the Undeliverable Mail Provision, Down Home North Carolina will have to divert resources it would otherwise spend on electoral work and grassroots community organizing to instead encourage eligible, rural, working voters to register prior to the registration deadline instead of relying on same-day registration. In addition, Down Home North Carolina will have to spend resources to educate its constituents about the new risks they will face if they rely on same-day registration, including ways to mitigate those risks. The time and resources diverted to these efforts are resources that Down Home North Carolina would otherwise spend on electoral and grassroots community organizing, both of which are important components of Down Home North Carolina's mission and programming.

30.    Down Home North Carolina's dues-paying members and larger community of rural, working constituents who are not yet registered to vote, or will have to re-register due to address changes, will be directly harmed by the Undeliverable Mail Provision. This is because many of Down Home North Carolina's members and constituents are more likely to have mail returned as

- 14 -

undeliverable. Many of Down Home North Caroliana's members and constituents are poor and more likely than wealthier North Carolinians to rent and experience housing instability, which will require them to re-register to vote when their address changes. Poor and working-class North Carolinians rely on same-day registration because they need to register and vote during the more flexible hours permitted for registration and voting during North Carolina's early voting period. This is because same-day registration considerably lowers the cost of voting, allowing voters to register and vote at the same time, and because same-day registration during the early voting period is available on weekends when eligible voters may not have to miss work to exercise their right to vote. Given the new risks to same-day registrants under the Undeliverable Mail Provision and the large numbers of eligible voters that Down Home North Carolina intends to organize and encourage to register to vote in 2024, there is an extremely high risk that at least some of Down Home North Carolina's members and constituents will be disenfranchised because of the Undeliverable Mail Provision.

31.     Plaintiff SOPHIE JAE MEAD is a senior at Appalachian State University and a member of the Watauga County Voting Rights Taskforce. Ms. Mead moved from Union County to Watauga County in 2020 to attend college, and she moved within Watauga County shortly before the 2022 general election. She used same-day registration to update her registration to reflect her current address in

Boone and to cast her ballot in the 2022 election. However, her ballot was challenged due to receipt of an undeliverable mail notice that resulted from poll worker error. When she registered, the poll worker who filled out Ms. Mead's electronic registration form correctly entered Ms. Mead's physical address in Boone, but then typed in "same" in the mailing address field. The Watauga County Board of Elections attempted to send Ms. Mead an Address Verification Notice, but the USPS returned the Address Verification Notice as undeliverable. Ms. Mead's ballot was subsequently challenged "based on the fact the voter's identification card was returned undeliverable by the US Postal Service." As soon as the challenge was filed, the Watauga Voting Rights Taskforce—of which Ms. Mead was already a member—notified her. Ultimately, Ms. Mead and the Voting Rights Taskforce were able to respond to the challenge and ensure that Ms. Mead's ballot was counted. Had the Undeliverable Mail Provision been in effect in the 2022 election, Ms. Mead's ballot and registration would have been automatically rejected.

32.    Ms. Mead is graduating from Appalachian State University this year, and she expects to relocate outside of Watauga County after graduation. Ms. Mead anticipates updating her registration during the one-stop early voting period and relying on same-day registration, because, given the uncertainty around where she will be working, she is unlikely to know what her new address will be until very

- 16 -

close to the date of the 2024 election. Ms. Mead is concerned that her registration and ballot will be rejected because of the Undeliverable Mail Provision.

33.    Plaintiff CHRISTINA BARROW is a 19-year-old African-American citizen who is eligible to register to vote in North Carolina. Ms. Barrow is originally from Fayetteville, Georgia. She is currently a sophomore at Duke University and resides at a dormitory on the Duke campus in Durham, North Carolina. Ms. Barrow is not currently registered to vote in North Carolina. Ms. Barrow turned 18 years old prior to the 2022 election. She attempted to register to vote online so that she could cast a ballot in the 2022 general election but was unable to successfully register because the State Board's website was inoperable. Given her time commitments to coursework and athletics at Duke University, and her previous inability to register to vote online, Ms. Barrow intends to register to vote in person and vote the same day in the 2024 election. However, Ms. Barrow has moved twice in the last few years and has experienced numerous issues with receiving mail at her dormitory address. Ms. Barrow is concerned that election officials may reject her registration and discard her ballot because of the Undeliverable Mail Provision, even though she is an eligible voter who is looking forward to participating in the franchise for the first time.

34.    Defendants Alan Hirsch, Jeff Carmon, Stacy Eggers IV, Kevin Lewis, and Siobhan Millen are sued in their official capacities as Members of the North

Carolina State Board of Elections ("NCSBE"). NCSBE is the supervising entity for elections in the state. N.C. Gen. Stat. § 163-22. It is empowered to promulgate "reasonable rules [or] regulations with respect to the conduct of primaries and elections" that are consistent with North Carolina's Election Laws, and it must "compel observance of the requirements of the election laws by county boards of elections and other election officers." *Id.*; *see also id.* § 163-33(1), (12) (NCSBE is also authorized to establish rules, orders, and directives, as necessary for the guidance of election officers and voters, with which county boards must comply). NCSBE also promulgated and enforces Numbered Memo 2016-15, which was the state's operative policy on behind same-day registration prior to the enactment of S 747.

35.    Karen Bell is sued in her official capacity as Executive Director of the NCSBE. The Executive Director is the chief state elections official. *Id*. § 163-27. The Executive Director leads the NCSBE, and, as the chief state elections official, is responsible for administering elections and executing the NCSBE's decisions and orders. *Id.* § 163-278.21. The Executive Director is also tasked with supervising the county boards of elections and is authorized to approve certain county-level policies. The Executive Director also promulgated and signed Numbered Memo 2016-15, which was the state's operative policy on same-day registration prior to the enactment of S 747.

36.     Defendant Dawn Y. Baxton is the Chair of the Durham County Board of Elections; Defendant David K. Boone is the Secretary of the Durham County Board of Elections; and Defendants Dr. James P. Weaver, Pamela A. Oxendine, and Donald H. Beskind are members of the Durham County Board of Elections. Each is sued in their official capacity, as they are responsible for the conduct of elections in Durham County, North Carolina. *See id.* § 163-33(1), (12). Under S 747, the county boards of election must verify voter registrations, count qualified votes, and are now required to remove a voter's ballot and discard their application if an Address Verification Notice is returned as undeliverable. *Id.* § 163-82.6B(d) (amended by S 747).

37.     Defendant Michael Behrent is the Chair of the Watauga County Board of Elections; Leta Councill, Eric Eller, Matt Walpole, and Elaine Rothenberg are members of the Watauga County Board of Elections. Each is sued in their official capacity, as they are responsible for the conduct of elections in Watauga County, North Carolina. *See id.* § 163-33(1), (12). Under S 747, the county boards of election must verify voter registrations, count qualified votes, and are now required to remove a voter's ballot and discard their application if an Address Verification Notice is returned as undeliverable. *Id.* § 163-82.6B(d) (amended by S 747).

## STATEMENT OF FACTS AND LAW

**I.     Same-day registration is a secure, long-standing method of voter registration and voting that has been extremely popular among North Carolina voters since its inception.**

38.     Same-day registration is available to voters who register to vote within the early voting period, which begins 20 days before the election and ends the Saturday before Election Day. N.C. Gen. Stat. § 163-227.2(b).

39.     During this time, eligible North Carolinians can register to vote in person and cast their ballots on the same day at an early voting site. *See id*.

40.     Same-day registration is extremely secure and has several safeguards in place to ensure that it only registers eligible applicants. Indeed, same-day registrants complete the same process as any other registered voter, but with additional verification measures added.

### North Carolina's registration process

41.     Like all voters registering for the first time, same-day registrants must establish their identity and eligibility to register and vote. First, same-day registrants must complete the standard North Carolina Voter Registration Application. That application requires the applicant to provide their name, date of birth, residential address, mailing address if different, county, and the date of the application. *Id.* § 163-82.4. To prove their identity, a registrant must also provide their driver's license

- 20 -

number, if they have one; or, alternatively, the last four digits of their social security number. *Id.*

42. Same-day registrants, like all registrants, must sign their registration form, attesting to their eligibility to register to vote "under penalty of a Class I felony." *Id.* § 163-82.4(c)(1); *see also id.* § 163-275(13) (making it a Class I felony "[f]or any person falsely to make or present any certificate or other paper to qualify any person fraudulently as a voter").

43. The next step is for election officials to make a "tentative determination whether the applicant is qualified to vote at the address given." N.C. Gen. Stat. § 163-82.7(a). If the county board makes a tentative determination that a voter is not qualified, it must send a notice of denial via certified mail. *Id.* § 163-82.7(b).

44. An applicant is entitled to appeal such a determination under N.C. Gen. Stat. § 163-82.18. *See* N.C. Gen. Stat. § 163-82.7(b). However, this appeal process is only available to initial determinations made under § 163-82.7(a) that a voter is not qualified. *See id.* at 82.7(b). Applicants whose registrations are denied based on the Address Verification Notice process, *id.* at 82.7(c)-(g), do not receive notice or the opportunity to appeal their denied registration, *see id.* at 82.7(f).

45. If the county board tentatively determines that an applicant is qualified to vote, the board must begin the validation and verification process. This includes validating the driver's license or social security number provided and checking the

registration database for duplicates. *See* N.C. Gen. Stat. § 163-82.12. County boards must also send an Address Verification Notice by non-forwardable mail to the applicant. *Id.* at 163-82.7(c). If that notice is never returned as undeliverable, the applicant becomes a registered voter. *Id*.

46. However, "[i]f the Postal Service returns the notice as undeliverable, the county board shall send a second notice by non-forwardable mail to the same address to which the first was sent. If the second notice is *not* returned as undeliverable, the county board shall register the applicant to vote." N.C. Gen. Stat. § 163-82.7(e) (emphasis added). If both notices are returned as undeliverable, the applicant will not be registered and election officials "need not try to notify the applicant further." *Id.*

### Additional steps required of same-day registrants before the Undeliverable Mail Provision

47. Unlike other registrants, same-day registrants must also provide photo identification, such as a driver's license or another government ID, *see id.* § 163-166.16, as well as a "HAVA document" containing the individual's current name and residence address, *see* S 747, Section 10.(a), subsection (b).[1]

---

[1] A "HAVA document" can be any of the following: (1) a current utility bill; (2) a current bank statement; (3) a current government check; (4) a current paycheck; (5) another current government document; or (6) a current document issued from an institution that issued the voter's photo ID (e.g., a college or university that issues student IDs). *See* S 747, Section 10.(a), subsection (e).

48.     Only after appearing in-person, filling out the registration form, and providing photo ID and a HAVA document, are same-day registrants permitted to cast a "retrievable ballot," *see* S 747, Section 10.(a), subsection (c); *see also* Exhibit A, Numbered Memo 2016-15 at 4, subsection (c). This is the same type of ballot cast by every other registered voter during the early voting period. *See* N.C. Gen. Stat. § 163-166.45.

49.     For same-day registrants, the county's tentative determination, described *supra* at ¶ 43, must be made within two business days. N.C. Gen. Stat. § 163-82.7(b).

### Same-day registration after the Undeliverable Mail Provision

50.     The Undeliverable Mail Provision makes two consequential changes to the Address Verification Notice process for same-day registrants.

51.     First, prior to the enactment of S 747, North Carolina law set an absolute floor for all registrants, which helped to protect them from arbitrary disenfranchisement as a result of the Address Verification Notice process. "If the county board has made a tentative determination that an applicant is qualified to vote [...], then that person shall *not* be denied the right to vote in person unless the Postal Service has returned as undeliverable two notices to the applicant." N.C. Gen. Stat. § 163-82.7(g)(1) (emphases added). Second, North Carolina law guaranteed that, if either notice is returned as undeliverable "after a person has already voted in an

- 23 -

election, then the county board shall treat the person as a registered voter." *Id.* at §

163-82.7(g)(3).[2]

52.     The Undeliverable Mail Provision eliminates both protections for

same-day registrants. Now, "if the Postal Service returns the *first* notice […] as

undeliverable before the close of business on the day before the canvass, the county

board shall *not* register the voter and shall retrieve the applicant's ballot and *remove*

that ballot's votes form the official count." *See* S 747, Section 10.(a), subsection (d).

53.     The result is a radically different voting and registration process—

which carries unique risks of disenfranchisement and failed registration without any

notice or opportunity to cure—for same-day registrants.

54.     And, considering all the steps that same-day registrants will have taken

to prove their identity and residency before the Address Verification Notice process

even begins, *see supra* at ¶¶ 42-43, 48-49, there is no legitimate state interest

sufficient to justify subjecting these voters to these wholly unnecessary—and

unconstitutional—risks to their fundamental right to vote.

---

[2] While a voter could theoretically face a challenge to their ballot based on one or more notices being returned as undeliverable under N.C. Gen. Stat. § 163-89, such a voter is guaranteed due process in the form of notice and a hearing before the county board of elections. *See id.* at § 163-89(e).

II.   **Meaningful and reliable same-day registration is particularly critical to the enfranchisement of eligible Black, Latinx, and young North Carolinians.**

55.   Since its inception, same-day registration has been particularly critical to the enfranchisement of young voters, Black voters, Latinx voters, and other racial minorities.

56.   In the 2008 general election—the first statewide general election in which same-day registration was available—Black voters comprised only about 22% of North Carolina's registered voters, but they were approximately 35% of its same-day registrants.

57.   In the 2010 and 2012 elections, Black voters again comprised over a third of all same-day registrants, despite being only about a fifth of the state's registered voters. *See McCrory*, 831 F.3d at 398.

58.   Black voters' disproportionate use of same-day registration has been found related to the fact that, in North Carolina, they are "more likely to move between counties than white residents," *id.* at 403, and for a variety of reasons "disproportionately benefit" from registering with in-person assistance at early voting locations. *Id.* at 217.

59.   Latinx voters have also relied on same-day registration at disproportionately high rates as compared to their white counterparts.

60.     A 2021 study found that Latinx turnout was up to 17 percentage points higher in states with same-day registration when compared to states without it.

61.     And in North Carolina, the continued accessibility of same-day registration is incredibly important for eligible Latinx voters, because even though there are more than one million eligible Latinx citizens in North Carolina, only one in three of them is registered to vote.

62.     This lower rate of registration overall has been attributed to the unique barriers faced by Latinx voters, including language barriers, insufficient voter education outreach to North Carolina's Latinx communities, and difficulties in obtaining childcare and taking time out of their workdays to register and to vote.

63.     Same-day registration, which allows voters to register and vote at any early voting location in their county including on the weekends, has helped to mitigate some of these hardships and difficulties in accessing and exercising the franchise.

64.     Same-day registration is also important to the enfranchisement of young voters. Because they frequently change addresses and may infrequently interact with government agencies providing registration services, young people are disproportionately burdened by traditional registration laws.

65.     Same-day registration significantly lowers the cost of registration because it allows voters to register and vote all at the same time, and

- 26 -

disproportionately increases the turnout of young voters as compared to voters of other age groups by up to seven percentage points.

66. The effect of same-day registration is also particularly pronounced in presidential elections since young voters are more likely to vote in presidential elections than midterm elections.

## III. The Undeliverable Mail Provision significantly undermines the same-day registration process.

67. Under the Undeliverable Mail Provision, a single piece of undeliverable mail will result in hundreds if not thousands of eligible North Carolina voters having their ballots and voter registrations discarded without any notice or opportunity to defend themselves. *See supra* at ¶ 8 (explaining undeliverable notices are often the result of USPS or poll worker error, rather than registrant error or a faulty address).

68. This is particularly problematic because the deliverability status of one piece of mail is not a dependable or accurate way to verify a person's eligibility.

69. Mailings themselves are already an illogical way to verify *residency* unless the voter's mailing address is the same as their residential address.

70. Moreover, there are countless reasons why a single piece of non-forwardable mail may be returned as undeliverable—that have no bearing on the voter's residency or qualifications to vote, or which are wholly outside the voter's control.

71. For example, USPS may return mail as undeliverable because the address is illegible; the recipient is not present at the address for unknown reasons; mail is unclaimed; mail is refused at the time of delivery; or even if a landlord has closed a post office box or there is no mail receptacle at all.[3]

72. The Office of the Inspector General of the USPS has reported that as much as 4.3% of all mail sent is undeliverable as addressed, which in 2014 amounted to 6.8 *billion* individual pieces of mail. Of this enormous amount of undeliverable mail, in 2015, the Inspector General found that 23% was undeliverable as the result of postal worker error, rather than an actual incorrect or faulty address.

73. The Undeliverable Mail Provision also threatens to disenfranchise voters based on poll worker or local Board administrative error. Same-day registration applications may be filled out by election officials based on information provided verbally by new registrants, rather than being filled out by the registrants themselves. Election official typographical errors and omissions in the address fields of these digital registration applications are commonplace.

74. The likelihood that a poll worker makes an error in inputting a registrant's address increases significantly for groups that move frequently like

---

[3] *See* USPS, *Domestic Mail Manual*, available at: https://pe.usps.com/text/dmm300/507.htm.

college students, who oftentimes also have mailing addresses that are distinct from physical addresses, as is the case with dormitories.

75.     Indeed, even if there is no error on the part of the poll worker or postal worker, the Undeliverable Mail Provision could *still* disenfranchise fully eligible voters who have provided a valid mailing address.

76.     For example, if a voter moves during the period between casting a ballot and the canvass, they are still entitled to vote at their prior address under North Carolina law. *See* N.C. Gen. Stat. § 163-55(a) (permitting voters to vote at prior residence within 30 days of relocation). However, a diligent voter who provided a forwarding address to USPS would be disenfranchised because the Address Verification Notice is sent via *non-forwardable* mail, meaning their notice would be returned as undeliverable.

77.     The Undeliverable Mail Provision threatens these voters and will prove disproportionately harmful to young voters and voters of colors. Not only are those populations more likely to use same-day registration, *see supra* ¶¶ 56-67, but they are also more likely to have mail erroneously returned as undeliverable since they are less likely to have permanent addresses and are more likely to move frequently and live in areas inconsistent with mail delivery, such as dormitories and multi-unit housing.

- 29 -

78.     The Undeliverable Mail Provision transforms same-day registration from an asset into an unjustifiable and burdensome trap. Whether a same-day registrant becomes registered to vote and their ballot is counted now depends on a notoriously unreliable process that voters have no control over—the delivery of one mailed notice. And if that notice is returned as undeliverable, voters' ballots are discarded without notice or recourse.

## IV.     The Undeliverable Mail Provision is not necessary to secure the state's elections or guard against ineligible registration.

79.     Rejecting same-day registrants' ballots and registrations based solely on a single piece of mail being returned as undeliverable, does not serve any legitimate—let alone compelling—state interest, particularly where, as here, the State has already otherwise verified a voter's eligibility to vote.

80.     Even if there was some evidence that same-day registration was the source of voter fraud—and there is none—the Undeliverable Mail Provision would not be an effective mechanism to deter it.

81.     Voters already prove their eligibility and their residency several times over through the same-day registration process. *See supra* at ¶¶ 42-43, 48-49.

82.     Moreover, whether a piece of mail is successfully delivered has almost no bearing on whether a voter is eligible to cast a ballot. Indeed, there are numerous scenarios, including those discussed above, where a piece of mail is not delivered to an eligible voter. Those include instances in which a voter has a different mailing

address from their physical address, typographical errors in voter registration applications, and the well-documented and commonplace USPS errors which result in properly addressed mail being erroneously returned as undeliverable.

## CLAIMS FOR RELIEF

## COUNT I

**Fourteenth Amendment: Denial of Due Process**
**U.S. Const. Amend. XIV; 42 U.S.C. § 1983**

83.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 82 as though fully set forth herein.

84.     To determine whether a plaintiff has been denied procedural due process in violation of the Due Process Clause of the Fourteenth Amendment, a court first asks whether a constitutionally protected liberty interest is at stake. If so, the court then determines whether the procedural protections provided are sufficient by examining three factors: "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *see also Democracy N. Carolina v. N. Carolina State Bd. of Elections*, 476 F. Supp. 3d 158, 227 (M.D.N.C. 2020).

- 31 -

85.    The right to vote is the most precious liberty interest, as all other rights and liberties are illusory without it. *Wesberry*, 376 U.S. at 17. Because access to the franchise is a fundamental right, the Due Process Clause protects against the erroneous deprivation of that right because of unfair election procedures.

86.    North Carolina allows all eligible voters to exercise their fundamental right to vote using same-day registration. There is thus a constitutionally protected liberty interest involved in the process of registering to vote and casting a ballot through the same-day registration process. *Cf. Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp 3d 158, 227 (M.D.N.C. 2020) (holding that "North Carolina, having 'authorized the use of absentee ballots,' must afford appropriate due process protections to the use of the absentee ballots").

87.    Defendants may not deprive eligible voters—who have cast valid ballots and submitted valid voter registration applications through the same-day registration process provided by the State—without adequate procedures.

88.    But the Undeliverable Mail Provision does exactly that. By requiring election officials to reject voter registration applications and remove ballots that have already been cast from the vote tally without any notice to the voter or opportunity to contest their exclusion from the franchise, the Undeliverable Mail Provision erroneously deprives eligible North Carolina voters of their fundamental right to vote.

- 32 -

89.    There is no state interest sufficient to justify the disenfranchisement of eligible voters merely because one piece of mail is returned as undeliverable.

90.    The Undeliverable Mail Provision fundamentally changes how same-day registrants vote. Previously, same-day registrants could trust that their ballot would be treated like every other early ballot—valid and counted unless successfully challenged. *See* N.C. Gen. Stat. § 163-82.7(g)(2)). Now, under S 747, voters' ballots and registrations are automatically discarded simply because a single mailed notice was undeliverable.

91.    This harsh outcome occurs without giving the impacted voter any notice or opportunity to prove that the address provided on their voter registration application is valid prior to completely disenfranchising them. These results are unjustifiable and compromise the integrity of the election process. Whatever slight administrative burdens such procedures might impose, they pale in comparison to the risk of disenfranchisement.

92.    If Defendants are permitted to enforce the Undeliverable Mail Provision, then tens of thousands, if not hundreds of thousands, of North Carolinians will be denied due process and suffer direct and irreparable injury. Individual Plaintiffs Ms. Barrow and Ms. Mead, and the members, constituents, and supporters of Plaintiffs Voto Latino, Down Home, and The Taskforce are especially at risk.

## <u>COUNT II</u>

**First and Fourteenth Amendments: Undue Burden on the Right to Vote
U.S. Const. Amend. I and XIV; 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202**

93.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 92 as though fully set forth herein.

94.     Under the First and Fourteenth Amendments to the U.S. Constitution, Defendants cannot utilize election practices that unduly burden the right to vote.

95.     A court considering a challenge to a state election law on the grounds that it imposes an undue burden on the right to vote must carefully balance the justifications put forward by the state against the burdens imposed by the relevant law. *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983).

96.     The Undeliverable Mail Provision imposes a severe burden—disenfranchisement—on the right to vote of same-day registrants. Rejecting such voters' ballots based solely on a single piece of mail being returned as undeliverable—particularly where that undeliverability is likely to have no bearing on their qualification to vote and be entirely beyond the voter's control—does not serve any legitimate, let alone compelling, state interest. Indeed, the state already otherwise verifies same-day registrants' eligibility to vote and there is no evidence that that verification system is inadequate.

97.     Tens of thousands of eligible North Carolina voters (and maybe more), including Ms. Barrow and Ms. Mead, and the members, constituents, and supports

- 34 -

of Voto Latino, Down Home, and The Taskforce, are at significant risk of direct and irreparable injury if the Undeliverable Mail Provision is not enjoined.

98.     Because the Undeliverable Mail Provision places an unduly severe burden on the right to vote without sufficient state justification, it violates the First and Fourteenth Amendments.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

a)     declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that the Undeliverable Mail Provision of S 747 violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

b)     declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that the Undeliverable Mail Provision of S 747 violates the First and Fourteenth Amendments to the United States Constitution as undue burdens on the right to vote;

c)     permanently enjoining Defendants, under the authority granted to this Court by 28 U.S.C. § 2202, from enforcing the Undeliverable Mail Provision of S 747;

d)     awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

e)     granting such other and further relief as the Court deems just and proper.

- 35 -

Dated: October 10, 2023.                     Respectfully submitted,

*/s/ Narendra K. Ghosh*
Narendra K. Ghosh
PATTERSON HARKAVY LLP
100 Europa Drive, Suite 420
Chapel Hill, NC 27217
Telephone: (919) 942-5200
nghosh@pathlaw.com

Aria Branch*
Alexi M. Velez*
Meaghan M. Mixon*
William K. Hancock*
ELIAS LAW GROUP LLP
250 Massachusetts Ave, N.W., Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
abranch@elias.law
avelez@elias.law
mmixon@elias.law
whancock@elias.law

*Notices of Special Appearance
Forthcoming*

*Counsel for Plaintiffs*