# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| VOTO LATINO, et al., | |
| Plaintiffs, | |
| v. | Case No. 1:23-cv-861-TDS-JEP |
| ALAN HIRSCH, in his official capacity as Chair of the State Board of Elections, et al., | |
| Defendants. | |

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
## FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

BACKGROUND ...................................................................................................2

  I.  North Carolina voting processes before and after S747................................2

     A.  Qualifications and registration .................................................................2

     B.  Verification of qualifications and residency .............................................4

     C.  Canvassing and disqualification of ballots................................................4

  II.  Same-day registration....................................................................................6

  III. Plaintiffs' lawsuit...........................................................................................7

LEGAL STANDARD............................................................................................13

ARGUMENT ........................................................................................................13

  I.  Plaintiffs have standing. ...............................................................................14

  II.  Plaintiffs are likely to succeed on their claim that the Undeliverable Mail Provision violates the Fourteenth Amendment's Due Process Clause..........15

     A.  The fundamental right to vote is at stake. ...............................................17

     B.  The risk of erroneous deprivation is high and the value of additional safeguards is substantial. ..........................................................................18

     C.  The burden of providing sufficient procedures is slight. .........................24

  III. Absent injunctive relief, Plaintiffs are likely to suffer irreparable harm. ......26

  IV. The public interest and balance of the equities favor granting a preliminary injunction....................................................................................................27

CONCLUSION.....................................................................................................28

i

## **INTRODUCTION**

Recently enacted Senate Bill 747 ("S747") disenfranchises eligible North Carolina voters who use same-day registration based on a single mailed address-verification notice. *See* S747 § 10.(a) (to be codified at N.C. Gen. Stat. § 163–82.6B(d)) (the "Undeliverable Mail Provision"). If a voter's notice is returned as undeliverable before the ballot canvass, S747 requires the county board to deny the voter's registration application and remove the voter's ballot from the count. *Id.* This strict rule applies even when the notice is returned for reasons entirely outside of the voter's control and unrelated to voter eligibility, including common forms of Postal Service and election official error.[1]

Defendant the North Carolina State Board of Elections (the "State Board") concedes—and this Court has previously found—that "the failure of the verification process does not necessarily mean that the voter should not have cast a ballot." Att'y Decl. of Aria C. Branch ("Branch Decl.") Ex. A at 1; *see N.C. State Conf. of the NAACP v. N.C. State Bd. of Elections*, No. 1:16CV1274, 2016 WL 6581284, at *7 (M.D.N.C. Nov. 4, 2016); *N.C. State Conf. of the NAACP v. McCrory*, 182 F. Supp. 3d 320, 449 (M.D.N.C. 2016). S747 does not require election officials to give notice to a voter before denying their registration application and disqualifying their ballot,

---

[1] Citations to N.C. Gen. Stat. § 163–82.6B and its subsections refer to the to-be-codified provision created by S747 § 10.(a).

1

and a voter is given no opportunity to contest their disenfranchisement. As a result, voters may not learn that their registrations and ballots were canceled until they attempt to vote in the next election.[2]

S747 flouts the constitutional guarantee of due process. The Fourteenth Amendment requires that a state provide constitutionally adequate safeguards against the erroneous deprivation of the right to vote *before* a voter's ballot is disqualified. *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 228 (M.D.N.C. 2020). Plaintiffs Voto Latino, the Watauga County Voting Rights Task Force, Down Home North Carolina, and Sophie Jae Mead accordingly move for a preliminary injunction against S747's Undeliverable Mail Provision. Preliminary-injunctive relief is needed to ensure that Plaintiffs, their members and constituents, and other eligible North Carolina voters can freely exercise the right to vote—the "fundamental" right that is "preservative of all rights," *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)—in coming elections.

## BACKGROUND

### I.    North Carolina voting processes before and after S747

#### A.    Qualifications and registration

The North Carolina Constitution entitles all adult citizens except felons to vote. N.C. Const. art. VI, §§ 1–2; *see* N.C. Gen. Stat. § 163–55(a). To be eligible to

---

[2] All declarations cited in this Brief are attached as exhibits to Plaintiffs' Motion for Preliminary Injunction.

2

vote in a given county, a voter must have resided in that county for at least 30 days prior to election day, N.C. Gen. Stat. § 163–55(a), and must register there, *id.* § 163–54. To register, a citizen must complete the North Carolina Voter Registration Application. *See id.* § 163–82.3. The application requires name, date of birth, residential address, mailing address (if different), county, application date, and party affiliation. Branch Decl. Ex. B; *see* N.C. Gen. Stat. § 163–82.4(a). To prove identity, an applicant must provide a driver's license number, where available, or the last four digits of a social security number. N.C. Gen. Stat. § 163–82.4(a)(11). An applicant's representations are made "under penalty of a Class I felony." *Id.* § 163–82.4(c)(1).

The deadline to register is 25 days before election day. *Id.* § 163–82.6(d). But a voter may also register or update their registration (*e.g.*, to change an address) in person at an early-voting location and cast a retrievable ballot on the same day during the early voting period. *Id.* § 163–82.6B. In addition to completing the same registration application as other registrants, *see id.*, same-day registrants must prove residence by presenting a HAVA document, *id.* § 163–82.6B(b)(2), and prove identity by presenting one of the forms of photo identification required for in-person voting, *id.* § (b)(3); *see also id.* § 163–166.16. A same-day registrant must vote a retrievable ballot immediately after submitting the registration form. *Id.* § 163–82.6B(c); *see also id.* § 163–166.45.

### B. Verification of qualifications and residency

Among other verification steps, county boards conduct an address-verification process for each first-time registrant or registrant updating their address. *Id.* §§ 163–82.7(c)–(g); 163–82.6B(d). Prior to S747, a single address-verification process applied to same-day and non-same-day registrants alike. A county board sent up to two notices by non-forwardable mail to the mailing address on the applicant's registration form. *Id.* § 163–82.7(d). If the first notice was not returned as undeliverable, then the applicant was registered to vote. *Id.* If the Postal Service returned the first notice as undeliverable, the county board would send a second notice to the same address. *Id.* § 163–82.7(e). If the second notice was not returned as undeliverable, the applicant was registered to vote. *Id*. Only if both notices were returned as undeliverable was the application denied. *Id.* § 163–82.7(f).

S747 eliminates the second notice for same-day registrants. *Id.* § 163–82.6B(d). Under S747's Undeliverable Mail Provision, "if the Postal Service returns the first notice required under [N.C. Gen. Stat. §] 163–82.7(c) as undeliverable before the close of business on the business day before the canvass, the county board shall not register the applicant[.]" *Id.*

### C. Canvassing and disqualification of ballots

In some circumstances, a voter may cast their ballot while the address-verification process is still ongoing. This is necessarily the case for same-day

4

registrants, who must vote immediately after submitting the registration form, *id.* § 163–82.6B(c), and is often the case for non-same-day registrants (*e.g.*, a voter who registers shortly before the 25-day deadline and then votes by absentee ballot). Prior to S747, the uniform rule was that a ballot cast prior to the completion of the address-verification process was included in the canvass like any other ballot. *Id.* § 163–82.7(g). If the voter later failed address verification, their ballot could be challenged on that basis. *Id.*; *see also id.* § 163–84 *et seq.* A challenged voter receives notice and a hearing. *Id.* §§ 163–86; 163–88.

S747 does not require automatic disqualification of non-same-day registrants who fail address verification after casting their ballots—such voters' ballots still must be counted unless they are challenged. For same-day registrants, however, S747's Undeliverable Mail Provision makes the ballot disqualification automatic: "if the Postal Service returns the first notice required under [N.C. Gen. Stat. §] 163–82.7(c) as undeliverable before the close of business on the business day before the canvass, the county board . . . *shall* retrieve the applicant's ballot and remove that ballot's votes from the official count." *Id.* § 163–82.6B(d) (emphasis added). Unlike the challenge process it replaces, the Undeliverable Mail Provision does not provide the affected voter with notice or a hearing.

5

## II.    Same-day registration

The General Assembly passed bipartisan legislation creating same-day registration in 2007. *See* N.C. Sess. Law 2007-253, § 1. Since then, an estimated one million voters have availed themselves of the option to register and cast their ballots during early voting. Decl. of Dr. Martha Kropf ("Kropf Decl.") ¶ 8. In recent years, same-day registration has cemented itself as an important means by which North Carolinians participate in elections. In the 2020 general election, 116,065 North Carolinians voted using same-day registration. *Id.* And in the 2022 midterms, even though overall turnout was lower, 104,336 voters took advantage of same-day registration. *Id.*

Same-day registration has been critical to the enfranchisement of young, Black, and Latinx voters. *See N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 230 (4th Cir. 2016); *see generally* Branch Decl. Ex. C. Same-day registration is particularly important for communities with lower registration rates or who need to more frequently update registrations. Black voters in North Carolina, in particular, rely on same-day registration because they are "more likely to move between counties than white residents," *McCrory*, 182 F. Supp. 3d at 403, and for a variety of reasons "disproportionately benefit" from registering with in-person assistance at early voting locations, *McCrory*, 831 F.3d at 217. And studies have shown that

6

same-day registration disproportionately increases the turnout of Latinx voters and young voters. *See generally* Branch Decl. Exs. C & D.

Despite same-day registration's broad popularity and importance for disadvantaged communities, the General Assembly has repeatedly sought to undermine it. In 2013, the General Assembly eliminated same-day registration entirely. *See* N.C. Sess. Law 2013-381, § 16.1. But the Fourth Circuit invalidated that repeal, concluding that "the General Assembly would not have eliminated same-day registration entirely but-for its disproportionate impact on African Americans." *McCrory*, 831 F.3d at 237; *see also id.* at 214 (finding that the 2013 reforms "target African Americans with almost surgical precision").[3] S747's Undeliverable Mail Provision is the General Assembly's latest assault on this longstanding and popular method of exercising the franchise.

## III. Plaintiffs' lawsuit

Plaintiffs filed this lawsuit on October 10, 2023. Plaintiff Sophie Mead aims to protect her right to vote in future elections. Organizational Plaintiffs seek to protect their members' and constituents' right to vote and prevent frustration of their respective missions as well as the diversion of their resources.

---

[3] Since its judicial reinstatement in *McCrory*, North Carolina's operative same-day registration statute, N.C. Gen. Stat § 163–82.6A, has been housed in State Board Numbered Memo 2016-15. Branch Decl. Ex. E.

7

Plaintiff Voto Latino is a nonpartisan organization that engages, empowers, and educates its core constituency of Latinx communities throughout the country to ensure that they are enfranchised and included in the democratic process. Decl. of Ameer Patel ¶ 3. For over a decade, Voto Latino has conducted voter-education activities in North Carolina. *Id.* ¶ 5. Voto Latino has typically encouraged voters to use same-day registration because it has been a convenient and effective way for its target constituency to register and vote. *Id.* ¶¶ 7–11. During the 2024 election cycle, Voto Latino anticipates spending upwards of $1 million on direct mail, digital outreach, Spanish language radio, and peer-to-peer text messaging, with the goal of registering 15,000 North Carolinians and turning out 100,000 already-registered voters. *Id.* ¶ 6.

The Undeliverable Mail Provision will frustrate Voto Latino's mission because its efforts to register voters and turn them out to vote will be nullified when registrations are rejected and ballots discarded based on one piece of undeliverable mail. *Id.* ¶¶ 12–13. The Undeliverable Mail Provision will also compel Voto Latino to divert resources—which it would otherwise expend on the above efforts, and on issue advocacy in North Carolina and other states—to educate its constituents about the new risks they will face if they rely on same-day registration, including ways to mitigate those risks. *Id.* ¶ 14.

8

Plaintiff Watauga County Voting Rights Task Force (the "Task Force") is a volunteer organization committed to nonpartisan voting-rights advocacy and defending the right to vote. Decl. of Dr. Stella Anderson ("Anderson Decl.") ¶ 4. The Task Force conducts voter-registration drives, outreach, and other pro-voter initiatives in Watauga County. *Id.* ¶ 5. Watauga County is home to Appalachian State University, and accordingly much of the Task Force's work involves educating and supporting young and first-time voters. *Id.* ¶ 12. Those voters often rely on same-day registration because they are first-time registrants and because they are more likely than the general population to have moved recently. *Id.*

The Undeliverable Mail Provision will compel the Task Force to divert resources—which it would otherwise expend on its existing pro-voter initiatives— to educate voters about the new perils of same-day registration and to assist voters whose ballots are jeopardized by the provision. *Id.* ¶ 15. Further, the Task Force assists its members and other Watauga voters who rely on same-day registration navigate procedural challenges to voting. *See* Decl. of Pamela Williamson ("Williamson Decl.") ¶¶ 3–5. The Undeliverable Mail Provision threatens to disenfranchise those members and constituents. *Id.* ¶ 22; Anderson Decl. ¶ 15. In November 2022, for instance, the Task Force helped 24 Watauga voters navigate challenges to their eligibility based entirely on undeliverable verification notices. Williamson Decl. ¶¶ 4–6. Under current law, many of those voters would have been

9

automatically disenfranchised by the Undeliverable Mail Provision without any notice or hearing. *Id.* ¶ 22. The Undeliverable Mail Provision will thus injure the Task Force through its members and constituents by threatening to disenfranchise them. *Id.*; Anderson Decl. ¶¶ 11, 15.

Plaintiff Down Home North Carolina ("Down Home") is a nonprofit social welfare organization working to build the power of rural working people to ensure that they can live with dignity, security, and inclusion. Decl. of Dreama Caldwell ¶ 3. Ensuring that working-class people have access to the franchise is integral to Down Home's mission, which means making sure they register, vote, and have their votes counted. *Id.* ¶¶ 5–6. A significant share of Down Home's constituency is low-income North Carolinians who rent their homes, move frequently, and often experience housing instability. *Id.* ¶¶ 7–10. And many of Down Home's members and constituents are not currently registered to vote. *Id.* For those reasons, and because many of Down Home's working constituents need to register and vote during off hours from work, Down Home's constituents rely heavily on same-day registration. *Id.*

The Undeliverable Mail Provision will frustrate Down Home's mission of ensuring that working people can fully participate in democratic society. *Id.* ¶ 11. It will also injure Down Home's members, many of whom rely on same-day registration, by threatening to disenfranchise them. *Id.* ¶ 12–19. And the

10

Undeliverable Mail Provision will compel Down Home to divert and expend resources from its existing initiatives building worker and rural power to educate its constituents about the new risks of same-day registration, including ways to mitigate those risks. *Id.* ¶¶ 20–23.

Plaintiff Sophie Mead is a senior at Appalachian State University, a Task Force member, and a qualified North Carolina voter currently registered to vote in Watauga County. Declaration of Sophie Jae Mead ("Mead Decl."), ¶¶ 2–3. In the 2022 general election, her ballot was challenged because her verification notice was returned as undeliverable due to a poll worker's error in recording her address. *Id.* ¶¶ 6–13; *see* Mead Decl. Ex. A. Ms. Mead had moved to a new address within Watauga County shortly before the election. Mead Decl. ¶ 7. She therefore relied on same-day registration to update her address and, at the same time, cast her ballot during early voting. *Id.* But the poll worker who filled out her electronic voter application erroneously wrote "same" in the mailing address field—rather than entering Ms. Mead's home address. *Id.* ¶ 11. The Watauga County Board of Elections subsequently generated and sent a verification notice addressed to "SAME":



*Id.* ¶ 12; Mead Decl. Ex. A at 3.

The Postal Service could not deliver a mail piece with a street address of "SAME," so the notice was returned and marked "undeliverable as addressed." Mead Decl. ¶¶ 10–12; Mead Decl. Ex. A at 3. Another voter—whom Ms. Mead does not know—subsequently challenged Ms. Mead's registration based on the notice's return. Mead Decl. ¶¶ 7–8; Mead Decl. Ex. A. With help from the Task Force, Ms. Mead was able to ensure that her ballot was counted. Mead Decl. ¶¶ 9, 13. But had the Undeliverable Mail Provision been in place, Ms. Mead's ballot would have been rejected without notice or an opportunity to contest. *Id.* ¶ 14.

Ms. Mead expects to graduate from Appalachian State in spring 2024. *Id.* ¶ 3. Because she anticipates that she will relocate outside Watauga County shortly before the November 2024 general election, Ms. Mead plans to rely on same-day registration to register and vote at her post-graduation address. *Id.* ¶ 5. In light of her past experience, Ms. Mead is concerned that her registration and ballot will be rejected in 2024 because of the Undeliverable Mail Provision. *Id.* ¶ 15.

## LEGAL STANDARD

To obtain a preliminary injunction, a movant must establish that (i) they are likely to succeed on the merits of their case; (ii) they are likely to suffer irreparable harm in the absence of relief; (iii) the balance of the equities tips in their favor; and (iv) an injunction would be in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014). The third and fourth requirements "merge when the government is the opposing party." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## ARGUMENT

Plaintiffs have standing and are likely to succeed on the merits of their procedural due process claim: The Undeliverable Mail Provision deprives voters of their fundamental right to vote without any notice or opportunity to be heard based on a pre-deprivation procedure—mailing a single verification notice—that this

13

Court and the State Board have acknowledged does not reliably provide accurate information about the voter's residence. Plaintiffs will be irreparably harmed absent an injunction because no post-election relief can cure the harm of disenfranchisement. And the equities and public interest favor protecting Plaintiffs' and their members' fundamental right to vote.

## I. Plaintiffs have standing.

Plaintiffs have standing to challenge the Undeliverable Mail Provision. To establish standing, a plaintiff must show an injury in fact that is fairly traceable to the defendant's conduct and that can be redressed by a favorable ruling. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *Hutton v. Nat'l Bd. of Examiners in Optometry, Inc.*, 892 F.3d 613, 619–20 (4th Cir. 2018). "When an action perceptibly impairs an organization's ability to carry out its mission and consequently drains the organization's resources, there can be no question that the organization has suffered injury in fact." *N.C. State Conf. of NAACP v. Raymond*, 981 F.3d 295, 301 (4th Cir. 2020) (cleaned up) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)). And an organization has "standing to sue in federal court either based on an injury to the organization in its own right or as the representative of its members who have been harmed." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 155 (4th Cir. 2000).

14

Plaintiffs satisfy the applicable Article III standards. All Plaintiffs will suffer direct injuries from the Undeliverable Mail Provision. The Undeliverable Mail Provision harms the missions of the Organizational Plaintiffs and will require them to divert their resources from other important initiatives to counteract the harms created by the Undeliverable Mail Provision. *Supra* Background, Part III. In particular, the lack of notice and a cure procedure frustrates Organizational Plaintiffs' mission of encouraging voter participation because, without such procedures, any efforts spent encouraging voters to use same-day registration may be for naught if their applications and ballots are rejected. *See id.* Plaintiff Sophie Mead, an individual voter who intends to rely on same-day registration, will suffer a direct and substantial risk of disenfranchisement. *See id.* The Task Force and Down Home have members who are at similar risk of disenfranchisement, *id.*, and so have standing on their members' behalf. And all of Plaintiffs' injuries are traceable to Defendants, who enforce the Undeliverable Mail Provision, and would be redressed by an injunction against them.

## II. Plaintiffs are likely to succeed on their claim that the Undeliverable Mail Provision violates the Fourteenth Amendment's Due Process Clause.

The Due Process Clause of the Fourteenth Amendment prohibits the deprivation of "life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1. "Where the government seeks to deprive someone of a liberty interest protected by due process, due process demands that certain procedural

15

safeguards be provided." *United States v. Baker*, 45 F.3d 837, 843 (4th Cir. 1995). "[A]t a minimum," the Due Process Clause requires that deprivation of a liberty interest be "preceded by notice and opportunity for hearing appropriate to the nature of the case." *Goss v. Lopez*, 419 U.S. 565, 579 (1975) (quotation marks omitted). To prevail on a procedural due process claim, a plaintiff must show (i) a cognizable interest; (ii) the deprivation of that interest by state action; and (iii) that the procedures employed were constitutionally inadequate. *Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 145 (4th Cir. 2009).

As this Court has recognized, "[t]he right to vote is a constitutionally protected liberty interest." *Democracy N.C.*, 476 F. Supp. 3d at 227. And it is axiomatic that "[t]he right to vote includes the right to have the ballot counted." *Reynolds v. Sims*, 377 U.S. 533, 555 n.29 (1964). The Undeliverable Mail Provision deprives voters of that right through state action in the most direct and flagrant way imaginable—by requiring that a voter's ballot be retrieved and disqualified rather than counted. N.C. Gen. Stat. § 163–82.6B(d). In this way, S747 sets a trap for voters whereby their votes may be discarded even if they are qualified and eligible to vote and comply with all statutory requirements.

"Having induced voters to vote" via same-day registration, the State cannot now ignore its obligation to "provide adequate process to ensure that voters' ballots are fairly considered and, if eligible, counted." *Saucedo v. Gardner*, 335 F. Supp. 3d

16

202, 217 (D.N.H. 2018); *see also Democracy N.C.*, 476 F. Supp. 3d at 229 (collecting cases). But the Undeliverable Mail Provision does just that: it requires disenfranchisement without notice or a hearing. This violates the baseline requirement that states must provide voters with notice and an opportunity to contest state action that deprives them of the right to vote. *See Democracy N.C.*, 476 F. Supp. 3d at 228–29.

The only process afforded to same-day registrants—mailing a single verification notice—does not satisfy the standard set forth by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Under *Mathews*, the adequacy of a state's procedures depends on (i) the private interest affected by the official action; (ii) the risk of an erroneous deprivation of that interest given the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (iii) the government's interest. *Accident, Inj. & Rehab., PC v. Azar*, 943 F.3d 195, 203 (4th Cir. 2019) (citing *Matthews*). Here, each factor weighs in favor of requiring North Carolina to—at minimum—provide same-day registrants with notice and an opportunity to defend their eligibility.

### A.     The fundamental right to vote is at stake.

*First*, because "the private interest at stake is the fundamental right to vote," the first factor is "entitled to substantial weight" in Plaintiffs' favor. *Self Advoc. Sols N.D. v. Jaeger*, 464 F. Supp. 3d 1039, 1053 (D.N.D. 2020) (quotation marks

omitted). The Supreme Court has "repeatedly recognized that all qualified voters have a constitutionally protected right to vote *and* to have their votes counted." *Reynolds*, 377 U.S. at 554 (emphasis added) (quotation marks and citations omitted). Here, the erroneous deprivation at issue is the direct denial of a voter's right to vote.

### B. The risk of erroneous deprivation is high and the value of additional safeguards is substantial.

*Second*, the Undeliverable Mail Provision imposes an extraordinary risk of erroneous deprivation on voters who rely on same-day registration. Because there is no post-deprivation process available to voters, "sufficient predeprivation process is the constitutional imperative." *Democracy N.C.*, 476 F. Supp. 3d at 226 (quotation marks omitted); *see Zessar v. Helander*, No. 5-C-1917, 2006 WL 642646, at *9 (N.D. Ill. Mar. 13, 2006). ("Once rejected, the ballot cannot be rehabilitated and cast after a post-deprivation hearing."). And because over 100,000 North Carolinians have used same-day registration in several consecutive elections, *supra* Background, Part II, a pre-deprivation process that is unreliable in even a small percentage of cases will cause many voters to be disenfranchised.

But S747's predeprivation process—mailing a single verification notice—is inherently error-prone and not a reliable indicator of non-residency or ineligibility. Defendant the State Board of Elections has cautioned that "several reasons . . . could [be] the basis for . . . unsuccessful verification mailings" so "the failure of the verification process does not necessarily mean that the voter should not have cast a

18

ballot." Branch Decl. Ex. A at 1. And just a few years ago, the State Board "clarified that 'same day registration does not result in the registration of voters who are any less qualified or eligible to vote than' traditional registrants, and that 'undeliverable verification mailings were not caused by the nature of same-day registration.'" *McCrory*, 831 F.3d at 237.

This Court has repeatedly recognized that "mail returned as undeliverable may not actually reflect a change of residence impacting a citizen's eligibility to vote in the jurisdiction" because "[t]here are a number of reasons why such mailings might be returned as undeliverable." *N.C. State Conf. of the NAACP*, 2016 WL 6581284, at *7; *see also, e.g.*, *McCrory*, 182 F. Supp. 3d at 449 (noting that undeliverable mail is "'not a precise verification system' for determining an applicant's residency"); 52 U.S.C. § 20507(d) (federal-law prohibition on canceling a registration unless the state sends a notice *and* the voter fails to vote in two consecutive elections). In particular, poll worker errors, Postal Service errors, and voters moving shortly before elections all cause verification notices to be returned as undeliverable even when the voters in question are entitled to vote using the addresses in question.

## 1. Poll worker errors

Poll worker errors often cause verification notices to be incorrectly addressed and so returned as undeliverable through no fault of the voter. In particular, when

officials transcribe address information incorrectly, voters suffer the consequences. For example, in the 2022 election, Plaintiff Sophie Mead utilized same-day registration and, as part of that process, she provided her residential address to the Watauga County official who prepared her registration form. Mead Decl. ¶ 11. But rather than copying that address into the mailing-address field, the official wrote "same." *Id*. The resulting address verification notice listed "SAME" as Ms. Mead's street address, was returned as undeliverable, and Ms. Mead's ballot was later challenged for that reason. *Id*. ¶ 12. Had the Undeliverable Mail Provision been in place at the time, Ms. Mead's ballot would not have been counted, and she would not have had the opportunity to prove her eligibility to vote at a hearing.

Typographical errors made by election officials are common and will expose many other voters to the same risk of disenfranchisement that Ms. Mead was subjected to in 2022. This is not speculation. The Task Force assisted many voters in rectifying such errors in 2022 alone:

- In addition to Ms. Mead, the Watauga County board sent at least one other voter a verification notice with a street address of "SAME." Williamson Decl. ¶ 18.

- The board addressed two voters' verification notices to incorrectly transcribed street numbers ("199 Wood Circle Dr." rather than "190

20

Wood Circle Dr." and "355 Old East King St." rather than "359 Old East King St."). *Id.* ¶¶ 11–12.

- The board sent two voters' verification notices to their prior addresses rather than the updated addresses they had provided during same-day registration. *Id.* ¶¶ 13–14.

- The board omitted two voters' apartment numbers entirely. *Id.* ¶¶ 15–16.

- The board sent a voter's verification notice to a P.O. box that did not exist. *Id.* ¶ 17.

- The board sent several verification notices to voters' residential addresses rather than their mailing addresses. *Id.* ¶¶ 19–20.

In each of the above cases, the Postal Service returned the notice in question as undeliverable. *Id.* ¶ 8. Such errors would trigger disenfranchisement under the Undeliverable Mail Provision.

### 2. Postal Service errors

Even when a voter's mailing address is correct, Postal Service errors may cause a verification notice to be returned as undeliverable. Mail may be returned as undeliverable for a host of reasons unrelated to the voter's residency, including faulty barcodes; illegible address information; lack of or damage to a receptacle; sorting error; assignment to the wrong carrier for the delivery; the resident's

21

temporary absence from the address, and so on. *See* Decl. of Timothy Greene ("Green Decl.") ¶¶ 8–13; Branch Decl. Ex. F. And the Postal Service's undeliverable mail codes shed no light on voter eligibility. Each of the following common Postal Service undeliverable codes may apply even when the voter is in fact entitled to vote at the address in question: NOT DELIVERABLE AS ADDRESSED; NO SUCH NUMBER; NO MAIL RECEPTACLE; ATTEMPTED – NOT KNOWN; UNABLE TO FORWARD (when forwarding is temporary or when the voter moves within 30 days of the election); MOVED, LEFT NO ADDRESS (when the voter moves within 30 days of the election); and VACANT (when the postal worker errs in designating the address vacant). *See* Green Decl. ¶¶ 8–13.

Undeliverable mail, moreover, is remarkably common: The Office of the Inspector General has reported that as much as 4.3 percent of all mail sent is undeliverable as addressed, which in 2014 amounted to 6.8 billion pieces of mail. Branch Decl. Ex. G at 5. And Postal Service error is a common cause of undeliverable mail: In 2015, the USPS Inspector General found that 23 percent of undeliverable mail resulted from such error. Branch Decl. Ex. H at 1. The most recent available data, from October 2023, indicates that these problems affect government mail specifically at persistently high rates. Branch Decl. Ex. F (finding that 16.8 percent of undeliverable "Government Related" mail was marked as

22

undeliverable for unknown reasons and that 2.88 percent was returned as undeliverable because the postal worker could not find the mail receptacle).

The Task Force's experience assisting challenged voters in the 2022 election also demonstrates that postal worker errors will cause the disenfranchisement of same-day registrants under the Undeliverable Mail Provision. During that cycle, the Task Force assisted at least two voters whose verification notices were addressed *correctly* but were still returned as undeliverable. Williamson Decl. ¶¶ 9–10. No reason for the Postal Service's failure to deliver was ever identified. *See id.*

### 3. Voters who move after voting

S747 will erroneously disenfranchise voters even when county election boards and the Postal Service make no errors. A voter who casts a ballot during early voting and subsequently moves elsewhere in North Carolina is often still entitled to have their ballot counted. *See* N.C. Gen. Stat. § 163–55(a) (permitting a voter to vote using a prior residence within 30 days of relocation). Yet if such a voter provides a forwarding address to the Postal Service, the voter will likely be disenfranchised because verification notices are *non-forwardable* mail, N.C. Gen. Stat. § 163–82.7(c), meaning any notice sent to an address with forwarding set will be returned as undeliverable, *see* Green Decl. ¶ 12.

\*\*\*

23

As a result of the error-prone processes described above, no amount of diligence on the part of a same-day registrant can ensure that a verification notice will not be returned as undeliverable. The value of additional procedural safeguards—like the notice and hearing process provided to formally challenged ballots—would accordingly be substantial. The evidence establishes that several Watauga County voters were able to prevent their erroneous disenfranchisement using the notice and hearing procedures that S747 overrides. Because Plaintiff Mead received notice that her ballot had been challenged and had an opportunity to defend against the challenge, she was able to take steps to ensure her ballot counted. Mead Decl. ¶¶ 9, 13. The same was true of more than 20 other voters who worked with the Task Force in 2022—which was just one organization working in a single county during a single midterm election. Williamson Decl. ¶¶ 5–22. If voters do not receive notice and a hearing prior to having their ballots discarded in the upcoming 2024 elections, S747's Undeliverable Mail Provision will disenfranchise many voters across the state.

## C. The burden of providing sufficient procedures is slight.

*Finally*, requiring adequate process before disenfranchising voters will not impose a substantial burden on the State. Prior to S747, North Carolina law provided several safeguards against the erroneous disenfranchisement of same-day registrants. Under the prior law, same-day registrants' ballots were counted unless

24

they were successfully challenged. *See* N.C. Gen. Stat. § 163–82.7(g). And in the event of a challenge, same-day registrants were afforded notice and an opportunity to prove their qualification to vote. *Id.* § 163–89(e). That process allowed eligible voters both to ensure that their ballots were counted and to prevent the need to re-register or otherwise correct address issues before voting in future elections.

Nothing suggests that regime imposed any substantial burden on the State. To the contrary, the State *continues* to provide *non*-same-day registrants with all those procedural protections, as well as several others. *Id.* § 163–82.7(e)–(g); *see also, e.g.*, *id.* § 163–166.11. It would strain credulity for the State to object to the burden of reinstating adequate notice and a hearing for same-day registrants when it is already providing that and more to all non-same-day registrants. From an administrative perspective, the Undeliverable Mail Provision disrupts a familiar, manageable procedure that has served North Carolina well for over fifteen years. In its place, the law adds new burdens on busy local officials, who must now track all undeliverable notices and remove the associated ballots from the official count, whether challenged or not. The Undeliverable Mail Provision will *add* administrative burden, not ameliorate it.

And although some proponents of S747 invoked "election integrity" as a rationale for the bill, that interest cannot justify the Undeliverable Mail Provision either. Voter fraud is exceedingly rare in North Carolina, and there is no history of

25

same-day registration *ever* serving as a vehicle for fraud. Kropf Decl. ¶¶ 9–11, 30; *see id.* ¶¶ 12–29. This is to be expected—same-day registrants must prove their identity and residence in multiple ways before registering and casting a ballot. *Supra* Background, Part I.B.

## III.   Absent injunctive relief, Plaintiffs are likely to suffer irreparable harm.

The Undeliverable Mail Provision will be in effect for the March 5, 2024, primary elections. Early voting and same-day registration for the primary election begins on February 15, 2024. Plaintiffs, and their members and constituents, will suffer irreparable harm if the Undeliverable Mail Provision is not enjoined before that election. *See supra* Background, Part III.

An infringement or abridgment of a constitutional right is an irreparable harm. *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011); *see also Preston v. Thompson*, 589 F.2d 300, 303 n.4 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm."). This is particularly true of infringements on the fundamental right to vote. *See Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental right to vote . . . constitutes irreparable injury."); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) (holding that plaintiffs "would certainly suffer irreparable harm if their right to vote were impinged upon").

26

## IV. The public interest and balance of the equities favor granting a preliminary injunction.

A plaintiff seeking a preliminary injunction must establish that the balance of the equities tips in their favor and that a preliminary injunction is in the public interest. *Winter*, 555 U.S. at 20. These requirements "merge when the government is the opposing party." *Miranda*, 34 F.4th at 365. In weighing the equities, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987).

The balance of equities tips sharply in Plaintiffs' favor. Plaintiffs face irreparable constitutional harm to the fundamental right to vote. Defendants, by contrast, face no risk of harm whatsoever; the Fourth Circuit has made quite clear that the State cannot claim to be harmed by an injunction against enforcing a law which "is likely to be found unconstitutional." *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) ("With respect to the harm that would befall if an injunction were put in place, [the public school defendant] is in no way harmed by issuance of a preliminary injunction which prevents it from enforcing a regulation, which, on this record, is likely to be found unconstitutional."); *see also Legend Night Club*, 637 F.3d at 302–03 ("[T]he State . . . is in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions."). "If anything," the State benefits from

27

"such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002).

A preliminary injunction is also in the public interest. In general, "[t]he public interest always lies with the vindication of constitutional rights." *Bernstein v. Sims*, 643 F. Supp. 3d 578, 588 (E.D.N.C. 2022). More specifically, "[b]y definition, the public interest favors permitting as many qualified voters to vote as possible." *Democracy N.C.*, 476 F. Supp. 3d at 237 (cleaned up) (quoting *League of Women Voters of N.C.*, 769 F.3d at 247–48).

## CONCLUSION

For the foregoing reasons, the Court should preliminarily enjoin the Undeliverable Mail Provision.

Dated: November 15, 2023.

Narendra K. Ghosh
PATTERSON HARKAVY LLP
100 Europa Dr., Suite 420
Chapel Hill, NC 27217
Telephone: (919) 942-5200
nghosh@pathlaw.com

Respectfully submitted,

/s/ Aria C. Branch
Aria C. Branch*
Alexi M. Velez*
Meaghan M. Mixon*
William K. Hancock*
Samuel T. Ward-Packard*
ELIAS LAW GROUP LLP
250 Mass. Ave. NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
abranch@elias.law
avelez@elias.law
mmixon@elias.law
whancock@elias.law
swardpackard@elias.law

*Special Appearance pursuant to
Local Rule 83.1(d)

Counsel for Plaintiffs

29

## **CERTIFICATE OF WORD COUNT**

I certify that this brief complies with the requirements of Local Rule 7.3. This brief contains 6,226 words exclusive of the cover page, caption, table of contents, signature lines, and this certificate.

Dated: November 15, 2023.

/s/ Aria C. Branch