# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### No. 1:23-CV-861

| | |
|---|---|
| VOTO LATINO; *et al.,*<br><br>        Plaintiffs,<br><br>v.<br><br>ALAN HIRSCH, in his official capacity as<br>Chair of the State Board of Elections; *et al.,*<br><br>        Defendants. | **MEMORANDUM IN SUPPORT OF<br>MOTION TO DISMISS** |

## INTRODUCTION AND STATEMENT OF THE NATURE OF THE MATTER

Intervenor-Defendants Philip E. Berger, in his official capacity as President *Pro Tempore* of the North Carolina Senate, and Timothy K. Moore, in his official capacity as Speaker of the North Carolina House of Representatives (collectively, the "Legislative Defendants") submit this Memorandum in Support of their Motion to Dismiss. Plaintiffs' Complaint, D.E. 1, should be dismissed in its entirety under Fed. R. Civ. P. 12(b)(1) because Plaintiffs lack Article III and prudential standing. In the alternative, Plaintiffs' claims should be dismissed for failure to state a claim upon which relief may be granted under Fed. R. Civ. P. 12(b)(6) for reasons including, but not limited to, that the challenged statute provides the notice and opportunity to cure that Plaintiffs seek in their Complaint.

## STATEMENT OF FACTS

Senate Bill 747 ("S.B. 747") was first introduced in the North Carolina Senate on June 1, 2023. The bill was designed to make various changes to election procedures to

ensure that North Carolina elections are fair and non-partisan.[1] Over the next several months, the General Assembly held hearings and received feedback from constituents and election officials, including the North Carolina State Board of Elections ("NCSBE"), that resulted in several amendments to S.B. 747. Ultimately, the General Assembly overrode Governor Cooper's veto and S.B. 747 became law on October 10, 2023. N.C. Sess. Law 2023-140.

Within hours of the veto override, Voto Latino, the Watauga County Voting Rights Task Force, Down Home North Carolina, and Sophie Jae Mead ("Mead")[2] (collectively, "Plaintiffs") filed suit against the NCSBE and its Members, challenging alleged changes to North Carolina's same-day registration ("SDR") requirements.[3] [D.E. 1]. Specifically, Plaintiffs allege that S.B. 747: (1) denies Plaintiffs' procedural due process rights under the 14th Amendment (Count I); and (2) presents an undue burden on right to vote under the 1st and 14th Amendments (Count II). Both claims fail.

Under North Carolina law, citizens can register to vote in person, online, via mail, or even at the DMV up to 25 days prior to election day. N.C.G.S. § 163-82.6(d). For voters who miss this 340-day window, North Carolina provides an accommodation in the form of SDR during the early voting period, which runs for seventeen days beginning the third Thursday prior to election day and ends at 3:00 p.m. the Saturday before election day. N.C.G.S. §163-227.2; S.B. 747 §10.(a) (*modifying* §163-82.6B). North Carolina also

---

[1] *See* https://www.ncleg.gov/BillLookUp/2023/S747 .
[2] Plaintiff Christina Barrow dismissed her claims without prejudice. [D.E. 23].
[3] The other provisions of S.B. 747 remain unchallenged in this suit.

allows no-excuse absentee voting for all registered voters, § 163-226(a), and voters may request an absentee ballot until 5:00 p.m. the Tuesday before election day. N.C.G.S. §163-230.1. Finally, as an additional accommodation to all voters, North Carolina also allows everyone to cast a provisional ballot on election day or during in-person early voting. N.C.G.S. §163-82.4(f). Under no circumstance is an election worker allowed to deny an individual the right to vote a provisional ballot. *See* N.C.G.S. §163-166.11.

In relevant part, S.B. 747 altered the SDR provisions in the following way:

- A SDR voter casts a "retrievable ballot" which is counted unless the county board of elections where the voter cast his/her ballot determines that the voter is not qualified to vote. S.B. 747 §10(a). A retrievable ballot is a ballot with an identifier to allow for retrievability. N.C.G.S. §163-227.5 Under N.C.G.S. §163-227.5, a statute undisturbed by S.B. 747, the State Board "shall adopt" standards for retrievable ballots, which mandates that ballots have a number or equivalent identifier to allow for retrievability such as those for absentee ballots printed in accordance. *See* N.C.G.S. §163-230.1.

- As part of the address verification process, the county boards of elections will retrieve any ballot if, before the close of canvass, the required address verification card is returned undeliverable. S.B. 747 §10(a). This change was made at the request of the NCSBE because the time between early voting and the end of canvass did not allow sufficient time for the mailing and return of two verification cards.

Notably, S.B. 747 did not alter several existing election laws pertaining to SDR and early/absentee voting, including:

- The requirement that individuals are notified if their voter registration application (which an SDR voter must complete) was rejected. This requirement, codified in N.C.G.S. §163-82.7(b), requires that voters be notified of their denial of registration by certified mail within two days, and provides for appeals from the denial of registration. N.C.G.S. §163-82.18. Moreover, nothing prohibits the county board's from challenging a ballot and providing notice under that challenge procedure pursuant to N.C.G.S. §163-89 for returned mail verification cards. In fact, S.B. 747 specifically contains a specific reference to N.C.G.S. §163-89 in the context of an undeliverable mail notice. S.B. 747 §11.

3

## STATEMENT OF QUESTION PRESENTED

1.      Do Plaintiffs have Article III and prudential standing?

2.      Even if Plaintiffs have standing, do Plaintiffs' allegations state a claim upon which relief can be granted?

## ARGUMENT

### I.      Plaintiffs lack Article III and prudential standing.

Under Fed. R. Civ. P. 12(b)(1) a complaint must be dismissed for lack of subject matter jurisdiction when it "fails to allege facts upon which subject matter jurisdiction can be based." Even construing all the facts in the Complaint as true in a light most favorable to Plaintiffs, Plaintiffs fail to establish Article III or prudential standing. *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982). Therefore, the Complaint should be dismissed in its entirety.

#### A.      Plaintiffs lack Article III standing to challenge S.B. 747.

To establish Article III standing, Plaintiffs must show: (1) an "injury in fact[;]" (2) "a causal connection between the injury and the conduct complained of[;]" and (3) that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotations omitted). At the motion to dismiss stage, "the party invoking the jurisdiction of the court must include the necessary factual allegations in the pleading, or else the case must be dismissed for lack of standing." *Bishop v. Bartlett*, 575 F.3d 419, 424 (4th Cir. 2009) (internal citation omitted). Individual Plaintiff, Mead, fails to meet this burden.

4

"[W]here the plaintiff is an organization, the standing requirements of Article III can be satisfied in two ways. Either the organization can claim that it suffered an injury in its own right or, alternatively, it can assert 'standing solely as the representative of its members.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2157 (2023) (citation omitted). Where an organization asserts standing on behalf of its members, it must "make specific allegations establishing that at least one identified member" would have standing in that member's own right. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). As shown below, Plaintiffs Voto Latino, the Watauga County Voting Rights Task Force, and Down Home North Carolina (the "Organizational Plaintiffs") fail to meet this burden.

### i. Plaintiffs have not suffered an injury in fact.

The "injury in fact" element of Article III standing requires a plaintiff to have a "personal stake in the outcome of the controversy." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). When an alleged harm amounts to a "generalized grievance[4] shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." *Id.* at 499 (internal quotation omitted). Thus the "injury in fact" element is only met when an injury is both "concrete *and* particularized" to the defendant. *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 334 (2016) (quotation omitted) (emphasis in original). An injury is concrete when it is actual and specific, not speculative. *See Doe v.*

---

[4] While there is some disagreement amongst circuits as to whether a generalized grievance requirement is separate and distinct from the injury in fact requirement of Article III standing, any difference between the two is immaterial here. *See Bishop v. Bartlett*, 575 F.3d 419, 424-425 (4th Cir. 2009).

*Va. Dept. of State Police*, 713 F.3d 745, 758 (4th Cir. 2013). An injury is particularized when it "affect[s] the plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 339. While a plaintiff may generally challenge alleged statutory or constitutional violations prospectively, the plaintiff must show that "the threatened injury is real, immediate, and direct." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).

Here, Plaintiffs' allegations amount to nothing more than generalized grievances and speculation. Moreover, the alleged harm throughout the Complaint is the same for all North Carolina citizens and lacks the specificity necessary for standing. [D.E. 1, ¶¶67, 78, 87-92, 96-97].

Regarding Mead, the only harm she alleges is speculative and attenuated at best. Mead alleges that she is "concerned" that her *potential* ballot will be rejected during a *future* election *if* she uses SDR to indicate a change in residency *if* she moves close in time to a *future* election. [D.E. 1, ¶32]. Mead alleges that she *may* use SDR *if* she moves outside of Watauga County and *if* her move is "very close to the date of the 2024 election." [*See* D.E. 1, ¶32]. Such allegations are fully speculative and cannot confer standing. *See Matherly v. Andrews*, 859 F.3d 264, 277 (4th Cir. 2017) (holding allegations that harm "could very likely" occur "at some point in the future" does not show a "certainly impending" injury necessary to confer standing). Moreover, Mead is already registered to vote in North Carolina and, therefore, is not an "applicant" if she uses SDR to update her address. Thus, the undeliverable mail provision of S.B. 747 would not apply to her change of address.

Regarding Down Home North Carolina's members,[5] it merely forecasts that many of its members "are poor and more likely than wealthier North Carolinians to rent and experience housing instability, which will require them to re-register to vote when their address changes," and assuming these unspecified members will use SDR, "there is an extremely high risk that at least some of Down Home North Carolina's members and constituents will be disenfranchised because of the Undeliverable Mail Provision." [D.E. 1, ¶30]. The Fourth Circuit has found similar allegations of potential harm to be "merely a claim of 'the right, possessed by every citizen, to require that the Government be administered according to law. . . .'" *Bishop,* 575 F.2d at 424 (quotation omitted) (holding allegations of "potentially misleading language" on a ballot was insufficient harm to establish standing for plaintiffs' due process claims). And again, like Mead—individuals that are already registered to vote in North Carolina are not subject to the undeliverable mail provision of S.B. 747 since they are not "applicants."

Organization Plaintiffs also allege a diversion of resources to support standing. However, a general diversion of resources to inform and educate voters on a new law, as alleged, without a sufficient connection to an organization's mission, is not a concrete injury under binding Fourth Circuit precedent. *Lane v. Holder*, 703 F.3d 668, 674–75 (4th Cir. 2012). In *Lane*, the Court determined that an organizational group lacked standing to challenge a new federal statute because allegations that a group's "resources [were] taxed by inquiries" about the new law did not constitute a concrete injury. *Id.* In so holding, the

---

[5] Voto Latino and the Watauga County Voting Rights Taskforce only bring claims on behalf of themselves and their constituencies—not members. [*See* D.E. 1, ¶¶17, 22].

7

Court specifically recognized that a general diversion of resources to "educat[e] members, respond[] to member inquiries, or undertak[e] litigation in response to legislation" are generalized grievances insufficient to establish standing.

As in *Lane*, this Court should find that Organizational Plaintiffs' assertions that they will be injured by mere budgetary concerns related to supporting and educating voters about S.B. 747's minimal changes do not establish a cognizable injury. Because the Complaint is devoid of any facts showing "operational costs beyond those normally expended to review, challenge, and educate the public" about voting laws, Plaintiffs fail to allege a cognizable injury. *See Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) (finding no standing when plaintiff failed to show how the challenged legislation forced it "to expend resources in a manner that keep [the organization] from pursuing its true purpose").

Finally, to the extent that Organizational Plaintiffs seek to assert associational standing, they wholly fail to identify any members of their organizations that have been denied the right to vote or not had their ballot count as a result of S.B. 747. *See Summers*, 555 U.S. at 498 (holding associational standing requires "specific allegations establishing that at least one identified member" would have standing in that member's own right). Nor do Organizational Plaintiffs offer anything other than speculation and conjecture that the law will have an actual impact on any of their members or constituencies.

8

### ii. Plaintiffs' alleged injuries are not fairly traceable to S.B. 747.

Even if the Court determines that Plaintiffs have suffered an injury in fact, Plaintiffs fail to plead facts sufficient to show injuries fairly traceable to S.B. 747. The causation, or fairly traceable, prong of the injury in fact test requires a plaintiff to "demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Disability Rights S. Carolina v. McMaster*, 24 F.4th 893, 901 (4th Cir. 2022) (emphasis omitted). For example, Plaintiffs' Complaint includes conclusory allegations that S.B. 747 will somehow "result in hundreds if not thousands of eligible North Carolina voters having their ballots and voter registrations discarded without any notice or opportunity to defend themselves." [D.E. 1, ¶67]. But Plaintiffs utterly fail to show how the minimal changes in S.B. 747 demonstrate this impending injury. *See Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 414 n. 5 (2013) (holding plaintiffs "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending"). Plaintiffs also fail to explain why same-day registrants should be treated *better* than timely registrants who likewise receive no notice if they fail mail verification.

### iii. Plaintiffs' alleged injuries are not adequately redressable through this litigation.

Lastly, Plaintiffs fail the redressability prong. "An injury is redressable if it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Doe*, 713 F.3d at 755. While this burden is not stringent, it is "problematic when third persons not parties to the litigation must act in order for an injury to arise or be cured." *Id.* In such situations, even when constitutional harm is alleged, the Fourth Circuit has

9

refused to find standing when there "exists an unchallenged, independent rule, policy, or decision that would prevent relief even if the court were to render a favorable decision." *Id.* at 756 (holding that because plaintiff had not yet attempted to follow the statutory process for challenging the statute in question, the Court had no way of determining whether her constitutional rights would ultimately be infringed).

Here, Plaintiffs failed to plead facts sufficient to show that, if the first verification card is returned as undeliverable, a second verification card sent to the same incorrect address would remedy the issue. Thus it is unclear how enjoining S.B. 747, and falling back to the two-mail verification, would redress Plaintiffs' concerns. Finally, S.B. 747 can be read to provide Plaintiffs with the remedy they seek, a notice and opportunity to cure. *See* S.B. 747 §11 referring to N.C.G.S. §163-89.

### B. Plaintiffs lack prudential standing to challenge S.B. 747.

Even if Plaintiffs could meet the Article III standing requirements, which they cannot, Plaintiffs also lack prudential standing. *See Doe*, 713 F.2d at 753. A "plaintiff generally must assert his own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties[.]." *Bishop*, 575 F.3d at 423 (quoting *Warth*, 422 U.S. at 499 (additional citations omitted)). In limited circumstances, a plaintiff may assert the legal rights or interests of third parties. To do so, the burden is on the plaintiff to prove: (1) the named plaintiff was injured in fact; (2) the named plaintiff has a "close relationship" to the injured third party; and (3) there was some hinderance to the third parties in asserting their own rights. *Campbell v. Louisiana*, 523 U.S. 392, 397 (1998). "[W]hen the plaintiff is not himself the object of the government action or inaction he

challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Id.* (internal quotation omitted). Typically, this requires some type of fiduciary duty or link between the plaintiff and the third party, such as a doctor suing on behalf of his or her patients. *Kowalski v. Tesmer*, 543 U.S. 125, 131 (2004). The Supreme Court looks upon third-party standing with disfavor. *Id.* at 130.

To the extent that Plaintiffs attempt to assert the rights of North Carolina voters, Plaintiffs fail to plead facts sufficient to show that a close relationship exists between voters their organizations. Plaintiffs also fail to show that such voters would face some hinderance in asserting their own rights. *See Indiana Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 818 (S.D. Ind. 2006), *aff'd sub nom. Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007), *aff'd,* 553 U.S. 181, 128 S. Ct. 1610 (2008) (declining to permit an organization to assert third party standing). Moreover, Plaintiffs' desire to bring legal claims on behalf of individuals who *might* be harmed is entirely speculative and therefore insufficient to confer standing on the organizations themselves. *See Summers*, 555 U.S. at 498.

## II.     In the alternative, Plaintiffs' claims should be dismissed under 12(b)(6).

Alternatively, Plaintiffs fail to plead sufficient facts which, accepted as true, state a claim for relief. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While all well-pleaded factual allegations are presumed to be true, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

11

statements" are insufficient. *Id.* at 678. And the court need not accept legal conclusions, arguments, or unwarranted inferences. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).

### A. Plaintiffs fail to show a Procedural Due Process violation (Count I).

Legislative Defendants acknowledge that there is a circuit split as to the appropriate test for assessing 14th Amendment procedural due process claims challenging election regulations. *See Democratic Party of Va. v. Brink*, 599. F. Supp. 3d 346, 360-61 (E.D. Va. 2022). While the Fourth Circuit has not directly addressed the issue, Defendants submit that the correct standard is likely the burden-shifting framework set forth in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takshi*, 504 U.S. 428, 434 (1992). *See Democratic Party of Va.*, 599 F. Supp. 3d at 360–61. That said, even under the more stringent procedural due process test articulated in *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976), Plaintiffs' claims fail.

Under *Mathews*, courts analyze three factors: (1) the private interest that will be affected by the official action; (2) the risk that the individual will be wrongly deprived of that interest under the existing procedure, as well as the value of additional procedures to safeguard against the loss of the interest; and (3) the governmental interest, including the function involved and the fiscal and administrative burdens that additional procedure would entail. *Id.* Plaintiffs cannot satisfy any of the three.

### i. Plaintiffs' do not possess a private interest.

North Carolina citizens have an undeniable interest in the right to vote. However, the private interest at issue here is the statutory right for qualified voters to use SDR subject

12

to the required address verification process. For SDR applicants, there is no vested interest in a voters' registration until that voter is actually registered. *See Mathews*, 424 at 336–37 (discussing the state and federal statutory prerequisites that must be met before the actual entitlement to disability benefits is bestowed on a worker). Under the plain reading of S.B. 747, a citizen registering to vote is an applicant, not a registrant, until mail verification is complete.[6] *See* N.C.G.S. §§163-54, 163-55; S.B. 747 § 10(a).

Organizational Plaintiffs are not North Carolina voters and cannot argue that the right to vote is a private interest they possess. They offer no discernable private interest beyond recounting the right to vote and alleging that Mead "and the members, constituents, and supporters of [Organizational Plaintiffs] are especially at risk" of being "denied due process and suffer direct and irreparable injury." [D.E. 1, ¶92]. Further, Organizational Plaintiffs' allegations that their core mission of educating and encouraging voter participation will be frustrated if S.B. 747 is not enjoined is attenuated at best. [*See* D.E. 1, ¶¶18-20, 22, 24, 26, 29]. On its face, S.B. 747 does not impact Plaintiffs' "encouragement" mission. For example, Plaintiffs may succeed in encouraging someone to vote, but it is difficult to see how that purpose is frustrated by the individual writing their address down incorrectly or failing to pick up their mail as instructed. By Plaintiffs' logic, their mission would be frustrated by "encouraging" a non-eligible individual, like a non-citizen, to vote. This makes no sense.

---

[6] Under S.B. 747, if the USPS returns the first mail card before the close of canvass, the county board "*shall not register the applicant* and *shall retrieve* the applicant's ballot and *remove* that ballot's votes from the official count." S.B. 747 § 10(a) (*emphasis added*).

13

While Mead has a private interest in the right to vote, Mead fails to allege she was prohibited from voting. Despite her "concern[s]" with the Undeliverable Mail Provision of S.B. 747, she still intends to utilize SDR if she moves close in time to a future election. [D.E. 1, ¶32]. But again, as discussed above, this is a mis-reading of the law and Mead will in fact, simply change her address. *Supra* p. 6. Thus, there is no risk.

### ii. Plaintiffs fail to show a risk of a wrongful deprivation of a privacy interest.

Plaintiffs' reading that S.B. 747 disenfranchises SDR applicants without notice or an opportunity to be heard is an implausible reading of the statute. Same-day registrants complete the same registration application as timely registrants. *See* S.B. 747 §10.(a); N.C.G.S. §163-82.4. The county boards still make the initial determination of whether the voter is qualified as with timely registration applications. If a same-day registrant's application is denied, the applicant is then entitled to the same due process as all other timely applicants, including those set forth in N.C.G.S. §163-82.7(b), §163-82.18, and §163-89. This correct reading of the statute allows the statutory provisions to be read as a whole. *Territory of Guam v. United States*, 141 S. Ct. 1608, 1613 (2021). Because same-day registrants are entitled to the same due process rights as timely registrants, the risk of erroneous deprivation is low.

Furthermore, Plaintiffs make much ado about the fact that voters who fail mail verification do not receive notice, but the pre-S.B. 747 version of the law likewise provided no notice when a voter failed mail verification. And the statutory right to register and vote has long been subject to a mail verification process. *See* 1992 North Carolina Laws Ch.

14

1044 (S.B. 1205) (imposing the mail verification requirement in the first instance). Because Plaintiffs misinterpret the applicable statutory scheme, and identical due process is provided for registration denials of same-day registrants and timely registrants, the risk of harm under S.B. 747 to a voter is minimal and no additional procedure is needed. *Mathews,* 424 U.S. at 334–35.

### iii. S.B. 747 supports the government's interest in conducting fair elections and preserving the integrity of the election process.

It is well-established that "[s]tate legislatures are presumed to have acted within their constitutional power" in the first instance. *McGowan v. Maryland*, 366 U.S. 420, 425–26 (1961). Therefore, a statute regulating voter qualifications should not be set aside on Fourteenth Amendment grounds "if any set of facts reasonably may be conceived to justify it." *Id.*

S.B. 747 is a manifestation of the General Assembly's desire to expand opportunities to register and vote and to work hand-in-hand with the NCSBE to ensure votes are timely counted. This promotes at least two government interests: (1) preserving the integrity of the election process and (2) instilling confidence in the electorate. These clear interests have been protected by the Courts for decades. *See Crawford,* 553 U.S. at 197 (recognizing the need to protect confidence "in the integrity and legitimacy of representative government."); *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 364, (1997) ("States certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials.").

15

S.B. 747 furthers these interests in several ways. First, it ensures that registrants live in the precinct where they vote. The importance of residency is fundamental to ensure that voters cast ballots to elect officials that represent their specific community needs. *Democracy N.C. v. NCSBE*, 476 F. Supp. 3d 158, 208 (M.D.N.C. 2020) (proof of residency is a legitimate state interest).

"Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy," *Purcell v. Gonzales,* 549 U.S. 1, 4 (2006), and is another compelling state interest here. To promote confidence in the election process, the General Assembly has an interest in setting deadlines that ensure election finality. An integral part of this is knowing which properly registered voters cast proper ballots in a timely fashion. S.B. 747 addresses the issue, raised by the NCSBE, that there was insufficient time for same-day registrants to be mailed two address verification cards in order to ensure the voter was properly registered and voted at the correct address. *See N.C. State Conf. of the NAACP v. McCrory*, 182 F. Supp. 3d 320, 449-455 (M.D.N.C. 2016) (discussing how SDR time limitations resulted in votes being counted despite voters failing mail verification), *reversed on other grounds*, 831 F.3d 204 (4th Cir. 2016), *cert. denied, N. Carolina v. N.C. State Conf. of the NAACP*, 137 S. Ct. 1399 (2017).

Plaintiffs' claims fail the *Mathews* test.[7] Notwithstanding that Mead, and only Mead in this instance, possess the right to vote; here, the risk of wrongful deprivation is minimal

---

[7] As Plaintiffs fail the more stringent *Mathews* standard, they also fail the *Anderson/Burdick* test.

and there are several compelling governmental interests; therefore, Plaintiffs' Procedural Due Process claims in Count I fail.

### B.  Plaintiffs Undue Burden Claim (Count II) Fails.

Plaintiffs' undue burden claim also fails. The *Anderson/Burdick* test is used to assess undue burden claims, whereby a court must "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that [Plaintiffs] seek[ ] to vindicate." *Anderson*, 460 U.S. at 789. Then, the court "must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule" and weigh "the legitimacy and strength of each of those interests." *Id.* The court must also "consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* However, "when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S. at  434.

#### i.     The magnitude of the alleged constitutional violation is minimal.

Plaintiffs challenge the single-notice address verification process in S.B. 747, alleging it imposes a severe burden on the right to vote. [D.E. 1, ¶98]. While Plaintiffs allege the undeliverable mail provision subjects voters to disenfranchisement caused by USPS or poll workers error, Plaintiffs also concede the risk of disenfranchisement also arises from voters' own errors, but that such errors on behalf of voters "offend the guarantee of due process because voters have no notice or opportunity to remedy an error." [D.E. 1, ¶9]. Each of these claims fall short.

17

First, as explained above, S.B. 747 does not alter the notice and opportunity to cure afforded under N.C.G.S. §163-82.18. Second, Plaintiffs entirely ignore that no one is required to use SDR. In fact, SDR is an accommodation for qualified applicants who failed to utilize the timely voter registration procedure. Moreover, North Carolina also allows all individuals to cast a provisional ballot on election day or during in-person early voting. N.C.G.S. §163-82.4(f).

Third, the Supreme Court has rejected arguments that voter inaction or negligence disenfranchises the voter. *See Rosario v. Rockefeller*, 410 U.S. 752, 757–58 (1973) ("[I]f their plight can be characterized as disenfranchisement at all, it was not caused by [the challenged voting regulation], but by their own failure to take timely steps to effect their enrollment."); *see also Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1188 (9th Cir. 2021) ("Most forms of voter negligence have no remedy."). Indeed, any allegation of poll worker error on a SDR application is negated by the fact that the application is printed for the SDR applicant, who after review, signs under penalty of perjury that the information is true and correct. [D.E. 55-1].

Finally, Plaintiffs pointing to USPS as a potential cause of disenfranchisement is a red herring. A properly addressed piece of mail is presumed delivered and is sufficient for service. *Nibagwire v. Gonzales*, 450 F.3d 153, 156 (4th Cir. 2006) (regular mail service is entitled to the presumption of effective delivery); *Fed. Deposit Ins. Corp. v. Schaffer,* 731 F.2d 1134, 1137 n.6 (4th Cir. 1984). And Congress chose mail verification as the proper mechanism to maintain voter registration lists under the National Voter Registration Act. *See* 52 U.S.C. § 20507. Thus, any claim that existing mail procedures create a risk of harm

18

is specious at best. A ruling by this Court mail is constitutionally improper would open the door for a similar challenge to voting by mail and likely have seismic repercussions. In sum, Plaintiffs' own negligence and the state's reliance on U.S.P.S. do not present any, even minimal, burden on the right to vote.

### ii. The State's interests are legitimate.

Under *Anderson/Burdick,* where an election regulation imposes a minimal burden that is non-discriminatory, courts "only ask that the state 'articulate' its asserted interests." *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 719 (4th Cir. 2016) (quoting *Timmons*, 520 U.S. at 358) (cleaned up). "'[E]laborate, empirical verification of weightiness' is not required." *Id.* (quoting *Timmons*, 520 U.S. at 364) (cleaned up).

As discussed above, the early voting period begins seventeen days before election day and ends three days prior to election day. Unlike timely registration, which is completed twenty-five days before election day, there is not enough time to send an SDR applicant two mail verification cards and have them returned before the relevant deadlines. *See N.C. State Conf. of the NAACP*, 182 F. Supp. 3d at 449-455. Thus, under the previous system, SDR applicants were more likely to fail mail verification after their vote was counted than timely registrants. *Id.* at 453. ("[F]or the 2012 general election, 2.44% of SDR registrants (2,361/97,373) failed mail verification after voting, compared to 0.34% of non-SDR registrants (2,306/680,904)."). This is the exact compelling governmental interest S.B. 747 is designed to remedy. As explained *supra* pp. 15-17, the State has a legitimate interest in verifying a voter's residency so that voters cast a ballot in the correct district, and in ensuring votes are timely counted.

19

It is beyond dispute that "[r]easonable regulation of elections . . . does require [voters] to act in a timely fashion if they wish to express their views in the voting booth." *Burdick*, 504 U.S. at 438. North Carolina provides voters ample timely opportunities to express their views. The State must balance those opportunities with the compelling government interest of the county boards of elections verifying the addresses of SDR voters. S.B. 747 does just that.

Additionally, while Defendants dispute Plaintiffs' contention that address verification is unnecessary to prove a voter's and residency, [D.E. 1, ¶54], the State is not required to show that "its chosen method was the least burdensome means" or the most "effective and efficient administration" of an election regulation because "the modest burden" here is "justified by the state's important regulatory interests." *Nelson v. Warner*, 12 F.4th 376, 390 (4th Cir. 2021). Indeed, given the relative ease with which a utility bill or bank statement could be altered, or the possibility that a voter could present a stale document, it is more than rational to require additional verification via mail.

Because S.B. 747 does not present a significant burden on the right to vote, and the General Assembly has a compelling interest in the rights protected by S.B. 747, Count II of Plaintiffs' complaint must be dismissed pursuant to Fed. R. Civ. P 12(b)(6).

**C. In The Alternative, the Court Should Construe S.B. 747 to Require a Challenge Pursuant to N.C.G.S. §163-89 under the Constitutional Avoidance Doctrine.**

While Legislative Defendants contend that S.B. 747 is constitutional and that Plaintiffs' claims fail, the Court has a duty under the constitutional avoidance doctrine to construe S.B. 747 to avoid constitutional issues unless such a construction is plainly

20

contrary to the intent of the enactor. *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988); *Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 177 (4th Cir. 2010) (collecting cases). The constitutional avoidance doctrine "reflects the prudential concern that constitutional issues must not be confronted needlessly." *Smithfield Foods, Inc. v. United Food & Com. Workers Int'l Union*, 585 F. Supp. 2d 789, 807 (E.D. Va. 2008).

Here, the Court does not need to confront the constitutional question because it is possible to read S.B. 747 to already require the notice and cure provisions Plaintiffs seek. Specifically, S.B. 757 §11 re-writes a portion of 82.7(g)(2), which discusses when mail verification cards are returned as undelivered. This includes a reference to N.C.G.S. §163-89[8] which outlines the challenge procedure for county boards challenging absentee ballots. Utilizing the same challenge provision as used for absentee is not only efficient, but logical since the undelivered mail is returned to the county boards like absentee ballots. Thus, it is entirely reasonable to construe S.B. 747 as already providing the notice and cure opportunities Plaintiffs seek in their Complaint.[9] Because of this, should the Court be concerned about due process without a new explicit challenge process, the Court should choose the "reasonable construction" and "interpretation that avoids raising constitutional

---

[8] Notably the previous version of 82.7(g)(2) also included a reference to 163-89.
[9] The NCSBE is likely to take issue with this ruling as running afoul of an order by Judge Biggs in *N.C. State Conf. of NAACP v. Bipartisan Bd. of Elections and Ethics Enforcement*, No. 1:16-CV-1274, 2018 WL 3748172 (M.D.N.C. Aug. 7, 2018). But, that case analyzed challenge provisions under §163-85 not, §163-89. *Id.* at *1.

21

problems." *FERC v. Powhatan Energy Fund, LLC,* 286 F. Supp. 3d 751, 758 (E.D. Va. 2017) (*citing United States v. Jin Fuey Moy,* 241 U.S. 394, 401 (1916)).

<u>**CONCLUSION**</u>

For these reasons, Legislative Defendants respectfully request that the Court dismiss Plaintiffs' Complaint in its entirety.

Respectfully submitted this the 16th day of January 2024.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

/s/ Phillip J. Strach
Phillip J. Strach
N.C. State Bar No. 29456
Thomas A. Farr
N.C. State Bar No. 10871
Alyssa M. Riggins
N.C. State Bar No. 52366
Cassie A. Holt
N.C. State Bar No. 56505
Alexandra M. Bradley
N.C. State. Bar No. 54872
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
Telephone: (919) 329-3800
Facsimile: (919) 329-3779
phil.strach@nelsonmullins.com
tom.farr@nelsonmullins.com
alyssa.riggins@nelsonmullins.com
cassie.holt@nelsonmullins.com
alex.bradley@nelsonmullins.com

*Counsel for Legislative Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.3(d), I hereby certify that this brief contains 5,892 words

as counted by the word count feature of Microsoft word.

**NELSON MULLINS RILEY &**
**SCARBOROUGH LLP**

By:/s/ Phillip J. Strach
        Phillip J. Strach
        N.C. State Bar No. 29456

## CERTIFICATE OF SERVICE

I, Phillip J. Strach, hereby certify that I have this day electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will provide electronic notification to counsel of record.

This the 16th day of January, 2024.

NELSON MULLINS RILEY &
SCARBOROUGH LLP

/s/ Phillip J. Strach
Phillip J. Strach
N.C. State Bar No. 29456