IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

VOTO LATINO, WATAUGA COUNTY )
VOTING RIGHTS TASK FORCE, DOWN )
HOME NORTH CAROLINA, and SOPHIE )
JAE MEAD, )
)
          Plaintiffs, )
)
       v. )
)
ALAN HIRSCH, in his official )
capacity as Chair of the State )
Board of Elections, JEFF )
CARMON, in his official )
capacity as Secretary of the )
State Board of Elections, )
STACEY EGGERS IV, in his )
official capacity as Member of )
the State Board of Elections, )
KEVIN N. LEWIS, in his official )
capacity as Member of the State )
Board of Elections, SIOBHAN )
O'DUFFY MILLEN, in her official )
capacity as Member of the State )
Board of Elections, KAREN )
BRINSON BELL, in her official )
capacity as Executive Director )
of the State Board of )
Elections, MICHAEL BEHRENT, )
in his official capacity as )
Chair of the Watauga County )
Board of Elections, ERIC ELLER, )
in his official capacity as )     1:23-CV-861
Member of the Watauga County )
Board of Elections, MATT )
WALPOLE, in his official )
capacity as Member of the )
Watauga County Board of )
Elections, LETA COUNCILL, )
in her official capacity as )
Member of the Watauga County )
Board of Election, and ELAINE )
ROTHENBERG, in her official )
capacity as Member of the )
)

Watauga County Board of Elections,                       )
                                     )
                                     )
                  Defendants,        )
                                     )
          and                        )
                                     )
PHILIP E. BERGER, in his             )
official capacity as President       )
Pro Tempore of the North             )
Carolina Senate, and TIMOTHY         )
K. MOORE, in his official            )
capacity as Speaker of the           )
North Carolina House of              )
Representatives,                     )
                                     )
                  Defendant-         )
                  Intervenors,       )
                                     )
          and                        )
                                     )
REPUBLICAN NATIONAL COMMITTEE,       )
NORTH CAROLINA REPUBLICAN            )
PARTY, VIRGINIA A. WASSERBERG,       )
and BRENDA M. ELDRIDGE,              )
                                     )
                  Defendant-         )
                  Intervenors.       )
_____    )
                                     )
DEMOCRATIC NATIONAL COMMITTEE        )
and NORTH CAROLINA DEMOCRATIC        )
PARTY,                               )
                                     )
                  Plaintiffs,        )
                                     )
          v.                         )
                                     )
NORTH CAROLINA STATE BOARD OF        )
ELECTIONS, KAREN BRINSON BELL,       )
in her official capacity as          )
Executive Director of the State      )
Board of Elections, ALAN             )
HIRSCH, in his official              )
capacity as Chair of the State       )
Board of Elections, JEFF             )
CARMON, in his official              )

2

capacity as Secretary of the )
State Board of Elections, )
STACEY EGGERS IV, in his )
official capacity as Member of )
the State Board of Elections, )        1:23-CV-862
KEVIN N. LEWIS, in his official )
capacity as Member of the State )
Board of Elections, SIOBHAN )
O'DUFFY MILLEN, in her official )
capacity as Member of the State )
Board of Elections, )
)
          Defendants, )
)
      and )
)
PHILIP E. BERGER, in his )
official capacity as President )
Pro Tempore of the North )
Carolina Senate, and TIMOTHY )
K. MOORE, in his official )
capacity as Speaker of the )
North Carolina House of )
Representatives, )
)
          Defendant- )
          Intervenors, )
)
      and )
)
REPUBLICAN NATIONAL COMMITTEE, )
NORTH CAROLINA REPUBLICAN )
PARTY, VIRGINIA A. WASSERBERG, )
and BRENDA M. ELDRIDGE, )
)
          Defendant- )
          Intervenors. )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

    In these two actions,[1] Plaintiffs contest recent changes to

_____

[1] The actions are not consolidated but are addressed jointly here because

North Carolina's rules for voters who register and cast a ballot during the State's seventeen-day same-day registration ("SDR") period that ends the Saturday before election day.  Pursuant to the State's address verification process, the county board of elections sends all same-day registrants a card by non-forwardable mail.  Under Senate Bill 747 ("S. 747"), which became law on October 10, 2023, as 2023 N.C. Sess. Laws 140, if, before the close of business on the day before the canvass, the United States Postal Service returns the verification card to the county board as undeliverable — even through no fault of the voter — the county board "shall not register the applicant and shall retrieve the applicant's ballot and remove that ballot's votes from the official count."  2023 N.C. Sess. Laws 140, § 10.(a) (codified as N.C. Gen. Stat. § 163-82.6B (2024)).

Before the court are motions for preliminary injunction by Plaintiffs Voto Latino, Watauga County Voting Rights Task Force, Down Home North Carolina, and Sophie Jae Mead ("Voto Latino Plaintiffs") (VL Doc. 44), and Plaintiffs Democratic National Committee and North Carolina Democratic Party ("Party Plaintiffs") (DNC Doc. 6) (collectively, "Plaintiffs").[2]  Defendants Karen

they raise identical issues.  A third case raising similar issues is also pending before this court, 1:23-cv-878.  The plaintiffs there have not moved for preliminary relief.

[2] Docket entry references for case number 1:23-CV-861 are "VL Doc. XX," and for case number 1:23-CV-862 are "DNC Doc. XX."

4

Brinson Bell, Alan Hirsch, Jeff Carmon, Stacy Eggers IV, Kevin N. Lewis, Siobhan O'Duffy Millen, and as to 1:23-cv-862, North Carolina State Board of Elections ("NCSBE") ("State Board Defendants"), Defendant-Intervenors Senator Philip E. Berger and Speaker Timothy K. Moore ("Legislative Intervenors"), and Defendant-Intervenors Republican National Committee, North Carolina Republican Party, Virginia Ann Wasserberg, and Brenda M. Eldridge ("Party Intervenors") (collectively, "Intervenors") have responded in opposition. (VL Docs. 51, 52, 54, 60; DNC Docs. 51, 52, 53.)[3] Plaintiffs have replied. (VL Doc. 59; DNC Doc. 58.)

Voto Latino Plaintiffs seek injunctive relief, claiming violations of the First and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. § 1983. (VL Doc. 1 ¶¶ 83-98.) Party Plaintiffs allege violations of the First and Fourteenth Amendments to the United States Constitution, Article I, sections 10 and 19 of the North Carolina Constitution, the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(A), the Help America Vote Act ("HAVA"), 52 U.S.C. § 21082, and the Voting Rights Act, 52 U.S.C. § 10307(b). (DNC Doc. 1 ¶¶ 52-100.) Legislative Intervenors and

---

[3] Voto Latino Plaintiffs named Michael Behrent, Eric Eller, Matt Walpole, Leta Councill, and Elaine Rothenberg, all of whom are members of the Watauga County Board of Elections, as Defendants. In response to Plaintiffs' motion, these Defendants state they take no position and are "obligated to faithfully administer the election laws of the State of North Carolina, whatever they may be." (VL Doc. 50 at 2-3.) Both actions otherwise share the same named Defendants and Intervenors, except that Party Plaintiffs also sue NCSBE.

Case 1:23-cv-00861-TDS-JEP   Document 68   Filed 01/21/24   Page 5 of 94

Party Intervenors have intervened in both cases to oppose Plaintiffs' claims and to represent the interests of the North Carolina General Assembly and their political party, respectively. (VL minute entry Nov. 15, 2023; DNC Docs. 47, 48.)

Beyond the briefs, the parties to the suit brought by Voto Latino Plaintiffs have filed declarations concerning the backgrounds and allegations of the organizational and individual Plaintiffs, depositions from leaders of the organizational Plaintiffs and Plaintiff Mead, two preliminary expert opinions and corresponding depositions, and several NCSBE "Numbered Memos," which provide guidance to county election boards. The parties to the suit brought by Party Plaintiffs likewise rely on NCSBE Numbered Memos.

The parties have requested resolution of these motions ahead of the 2024 primary election, for which same-day registration begins on February 15, 2024. The court heard argument on the motions on December 28, 2023. For the reasons set forth below, the motions will be granted in part and denied in part.

I.   **BACKGROUND**

The North Carolina General Assembly passed S. 747 over Governor Roy Cooper's veto on October 10, 2023. 2023 N.C. Sess. Laws 140, available at https://ncleg.gov/Sessions/2023/Bills/Senate/PDF/S747v6.pdf. The relevant provisions of S. 747, "[a]n act to make various changes regarding elections law,"

6

became effective January 1, 2024.  Id. § 50.  While the bill amends several provisions of the election laws in Chapter 163 of the North Carolina General Statutes, the present motions specifically seek to enjoin the enforcement of portions of section 10.(a), codified as N.C. Gen. Stat. § 163-82.6B, which makes changes to North Carolina's SDR procedures.

### A.    Voter Registration

All adult citizens, except felons, are entitled to vote in North Carolina.  N.C. Const. art VI, §§ 1-2; N.C. Gen. Stat. § 163-55(a).  To be eligible to vote in a given county, a voter must have resided in that county for at least 30 days prior to election day, N.C. Gen. Stat. § 163-55(a), and register there, id. § 163-54.

North Carolina offers two general methods of registration. Under the first method used by nearly all North Carolinians, called "traditional registration" or "non-SDR" herein, an eligible voter may register 25 days or more before an election day.  Id. § 163-82.6(d).  These registrants must complete a registration application that requires name, date of birth, residential address, and mailing address, if different.  Id. § 163-82.4(a); see also North Carolina Voter Registration Application, Form 06W, at https://dl.ncsbe.gov/Voter_Registration/NCVoterRegForm_06W.pdf (last accessed Jan. 18, 2024).  The mailing address need not be in the same precinct or even county as the residential address.  (DNC

7

Doc. 62 at 59:8-13.)  The application also requests identifying information, such as a driver's license number, last four digits of a social security number, and gender and ethnicity, and allows an applicant to select a political party affiliation.  N.C. Gen. Stat. § 163-82.4(a).  The applicant must attest that he is a citizen, is 18 years old or will be on election day, and that the contents of the application are true under penalty of perjury. Id. § 163-82.4(c), (e).  The non-SDR applicant need not provide any document that proves residency.

When a county board of elections receives the application, it must make a "tentative determination that the applicant is qualified to vote at the address given."  Id. § 163-82.7(a).[4]  If the applicant is found not qualified, the county board of elections will mail him a notice within two days of the denial which informs him of alternatives to exercise the franchise and of the opportunity to appeal under section 163-82.18.[5]  Id. § 163-82.7(b).

---

[4] Section 163-82.7(a) does not expressly state, and the parties have not represented, what the county board's initial determination for traditional registration entails.  Presumably, it involves checking the applicant's age, citizenship status, felon status, driver's license or last four digits of the social security number, if provided, etc. to determine if the applicant is qualified to vote or is already registered. See N.C. Gen. Stat. § 163-82.6B(d).

[5] An applicant who receives a denial notice may appeal within five days of receiving the notice.  N.C. Gen. Stat. § 163-82.18(a).  The appeal is first heard before the county board of elections, which must provide notice of its decision within five days of the hearing.  Id. § 163-82.18(b).  If the denial is sustained, the applicant may appeal to a superior court of the county in which the board is located within ten

8

If the applicant is "tentative[ly] determin[ed]" to be qualified, the county board will implement the statutory procedures for "Verification of Address by Mail," or "address verification." Id. § 163-82.7(c). First, the county board will mail a "notice" (commonly referred to as "voter registration card"; hereinafter, "card") confirming the precinct and voting place of the voter by non-forwardable mail to the address provided on the application. Id. If the mailing address differs from the residence address, the county board will mail the verification card to the mailing address. (DNC Doc. 62 at 59:8-13); see also N.C. Gen. Stat. § 163-57(1)(c) ("Residence shall be broadly construed to provide all persons with the opportunity to register and to vote, including stating a mailing address different from residence address.").

If the Postal Service does not return the card to the county board as undeliverable, "the county board shall register the applicant to vote."[6] Id. § 163-82.7(d). If the card is returned, however, the county board will send a second card. Id. § 163-82.7(e). As with the first, if the Postal Service does not return the second card as undeliverable, "the county board shall register the applicant to vote." Id. But if the second card is returned

_____

days of receiving notice of the county board's final decision. Id. § 163-82.18(c).

[6] Neither the statute nor the NCSBE provides any time deadline for return of the address verification card. Thus, there is no specific time when an applicant is deemed "registered" — only the opposite.

as undeliverable, the county board will deny the application and "need not try to notify the applicant further." Id. § 163-82.7(f). Voters may nevertheless check their registration status online via NCSBE's "Voter Search" tool. See NCSBE, View Your Voter Registration Status, at https://www.ncsbe.gov/registering/checking-your-registration (last accessed Jan. 9, 2024).[7]

Under the second method of registration, implemented in 2007, an individual who is qualified to register to vote may register in person and simultaneously cast a ballot at an early voting site in the individual's county of residence during the period of early voting. N.C. Gen. Stat. § 163-82.6B(a).[8] This is commonly called "same-day registration," or "SDR." To same-day register and vote, an individual must (1) complete a voter registration application; (2) provide proof of residence by presenting a HAVA[9]-compliant

---

[7] Section 163-82.7(g)(3) requires non-SDR voters who vote prior to failing two-card address verification to be treated "as a registered voter."

[8] Same-day registration was enacted in North Carolina in 2007. 2007 N.C. Sess. Laws 253, § 1 (codified as N.C. Gen. Stat. § 163-82.6A). Though section 163-82.6A once contained North Carolina's same-day registration rules, it was largely repealed by North Carolina Session Laws 2013-381, § 16.1. After the Fourth Circuit held this repeal unlawful, N.C. State Conf. of the NAACP v. McCrory, 831 F.3d 204 (4th Cir. 2016), section 163-82.6A was given legal effect again. However, Numbered Memo 2016-15 has effectively housed North Carolina's same-day registration laws from September 22, 2016, until January 1, 2024, because Chapter 163 was never amended to codify the holding in McCrory. (See VL Doc. 55-2 at 4 (NCSBE Numbered Memo 2016-15, Appendix A).) Section 163-82.6B now appears to abrogate the legal effect of Numbered Memo 2016-15's Appendix A. N.C. Gen. Stat. § 163-82.6B(a) ("Notwithstanding any provision of law to the contrary . . . .").

[9] Help America Vote Act, 52 U.S.C. § 20901 et seq.

document listing the individual's current name and residence address; and (3) present photo identification pursuant to section 163-166.16.[10]  Id. § 163-82.6B(b).  A HAVA-compliant document is one of the following:

> (1) A current utility bill
> (2) A current bank statement
> (3) A current government check
> (4) A current paycheck
> (5) Another current government document
> (6) A current document issued from the institution who issued the photo identification shown by the voter pursuant to G.S. 163-166.16.

Id. § 163-82.6B(e).[11]  A "current" HAVA document must be unexpired or have an issuance date within six months of presentation to an election official.  (VL Doc. 55-5 at 3 (NCSBE Numbered Memo 2023-05 (Dec. 8, 2023)).)  As with traditional registration, the mailing address on the application may be different from that on the HAVA document and can even be in a different county.  (DNC Doc. 62 at 59:8-13.)  Upon completing these steps, an individual then "vote[s] a retrievable ballot."  N.C. Gen. Stat. § 163-82.6B(c).

Prior to S. 747, the procedures up until address verification

_____

[10] As a technical matter, the same-day registration law prior to S. 747 did not expressly require a same-day registrant to show a photo identification to vote.  However, in light of the North Carolina Supreme Court's April 2023 opinion upholding section 163-166.16, SDR voters would appear to be required to present a photo identification even without S. 747.  See Holmes v. Moore, 384 N.C. 326, 460 (2023).

[11] NCSBE Numbered Memo 2023-05 provides further guidance to county boards on government documents allowable under (5) and (6).  (VL Doc. 55-5 at 3-5 (NCSBE Numbered Memo 2023-05 (Dec. 8, 2023)).)

11

were the same, except that the proof-of-residency documents
required to be produced in person at registration were: "North
Carolina drivers license, a photo identification from a government
agency, or ['a current utility bill, bank statement, government
check, paycheck, or other government document']." See N.C. Gen.
Stat § 163-82.6A (2012), available at VL Doc. 55-2 at 4 (NCSBE
Numbered Memo 2016-15, Appendix A). Additionally, rather than
vote a "retrievable ballot" as S. 747 requires, the same-day
registrant would previously vote a "retrievable absentee ballot as
provided in G.S. 163-227.2." Id. § 163-82.6A(c)(2012) (emphasis
added).

Under S. 747, after a same-day registrant casts a ballot, the
county board must, within two business days of registration,
"determine[]" if he is qualified to vote by verifying the North
Carolina driver's license or social security number in accordance
with section 163-82.12, updating the statewide registration
database, and searching for possible duplicate registrations.
N.C. Gen. Stat. § 163-82.6B(d). A same-day registrant's vote will
be counted "unless the county board determines that the applicant
is not qualified to vote in accordance with the provisions of this
Chapter." Id.[12]

_____

[12] As discussed below, the parties to civil action number 1:23-CV-862
disagree on the practical effect of this clause in terms of its provision
of notice and opportunity to be heard for voters found "not qualified."

12

**B. Address Verification for SDR**

If the county board of elections tentatively determines that a same-day registrant is eligible to vote (i.e., passes check of driver's license number, social security number, etc.), the county board of elections proceeds to conduct address verification by mail. The core dispute on these motions concerns S. 747's changes to the State's process for doing so for SDR voters, which the parties refer to as the "undeliverable mail provision."

Prior to S. 747, if a same-day registrant was determined eligible, the county board would conduct address verification. N.C. Gen. Stat. § 163-82.6A(d) (2012); N.C. Gen. Stat. § 163-82.7(c)-(f). Just as for non-SDR voters, if the first non-forwardable card was returned as undeliverable, the county board would send a second one. However, given the short window between early voting and the county canvass, in some instances the second card was returned as undeliverable after the county canvass. In those instances, although those SDR voters failed address verification, their votes were counted. N.C. Gen. Stat. § 163-82.7(g); (VL Doc. 55-2 at 3 (NCSBE Numbered Memo 2016-15 (Sept. 22, 2016)).)

When the Postal Service returned the second card as undeliverable before the county canvass, however, the law before S. 747 provided that the ballot (then considered a "retrievable absentee" ballot) could be challenged pursuant to section 163-89,

13

which authorizes a challenge procedure for absentee ballots to occur ten days after the election. Id. §§ 163-82.7(g)(2), 163-182.5. If this occurred, the county board would "need not try to notify the applicant further." Id. § 163-82.7(f).[13] However, the voter is entitled to appear and present evidence as to the validity of the ballot, provided he is notified of the challenge, for example, by another voter or organization. Id. § 163-89(e). Under this challenge system, "[n]o challenge shall be sustained unless the challenge is substantiated by affirmative proof," and "[i]n the absence of such proof, the presumption shall be that the voter is properly registered or affiliated." Id. § 163-90.1(b). In the last four even-year elections, 1,799 out of 100,578; 696 out of 45,666; 2,151 out of 116,326; and 391 out of 34,289 same-day registrants failed address verification. NCSBE, Presentation to House Oversight and Reform Committee, at 6 (June 22, 2023), at https://webservices.ncleg.gov/ViewDocSiteFile/80406 (last

---

[13] SDR voters may utilize NCSBE's "Voter Search" to track the status of their ballot, but NCSBE's website indicates that a voter's history "may take up to a few weeks after Election Day" to update. NCSBE, Vote Early in Person, at https://www.ncsbe.gov/voting/vote-early-person (last accessed Jan. 9, 2024). Moreover, even though SDR ballots were technically considered "absentee" ballots prior to S. 747, the court has no record that NCSBE's vote-by-mail tracking system, BallotTrax, was or is now available to SDR voters. See NCSBE, Ballot Tracking Available Again for Absentee-By-Mail Voters, at https://www.ncsbe.gov/news/press-releases/2022/03/14/ballot-tracking-available-again-absentee-mail-voters (Mar. 14, 2022) (last accessed Jan. 9, 2024).

accessed Jan. 3, 2023).[14]

In reality, however, no challenges based on failed address verification have been held since August 2018. (VL Doc. 61 at 53:13-16 (State Board stating so at oral argument); VL Doc. 55-4 at 1-2 (NCSBE Numbered Memo 2018-07 (Aug. 8, 2018)); see also VL Doc. 55-3 at 8 (NCSBE Numbered Memo 2022-05 (May 12, 2022)).)[15] This results from the NCSBE's interpretation of an injunction entered in North Carolina State Conference of the NAACP v. Bipartisan Board of Elections & Ethics Enforcement, No. 1:16CV1274, 2018 WL 3748172 (M.D.N.C. Aug. 7, 2018). (See VL Doc. 55-3 at 8 (NCSBE Numbered Memo 2022-05 (May 12, 2022)) (explaining that "a 2018 federal court order [i.e., the Bipartisan Board order] prohibits any voter challenges from being brought without individualized knowledge within 90 days of a federal election"); VL Doc. 44-4 at 9-10 (Letter from State Board to Watauga County Board ordering the county board, pursuant to Bipartisan Board injunction, to halt its section 163-89 challenges based on same-day registrants' failure to complete address verification)).)

---

[14] The court may take judicial notice of facts that are "matters of public record." Justice 360 v. Stirling, 42 F.4th 450, 455 (4th Cir. 2022); Fed. R. Evid. 201.

[15] NCSBE updated the version of Numbered Memo 2022-05 available online on December 15, 2023, in light of S. 747. See NCSBE Numbered Memo 2022-05 (Dec. 15, 2023 update), at https://s3.amazonaws.com/dl.ncsbe.gov/sboe/numbermemo/2022/Numbered%20Memo%202022-05_Absentee%20Voter%20Challenges%20by%20County%20Board.pdf. The memo before the updates is memorialized at VL Doc. 55-3 and DNC Doc. 54-3.

In Bipartisan Board, individual voters in Beaufort, Cumberland, and Moore counties sent a single mailing to thousands of registered voters. Bipartisan Board, 2018 WL 3748172, at *4-9. These individuals together received thousands of pieces of mail returned as undeliverable, after which they brought challenges pursuant to N.C. Gen. Stat. §§ 163-85 and 163-86, which permit third-party challenges to a voter's right to register in a county due to, among other reasons, change in residency.[16] Id. When presented to the county boards, the single unreturned mailings constituted prima facie evidence that the corresponding voters did not reside at the address listed. Id.; N.C. Gen. Stat. § 163-85(e). The county boards thus struck the registrations of scores of registered voters, and plaintiffs sued to restore the registrations and receive prospective relief pursuant to the National Voter Registration Act ("NVRA," also known as the "Motor Voter Act"), 52 U.S.C. § 20507. Id. at *1. Finding that these third-party challenges violated 52 U.S.C §§ 20507(d)[17] and

---

[16] The Bipartisan Board order refers to these provisions as N.C. Gen. Stat. §§ 163A-911 and 163A-912. The provisions were re-codified by North Carolina Session Laws 2018-146, § 3.1(a), effective January 31, 2019, as N.C. Gen. Stat. §§ 163-85 and 163-86. This order will refer to the provisions as presently codified.

[17] Section 20507(d)(1) prohibits "remov[ing] the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant": (1) confirms in writing that he has moved outside the registrar's jurisdiction; or (2) fails to respond to a notice as outlined under subsection (d)(2), and (3) has not voted or appeared to vote in

16

(c)(2)(A),[18] the court permanently enjoined the NCSBE from

> (1) removing the registration of voters from the
> official list of eligible voters in elections for
> federal office through the challenge procedures set
> forth in N.C. Gen. Stat. §§ 163A-911 et seq.,[19] when
> those challenges are based on change of residency and
> the State has neither received written confirmation from
> the voter of a change of residency outside of the county,
> nor complied with the NVRA's prior notice requirement
> and two-election cycle waiting period;
>
> (2) using the challenge procedure set forth in N.C. Gen.
> Stat. §§ 163A-911[20] et seq. to remove voters from the
> rolls without individualized inquiry as to the
> circumstances of each voter in the 90 days preceding a
> federal election in the absence of a request of the
> registrant, necessity under State law by reason of
> criminal conviction or mental incapacity, or the death
> of the registrant; and
>
> (3) holding hearings or taking any other action(s) to
> process challenges filed under those provisions in the
> circumstances identified above.

Bipartisan Board, 2018 WL 3748172, at *12.  The court found that

the challenges, which occurred within 90 days of a federal election

based on a single mailing, violated the NVRA because the process

did not rely upon "individualized information" as to the voters

sought to be removed.  Id. at *6-10 (citing Arcia v. Fla. Sec'y of

---

two federal election cycles following receipt of notice.  Section
20507(d)(2) prescribes the content for a NVRA-compliant notice.

[18] Section 20507(c)(2)(A) provides that "[a] State shall complete, not
later than 90 days prior to the date of a primary or general election
for Federal office, any program the purpose of which is to systematically
remove the names of ineligible voters from the official lists of eligible
voters."

[19] Now codified as N.C. Gen. Stat. §§ 163-85 et seq.

[20] Now codified as N.C. Gen. Stat. §§ 163-85 et seq.

*State*, 772 F.3d 1335, 1346 (11th Cir. 2014)). Although <u>Bipartisan</u> <u>Board</u> dealt with challenges pursuant to section 163-85, State Board Defendants have construed the injunction to also prohibit challenges under section 163-89 for same-day registrants under the belief that the challenge procedures "bear a close resemblance" to one another. (<u>VL</u> Doc. 44-4 at 9-10 (pointing to the <u>Bipartisan</u> <u>Board</u> court's finding that the mailings constituted "generic evidence [that] conveyed no information about each challenged voter's specific circumstances").) As a result of <u>Bipartisan Board</u> and State Board Defendants' interpretation of it, failed address verifications for same-day registrants have not resulted in challenges since 2018.

S. 747 amends the address verification system for SDR voters to, as State Board Defendants contend, address the State's inability to conduct address verification before the canvass and to avoid counting ballots of SDR voters who fail address verification. (<u>DNC</u> Doc. 53 at 13; <u>VL</u> Doc. 54 at 11.) In pertinent part, the "undeliverable mail provision" now provides:

> Notwithstanding any other provision of this Chapter, if the Postal Service returns the first notice required under G.S. 163-82.7(c) as undeliverable before the close of business on the business day before canvass, the county board shall not register the applicant and shall retrieve the applicant's ballot and remove that ballot's votes from the official count.

18

N.C. Gen. Stat. § 163-82.6B(d).[21]   State Board Defendants state that all SDR voters will be given a notice at the polling place that their vote may not be counted if address verification fails, but there is no individualized notice and opportunity to be heard after the card is returned as undeliverable and before the ballot is removed from the official count.  (See VL Doc. 55-6 (Notice to Same Day Registrants); VL Doc. 54 at 13 n.8 ("The State Board has also created a written notice that poll workers are required to give to all same-day registrants informing them" that, if address verification fails, their "voter registration will be denied and [their] vote will not be counted").)

State Board Defendants contend that North Carolina's interest in the undeliverable mail provision is "in ensuring only eligible ballots are counted in an election."  (DNC Doc. 53 at 13.) Legislative Intervenors argue that S. 747 "(1) preserv[es] the integrity of the election process; and (2) instill[s] confidence in the fairness of the election."  (DNC Doc. 52 at 17.)   With respect to election integrity, Legislative Intervenors contend that the law "ensure[s] that registrant[s] live in the precinct within which they seek to vote."  (Id. at 18.)   They argue that

---

[21] It is unclear whether the provision referencing the "first notice" indicates that no second card will be sent, especially in light of the provision that the county board "shall not register" the SDR voter. State Board Defendants take the view that a second card is sent only if the first card returns after the canvass.  (VL Doc. 55-5 at 7 (NCSBE Numbered Memo 2023-05 (Dec. 8, 2023)).)

North Carolina has a "legitimate interest" in ensuring "that the card is returned before the end of the canvass," and that S. 747 is designed to bring SDR voters into parity with other voters. (VL Doc. 52 at 14; VL Doc. 61 at 66:13-15.) Legislative Intervenors also rely on the expert report and testimony of Dr. Andrew Taylor which, as discussed in more detail below, they urge shows that the undeliverable mail provision supports the State's interests. (See VL Doc. 52-1.) Party Intervenors contend that the State's "compelling interest" is in "ensuring verification of each applicant's address, which is fundamental to determining a voter's eligibility" (DNC Doc. 51 at 7-8), and in "discouraging and preventing fraud," (VL Doc. 51 at 11).

Neither State Board Defendants nor Intervenors point to any portion of the legislative history to demonstrate the General Assembly's purpose in enacting this change.[22] Legislative

_____

[22] State Board Defendants and Intervenors have cited just one source of legislative history, a transcript of testimony by Defendant Bell before the House Committee on Oversight and Reform, available at https://webservices.ncleg.gov/ViewDocSiteFile/80708 (last accessed Jan. 17, 2024). However, neither this source nor other documents available online through the Senate Committee on Redistricting and Elections or the House Committee on Election Law and Campaign Finance Reform reveals the General Assembly's rationale for the undeliverable mail provision. This may be explained by the fact that the undeliverable mail provision appears to have been added to S. 747 by the House Committee on Election Law and Campaign Finance Reform one day before it passed the full chamber. See North Carolina General Assembly, Senate Bill 747 House Committee Substitute (Aug. 15, 2023), https://www.ncleg.gov/Sessions/2023/Bills/Senate/PDF/S747v4.pdf; see also North Carolina General Assembly, Senate Bill 747 / SL 2023-140, https://www.ncleg.gov/BillLookUp/2023/s%20747 (last accessed Jan. 17, 2024).

Intervenors represent that State Board Defendants requested the change, the evidentiary support for which is a former State and Watauga County election board member's understanding. (VL Doc. 52 at 4; Doc. 52-2 at 9.) There is no record that address verification has ever revealed a same-day registrant who was in fact ineligible to vote because he did not reside at the residence provided. In fact, State Board Defendants state that they would have "no way to know" from the card itself. (VL Doc. 61 at 60:21.)

### C. Parties

Plaintiff Voto Latino is a section 501(c)(4) nonprofit that encourages voting and assists with voter registration, particularly among eligible Latino voters. (VL Doc. 1 ¶¶ 17, 18.) Plaintiff Watauga County Voting Rights Taskforce is a volunteer, nonpartisan organization that conducts voter registration drives, voter education sessions, volunteer training, community outreach, among other functions. (Id. ¶¶ 22-24.) Relevant here, the Taskforce has defended voters whose ballots have been challenged. (Id. ¶ 25.) Plaintiff Down Home North Carolina is a section 501(c)(4) nonprofit that works, in part, to ensure that rural, working-class people in North Carolina have access to the franchise. (Id. ¶ 28.) Plaintiff Sophie Jae Mead is a senior at Appalachian State University and a member of the Watauga County Voting Rights Taskforce. (Id. ¶ 31.) Her ballot was allegedly challenged under section 163-89 due to an undeliverable address

21

verification card in 2022.  (Id. ¶ 31.)  Plaintiff Democratic National Committee ("DNC") is the national committee of the Democratic Party.  (DNC Doc. 1 ¶¶ 22-23.)  Plaintiff North Carolina Democratic Party ("NCDP") is a state committee of the Democratic Party.  (Id. ¶ 25.)

Party Plaintiffs have sued the NCSBE, which is the executive agency responsible for administering election laws in North Carolina.  (Id. ¶ 28.)  All Plaintiffs also have sued NCSBE's executive director, Defendant Karen Brinson Bell, NCSBE's chair, Defendant Alan Hirsch, NCSBE's secretary, Defendant Jeff Carmon, and NCSBE members, Defendants Stacy Eggers IV, Kevin N. Lewis, and Siobhan O'Duffy Millen.  (Id. ¶¶ 29-34; VL Doc. 1 ¶¶ 34-35.)  All these individuals are sued in their respective official capacities.  (DNC Doc. 1 ¶¶ 29-34; VL Doc. 1 ¶ 34.)  Voto Latino has also sued Defendant Michael Behrent, the chair of the Watauga County Board of Elections, and Defendants Leta Councill, Eric Eller, Matt Walpole, and Elaine Rothenberg, who are members of the Watauga County Board of Elections, in their respective official capacities.  (VL Doc. 1 ¶ 37.)

Legislative Intervenors are Philip E. Berger, President Pro Tempore of the North Carolina Senate, and Timothy K. Moore, Speaker of the North Carolina House of Representatives.  They have intervened in their respective official capacities.  Party Intervenors are the North Carolina Republican Party, the

Republican National Committee, Brenda M. Eldridge, and Virginia Ann Wasserberg.  Eldridge and Wasserberg are registered Republican voters who "typically vote for Republican candidates, have served as poll observers in the past, and intend to do so in the future.  (DNC Doc. 48 at 3.)

### D.  Procedural Background

Voto Latino Plaintiffs filed their motion for preliminary injunction on November 15, 2023 (VL Doc. 44), to which State Board Defendants and Intervenors responded on December 13, 2023 (VL Docs. 50-54).  In the period between the motion and responses, the parties engaged in limited discovery by mutual agreement, the result of which are filings attached to State Board Defendants' and Intervenors' responses and Voto Latino Plaintiffs' reply brief.  Voto Latino Plaintiffs' motion seeks preliminary injunctive relief solely against the enforcement of the undeliverable mail provision.

In the other case, Party Plaintiffs filed their motion for preliminary injunction on October 10, 2023 (DNC Doc. 6), to which State Board Defendants and Intervenors responded on November 20, 2023 (DNC Docs. 51-53).  Party Plaintiffs replied on December 4, 2023.  (DNC Doc. 58.)  Party Plaintiffs seek preliminary injunctive relief precluding the following:

> (1) requiring same-day registrants (i.e., voters who seek to register and vote on the same day, prior to election day) to produce documentation that other

23

registrants need not produce;

(2) denying a same-day registrant's application to register without providing that individual with sufficient notice and a meaningful opportunity to be heard;

(3) rejecting a same-day registrant's application to register based on the return of a single notice as undeliverable by the U.S. Postal Service;

(4) applying different voting-registration standards, practices, or procedures to different individuals in the same county; and

(5) failing to provide a free-access system by which same-day registrants can track their retrievable ballots.

(DNC Doc. 6.)

Before proceeding, it bears noting what is not presently before the court. As described above, State Board Defendants have not enforced North Carolina's two-card address verification requirement for same-day registrants since the 2018 Bipartisan Board injunction against using challenges under N.C. Gen. Stat. §§ 163-85 et seq. to remove voters from the rolls in violation of the NVRA. At present, Plaintiffs have not brought suit under the NVRA, which requires 90 days' notice before an "aggrieved person may bring a civil action." 52 U.S.C. § 20510(b). At the hearing on the present motions, Party Plaintiffs represented that they have given notice to State Board Defendants of their intent to sue and that the 90-day notice period will expire sometime this month. (DNC Doc. 62 at 78 ("Nowhere near 90 days has gone past. We didn't

24

think when we filed our preliminary injunction motion asking that the Court rule by January, which will be 90 days, that there would be time to get effective relief under the NVRA.").)

The parties have studiously avoided any argument as to whether the undeliverable mail provision of S. 747 complies with the NVRA and/or the Bipartisan Board injunction. Despite figuring prominently in the history of SDR, the injunction is raised only in passing in the briefs. (VL Doc. 59 at 22 n. 6; VL Doc. 54 at 6; DNC Doc. 53 at 6-7.) Though during the hearing the court probed the parties about the effect, if any, of the Bipartisan Board injunction and the NVRA on Plaintiffs' requested relief, the parties demurred (DNC Doc. 61 at 78:9-18 (Party Plaintiffs expressing that "we have not yet looked at this issue"); id. at 35:11-12 (Voto Latino Plaintiffs expressing view that "it is certainly possible that the law does violate the injunction . . . and the NVRA"); id. at 43:11-22 (State Board Defendants expressing that they "haven't completely looked at whether the new law as a whole" violates Bipartisan Board but expressing belief that challenge procedures would); id. at 77:4-11 (Legislative Intervenors expressing belief that Bipartisan Board is "distinguishable")), such that it is assuredly not raised before the court at this time. Thus, the court expresses no opinion on the effect, if any, of the injunction or the NVRA, and turns to consideration of the statutory and constitutional claims actually

25

raised.

## II. ANALYSIS

### A. Standing

Legislative Intervenors and Party Intervenors challenge the Article III standing of all Voto Latino Plaintiffs. (VL Doc. 51 at 4-7; VL Doc. 52 at 15-16.) Plaintiff Mead contends that she has standing as an individual, Plaintiff Voto Latino contends that it has standing in its own right as an organization, and Plaintiffs Task Force and Down Home NC contend that they satisfy either standing in their own right or representational standing. (VL Doc. 45 at 16-17.) Intervenors argue that the organizational Voto Latino Plaintiffs' claims are generalized grievances and that the organizations have not demonstrated that a diversion of resources "has yet to occur," and that they "may never occur." (VL Doc. 51 at 7, Doc. 52 at 15, Doc. 60 at 2-3.) Moreover, Legislative Intervenors maintain that Plaintiff Mead's injury is speculative because it involves "some *potential* SDR issue in a *future* election where she *might* utilize SDR." (VL Doc. 52 at 16 (emphasis in original).)

Legislative Intervenors also challenge the Article III standing of Party Plaintiffs. (DNC Doc. 52 at 7-8.) Party Plaintiffs argue that they have standing in their own right and representational standing. (DNC Doc. 58 at 14 n.5.) Legislative Intervenors argue that Party Plaintiffs "utterly failed to allege

26

that any of the same-day registration provisions challenged in S.B. 747 create[s] specific harm to their organizations or Democratic voters," such that the claims are speculative, generalized grievances.  (DNC Doc. 52 at 8.)

"No lawsuit may proceed in federal court unless the party seeking relief has Article III standing."  Carolina Youth Action Project v. Wilson, 60 F.4th 770, 778 (4th Cir. 2023).  The basic standing requirements are that a plaintiff must show: (1) he has suffered an "injury in fact," (2) the injury is "fairly . . . trace[able] to the challenged action of the defendant," and (3) it is "likely" that "the injury will be redressed by a favorable decision."  Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992) (citations and internal quotation marks omitted) (alteration and omission in original).  In multi-plaintiff cases, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint."  Town of Chester v. Laroe Estates, Inc., 137 S. Ct. 1645, 1651 (2017).  If there is one such plaintiff, the court need not consider whether other plaintiffs have standing to seek that same form of relief.  Carolina Youth Action, 60 F.4th at 778.

The injury in fact "requirement ensures that plaintiffs have a 'personal stake in the outcome of the controversy.'"  Kenny v. Wilson, 885 F.3d 280, 287 (4th Cir. 2018) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)).  An injury in fact is "'an invasion of a legally protected interest' that is 'concrete and

27

particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, Inc. v. Robins, 578 U.S. 330, 339 (2016) (quoting Lujan, 504 U.S. at 560). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (citation and internal quotation marks omitted). When plaintiffs seek prospective relief, they must establish an ongoing or imminent injury in fact. O'Shea v. Littleton, 414 U.S. 488, 495–96 (1974).

An organizational plaintiff can satisfy the standing requirements in two ways: either injury in its own right, or injury as a representative of its members. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181, 199 (2023). To have standing in its own right, the organization may show that an alleged illegal action "perceptibly impair[s]" its ability to carry out its mission, including by draining the organization's resources. Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982). An organization does not have standing, however, where injury results "not from any actions taken by [the defendant], but rather from the [organization's] own budgetary choices," such as "educating members, responding to member inquiries, or undertaking litigation in response to legislation." Lane v. Holder, 703 F.3d 668, 674–75 (4th Cir. 2012) (internal quotation marks and citation omitted) (finding lack of standing

28

where resource drain resulted from "inquiries [from members] into the operation and consequences of interstate handgun transfer provisions").

Some voter advocacy groups in this district have established standing on their own behalf under Havens Realty and Lane where they allege a link between their mission and the alleged illegal act, as well as resource expenditures beyond merely educating voters and responding to inquiries. Democracy N.C. v. N.C. State Bd. of Elections, 476 F. Supp. 3d 158, 182-83 (M.D.N.C. 2020) (finding standing where organization would divert resources to assist voters with registering to vote before 25-day deadline); Action NC v. Strach, 216 F. Supp. 3d 597, 617-18 (M.D.N.C. 2016) (finding standing where organization would divert limited time and resources to assist voters with registration after DMV allegedly failed to transmit voter registration information to NCSBE); N.C. State Conf. of the NAACP v. N.C. State Bd. of Elections, 283 F. Supp. 3d 393, 402-03 (M.D.N.C. 2017) (finding standing where organization would divert resources to combat "en masse voter challenges"). Moreover, a political party may have standing in its own right where a law "threatens and inhibits" the party's efforts to register eligible voters and requires diverting resources to cure ballot defects. Democratic Party of Va. v. Brink, 599 F. Supp. 3d 346, 355 (E.D. Va. 2022) (citing Crawford v. Marion Cnty. Election Bd., 472 F.3d 949, 951 (7th Cir. 2007)

29

(Posner, J.), aff'd, 553 U.S. 181 (2008)).

To represent its members, rather than have injury in its own right, the organization must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Students for Fair Admissions, 600 U.S. at 199 (quoting Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977)).

Standing is not "dispensed in gross"; instead, the court must consider standing with respect to the requested relief. Town of Chester, 581 U.S. at 439. The court will first consider Plaintiffs' request to enjoin the enforcement of the undeliverable mail provision — i.e., relief that all Plaintiffs join in seeking. It will then turn to Party Plaintiffs' other requested relief.

Plaintiff Voto Latino alleges that its mission is "engag[ing], empower[ing], and educat[ing] its core constituency of Latinx communities throughout the country to ensure that they are enfranchised and included in the democratic process." (VL Doc. 1 ¶ 17.) Voto Latino anticipates spending approximately $1 million during the 2024 election cycle in North Carolina, including on registering new voters through same-day registration. (Id. ¶ 18.) It contends that its mission will be frustrated because it

30

will divert resources ordinarily spent on issue advocacy toward encouraging eligible voters to register prior to early voting to avoid the risk of failing address verification. (Id. ¶ 19.) Further, Voto Latino contends that it will spend more resources (1) reaching out to voters to encourage them to provide a mailing address where they can receive mail as a second address, (2) registering more voters to account for those who will be erroneously not counted, and (3) contacting voters whose registrations were ultimately denied to get them registered again. (VL Doc. 51-4 at 53:24-55:1.) Moreover, Voto Latino contends that "thousands of eligible voter constituents that Voto Latino plans to assist in 2024" face an "extremely high risk" that they will be disenfranchised because of the undeliverable mail provision. (VL Doc. 1 ¶ 21.)

Plaintiff Voto Latino's allegations are sufficient to establish standing in its own right at this stage. As alleged, erroneous disenfranchisement of SDR voters would hinder Voto Latino's mission of registering eligible voters and engaging in voter advocacy. See League of Women Voters of S.C. v. Andino, 497 F. Supp. 3d 59, 75-76 (D.S.C. 2020) (finding organizational standing where state removed notice-and-cure procedure for absentee ballots and thus impaired the organization's mission to register voters). Moreover, Voto Latino sufficiently alleges resource expenditures required to address the change in law with

31

prospective same-day registrants. See Democracy N.C., 476 F. Supp. 3d at 182 (finding organizational standing where an organization would have to divert resources to warn voters about the risks of absentee voting and where efforts spent encouraging voter participation would be obviated by inadvertent disenfranchisement). The court further finds that Voto Latino's alleged injury is traceable to the undeliverable mail provision and would be redressable by the requested relief. Lujan, 504 U.S. at 560-61. As a result, Voto Latino has standing as an organization.

Because Plaintiff Voto Latino has standing to pursue this relief, the court need not determine the standing of the other Voto Latino Plaintiffs. Carolina Youth Action, 60 F.4th at 778. Nevertheless, it is likely that Down Home NC would have representational standing as well. Down Home NC has identified at least one member who would have standing. Summers v. Earth Island Inst., 555 U.S. 488, 498-99 (2009) (requiring an organization to name affected members, unless all members of the organization are harmed). This individual has allegedly resided in a hotel in Alamance County since a fire destroyed her home. (VL Doc. 60-3 at 67:6-8.) Down Home NC contends that she is unable to stay in the same room to establish residency, (id. at 67:6-10), and that she intends to use same-day registration in 2024, (id. at 76:4). Because a person's right to vote is "individual and personal in

32

nature," Reynolds v. Sims, 377 U.S. 533, 561 (1964), "'voters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage." Gill v. Whitford, 138 S. Ct. 1916, 1920 (2018) (quoting Baker v. Carr, 369 U.S. 186, 206 (1962)). This individual identified by Down Home NC would have standing, as she faces a concrete and imminent risk of harm because she is unlikely to have a stable address where she can receive mail at least by early voting in February 2024. See Lujan, 504 U.S. at 564 (finding no standing upon mere "some day" intentions without "any description" of concrete plans); N.C. State Conf. of the NAACP, 283 F. Supp. 3d at 404 (finding standing where individual faced "real and imminent risk" of being unlawfully removed from voter rolls by "systematic, *en masse*" voter challenges). This individual thus has a concrete risk of having her vote not counted after she same-day registers. Moreover, the interests Down Home NC seeks to protect are germane to its stated purpose of "ensur[ing] that working-class North Carolinians . . . have access to the franchise." (VL Doc. 44-3 ¶ 5.) Finally, this individual's participation is not required in this lawsuit. Students for Fair Admissions, 600 U.S. at 199 (quoting Hunt, 432 U.S. at 343)). Accordingly, Down Home NC has satisfied the requirements of representational standing. Id.

In the other lawsuit, North Carolina Democratic Party's mission is to "elect Democratic candidates to public office

33

throughout North Carolina." (DNC Doc. 1 ¶ 25.) The Democratic National Committee's organizational purpose is to "communicate the Democratic Party's position and messages on issues; protect the legal rights of voters; and aid and encourage the election of Democratic candidates at the national, state, and local levels, including by persuading and organizing citizens not only to register to vote as Democrats, but also to cast their votes for Democratic candidates." (Id. ¶ 23.) Party Plaintiffs contend that it is "exceedingly likely" that one or more of the 2.4 million registered Democratic Party members in North Carolina will be removed from the voting rolls. (DNC Doc. 1 ¶ 26.) Of note, however, Party Plaintiffs do not name any specific members. Party Plaintiffs also contend they are harmed as organizations because the law will "require each organization to expend and divert funds and resources that they would otherwise spend on voter outreach and mobilization efforts . . . in order to ensure that those voters are not erroneously prevented from voting." (Id. ¶ 27.) Moreover, they allege that the "likely erroneous denial of Democratic voters' right to cast a ballot and have it counted . . . undermin[es] the two organizations' abilities to succeed in getting Democrats elected." (Id.) Party Plaintiffs represented that 880 of the 2,000 voters who required a second address verification card in 2020 were registered Democrats. (DNC Doc. 62 at 13:11-12.)

For much of the same reasons as for Plaintiff Voto Latino,

34

Party Plaintiffs have standing on their own behalf to seek relief as to the undeliverable mail provision because they have adequately alleged a frustration of their mission of registering voters and a diversion of resources as a result of the undeliverable mail provision. See Brink, 599 F. Supp. 3d at 355; Andino, 49 F. Supp. 3d at 75-76; Democracy N.C., 476 F. Supp. 3d at 182.

Party Plaintiffs seek additional relief that Voto Latino does not. This includes "requiring same-day registrants . . . to produce documentation that other registrants need not produce; [] denying a same-day registrant's application to register without providing that individual with sufficient notice and a meaningful opportunity to be heard; [] applying different voting-registration standards, practices, or procedures to different individuals in the same county; and [] failing to provide a free-access system by which same-day registrants can track their retrievable ballots." (DNC Doc. 6.) The parties have not made any particularized arguments as to Party Plaintiffs' Article III standing for these forms of relief. The court nevertheless finds at this stage that Party Plaintiffs' standing to seek these forms of relief is no different than it is for the undeliverable mail provision, as each would redress the injuries to the missions and the resource diversions alleged above. The court will address State Board Defendants' and Intervenors' positions on statutory standing under the Civil Rights Act and the Help America Vote Act below.

35

Having found the requisite Article III standing, the court will turn to the merits of the motions.

**B.    Preliminary Injunction Standard**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). Such an injunction "is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017). To demonstrate a likelihood of success on the merits, "[a] plaintiff need not establish a certainty of success, but must make a clear showing that he is likely to succeed at trial." Id.

Party Plaintiffs alone raise two statutory claims that reach S. 747's undeliverable mail provision as well as other provisions of state election law. Before the court "can address the constitutional arguments," it must "attempt to resolve" the motions "on non-constitutional grounds first, if possible." Nat'l Lab. Rels. Bd. v. Enter. Leasing Co. Se., LLC, 722 F.3d 609, 613 (4th Cir. 2013); Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 347 (1936) (Brandeis, J., concurring). The court thus turns to these statutory claims first.

36

## C. Civil Rights Act

Party Plaintiffs alone argue that S. 747 violates the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(A), by applying different registration standards, practices, or procedures to different groups of individuals in the same county. (DNC Doc. 7 at 21.) Party Plaintiffs contend that S. 747 treats SDR and non-SDR voters disparately by requiring SDR voters to provide documentary proof of residency; by providing SDR voters only one mail card for address verification, instead of two; and by not providing notice and opportunity to be heard to SDR voters who are found ineligible to vote by the State Board. (Id. at 22-23.) Party Plaintiffs seek an order enjoining these differences in treatment. (DNC Doc. 6.)

In response, State Board Defendants argue that the CRA is only enforceable through 42 U.S.C. § 1983 and that Party Plaintiffs must, but did not, bring their CRA claim pursuant to that statute. (DNC Doc. 53 at 15.) Intervenors contend that Party Plaintiffs are unlikely to show that they have a private right of action to enforce their claims under 52 U.S.C. § 10101. (DNC Doc. 52 at 8-9; DNC Doc. 51 at 12-13.) Moreover, State Board Defendants and Intervenors contend that SDR and non-SDR are "inherently different" types of registration and thus require different procedures for each. (Id.; DNC Doc. 51 at 13-14 ("[T]his is not a case where different standards are applied to individuals based

37

on race, age, gender, neighborhood of residence, profession, etc."); DNC Doc. 52 at 10.)  They argue, in addition, that Party Plaintiffs' interpretation of the CRA would put in jeopardy all requirements which apply to a set of voters, including differences between procedures for vote-by-mail and in-person voting.  (DNC Doc. 53 at 16; DNC Doc. 52 at 10; DNC Doc. 51 at 14-16.)

Whether the CRA creates a private right of action is a question of "statutory standing."  CGM, LLC v. BellSouth Telecommc'ns, Inc., 664 F.3d 46, 51-52 (4th Cir. 2011).  Statutory standing "applies only to legislatively-created causes of action" and concerns "whether a statute creating a private right of action authorizes a particular plaintiff to avail herself of that right of action."  Id. (internal quotation marks omitted).

Courts have disagreed as to whether the CRA provides a private right of action.  McKay v. Thompson, 226 F.3d 752, 756 (6th Cir. 2000) (no private right of action, but decided before Gonzaga Univ. v. Doe, 536 U.S. 273 (2002)); Schwier v. Cox, 340 F.3d 1284, 1297 (11th Cir. 2003) (private right of action); Vote.org v. Callanen, 89 F.4th 459, 474-78 (5th Cir. 2023) (private right of action). The Fourth Circuit has assumed without deciding that a private right of action existed.  Washington v. Finlay, 664 F.2d 913, 926 (4th Cir. 1981).  And the Third Circuit reversed a district court that had found no private right of action, but the Supreme Court subsequently vacated the decision and ordered that the case be

38

dismissed as moot.  Migliori v. Cohen, 36 F.4th 153 (3d Cir. 2022), cert. granted, judgment vacated sub nom. Ritter v. Migliori, 143 S. Ct. 297 (2022).

This statutory standing question would be properly considered on a motion to dismiss for failure to state a claim upon which relief can be granted.  CGM, LLC, 664 F.3d at 51-52.  Unlike a jurisdictional question that the court must answer, the statutory standing question here may be avoided where there are alternative grounds upon which to resolve the motion.  Willner v. Dimon, 849 F.3d 93, 102 n.1 (4th Cir. 2017) (avoiding alternative bases to dismiss "in view of the resolution of th[e] case on other bases").  Such alternative grounds exist here to find that Party Plaintiffs are unlikely to succeed on the merits.[23]

The CRA states in part:

> No person acting under color of law shall . . . in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar subdivision who have been found by State officials to be qualified to vote[.]

52 U.S.C. § 10101(a)(2)(A) (previously codified as 42 U.S.C. § 1971).  In Rokita, the plaintiffs argued that the photo ID requirement violated the CRA because all voters, namely absentee

---

[23] For similar reasons, the court need not address Party Plaintiffs' lack of citation to 42 U.S.C. § 1983, as raised by State Board Defendants. (DNC Doc. 53 at 15.)

voters, did not need to present a photo ID. Ind. Democratic Party
v. Rokita, 458 F. Supp. 2d 775, 839 (S.D. Ind. 2006), aff'd sub
nom. Crawford v. Marion Cnty. Election Bd., 472 F.3d 949 (7th Cir.
2007) (Posner. J.), aff'd, 553 U.S. 181 (2008). The court rejected
the plaintiffs' argument, in part, because the CRA is not intended
to prevent states from providing different procedures for
different methods of voting. Id. at 839-40. The court reasoned
that because "absentee voting is an *inherently* different procedure
from voting in person," the State must apply different "standards,
practices, or procedures" to these two groups of voters. Id. at
840 (emphasis in original). The court further observed that
prohibiting such differences would be a "radical departure from
settled law." Id.

Here, Party Plaintiffs cite no case in support of their
construction and no persuasive limiting principle that would avoid
the unintended consequences identified in Rokita and by State Board
Defendants and Intervenors. Party Plaintiffs urge that the CRA
under their theory would only stop differential treatment "in
determining whether any individual is qualified under State law or
laws to vote," rather than different methods of registration or
voting. (DNC Doc. 58 at 12 (quoting § 10101(a)(2)(A).) Even if
this were a meaningful distinction, Party Plaintiffs have not shown
that the CRA nevertheless undercuts North Carolina's ability to
employ different procedures for determining one's qualifications

to vote depending on how one registers, without due regard to the practical reality that offering various methods of registration — many of which may be <u>less</u> burdensome on voters — may require different procedures.

Moreover, Party Plaintiffs have not established a likelihood of success in demonstrating that a court may properly consider SDR registrants as a class under the CRA when comparing standards, practices, and procedures applied between "any individual" and "other individuals." <u>See</u> 52 U.S.C. § 10101(a)(2)(A). While the parties have not argued, and this court thus does not hold, that the CRA applies only to certain protected classes, Party Plaintiffs have not fairly raised any allegation of discrimination against a protected class, stating only in a footnote that "[h]olding same-day registrants to a higher standard is [] likely to disproportionately disenfranchise African American voters." (<u>DNC</u> Doc. 7 at 23 n.8; <u>see also</u> <u>DNC</u> Doc. 52 at 10 n.8 (demonstrating Legislative Intervenors' intent to move to dismiss CRA claim for failure to allege or prove race discrimination).) Party Plaintiffs' lack of authority raises considerable doubt as to their likelihood of success in showing that the CRA protects SDR voters. Consequently, the court will deny Party Plaintiffs' motion for injunctive relief under the CRA.

### D. Help America Vote Act

Party Plaintiffs argue, pursuant to the Help America Vote

41

Act, 52 U.S.C. § 21082(a)(5), that S. 747 does not provide an individual who casts a provisional ballot with a "free access system" to track if a provisional ballot is counted and "written information" about a tracking system. (DNC Doc. 7 at 24.) Party Plaintiffs contend that the retrievable ballot under S. 747 is a "provisional ballot" under HAVA. (Id.) They thus seek an order requiring that State Board Defendants "provide a free-access system by which same-day registrants can track their retrievable ballots." (DNC Doc. 6.)

In response, State Board Defendants argue that HAVA is only enforceable through 42 U.S.C. § 1983 and that that Party Plaintiffs must, but did not, bring their HAVA claim pursuant to that statute. (DNC Doc. 53 at 17.) Legislative Intervenors contend that Party Plaintiffs are unlikely to show that they have a private right of action to enforce their claims under 52 U.S.C. § 21082. (DNC Doc. 52 at 8-9.) Moreover, State Board Defendants and Intervenors argue that a retrievable ballot under S. 747 is not a provisional ballot that triggers HAVA's requirements, and that North Carolina is otherwise in compliance with HAVA. (DNC Doc. 53 at 18-20; DNC Doc. 52 at 9; DNC Doc. 51 at 10-11.)

As with the CRA, courts have disagreed as to whether HAVA provides a private right of action. Am. Civil Rights Union v. Phila. City Comm'rs, 872 F.3d 175, 181 (3d Cir. 2017) ("HAVA does not include a private right of action that allows aggrieved parties

42

to sue nonconforming states."); <u>Crowley v. Nevada ex rel. Nev.</u>
<u>Sec'y of State</u>, 678 F.3d 730, 735 (9th Cir. 2012) (recognizing
there is no private right of action under the HAVA, and foreclosing
a section 1983 suit)); <u>Colon-Marrero v. Velez</u>, 813 F.3d 1, 22 (1st
Cir. 2016) (permitting private right of action through section
1983); <u>Sandusky Cnty. Democratic Party v. Blackwell</u>, 387 F.3d 565,
572 (6th Cir. 2004) (same). For the same reasons stated above for
the CRA, the court need not address this statutory standing
question because Party Plaintiffs' HAVA claim can be resolved on
alternative grounds. See <u>CGM, LLC</u>, 664 F.3d at 51-52; <u>Willner</u>,
849 F.3d at 102 n.1 (avoiding alternative bases to dismiss "in
view of the resolution of th[e] case on other bases").[24]

    In relevant part, HAVA provides:

    The appropriate State or local election official shall
    establish a free access system (such as a toll-free
    telephone number or an Internet website) that any
    individual who casts a provisional ballot may access to
    discover whether the vote of that individual was
    counted, and, if the vote was not counted, the reason
    that the vote was not counted.

52 U.S.C. § 21082(a)(5)(B). HAVA also provides that when an
individual casts a provisional ballot, the "election official
shall give the individual written information" about the tracking
system. <u>Id.</u> § 21082(a)(5)(A). The provisions Party Plaintiffs

---

[24] Similarly, the court need not address State Board Defendants' argument
regarding Party Plaintiffs' lack of citation to 42 U.S.C. § 1983. (<u>DNC</u>
Doc. 53 at 17.)

43

rely upon apply to an individual who "declares" that he is a "registered voter" but whose name does not appear on the official list of eligible voters.  52 U.S.C. § 21082(a).

In North Carolina, a "'[p]rovisional official ballot' means an official ballot that is voted and then placed in an envelope that contains an affidavit signed by the voter certifying identity and eligibility to vote."  N.C. Gen. Stat. § 163-165(6).  By contrast, a retrievable ballot is one that a voter "shall cast . . . and then shall deposit [] in the ballot box or voting system in the same manner as if such box or system was in use in a precinct on election day."  N.C. Gen. Stat. § 166.45 (as amended by section 27.(c) and recodified by section 1.(b) of 2023 N.C. Sess. Laws 140).  According to NCSBE Numbered Memo 2023-04, a same-day registrant who does not have a HAVA document — i.e., one who does not complete an SDR registration — may vote a provisional ballot instead of a retrievable ballot.  NCSBE Numbered Memo 2023-04, at 9 (Oct. 12, 2023), https://s3.amazonaws.com/dl.ncsbe.gov/sboe/numbermemo/2023/Numbered%20Memo%202023-04%20Provisional%20Ballots%20and%20Canvass%20Procedures.pdf (last accessed Jan. 2, 2023).

Here, Party Plaintiffs have not demonstrated that they are likely to succeed in showing that this provision applies to SDR voters.  In their reply, Party Plaintiffs argue that SDR voters are provisional voters because they "declare they are registered

44

upon turning in a completed registration form" and "will not immediately appear on the list of eligible voters." (DNC Doc. 58 at 12.) While that may be one technical, if not strained, similarity between provisional voters and SDR voters, North Carolina law otherwise treats these voters differently. See, e.g., N.C. Gen. Stat. § 166.45 (requiring retrievable ballots be placed in ballot box); NCSBE Numbered Memo 2023-04, supra (outlining procedures applicable to provisional ballots to determine eligibility and to count the ballot). Moreover, Party Plaintiffs do not argue that North Carolina is otherwise out of compliance with HAVA. As a consequence, Party Plaintiffs' motion for preliminary injunction pursuant to HAVA will be denied.

### E. Fourteenth Amendment Claims

#### 1. Due Process and Anderson-Burdick

All Plaintiffs challenge portions of section 10.(a) of S. 747 (codified as N.C. Gen. Stat. § 163-82.6B) on procedural due process grounds. The parties dispute which test should apply. Plaintiffs argue that the court should apply the test set out in Mathews v. Eldridge, 424 U.S. 319 (1976). (DNC Doc. 7 at 15; VL Doc. 45 at 19.) They argue, alternatively, that even if the court were to apply the test provided by Anderson v. Celebrezze, 460 U.S. 780 (1983) and Burdick v. Takushi, 504 U.S. 428 (1992), commonly called "Anderson-Burdick," they should prevail anyway. (DNC Doc. 58 at 5-6; VL Doc. 59 at 24-29.)

To prevail on a claim for a procedural due process deprivation under Eldridge, a plaintiff must demonstrate: "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate." Accident, Injury & Rehab., PC v. Azar, 943 F.3d 195, 203 (4th Cir. 2019) (internal quotation marks omitted). "To assess the constitutional adequacy of an opportunity to be heard, courts consider (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of that interest given the procedures used, as well as the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest," id., "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail," Eldridge, 424 U.S. at 335.

State Board Defendants concede that if Eldridge were the proper test, the undeliverable mail provision would be unconstitutional. (DNC Doc. 53 at 10-11; VL Doc. 54 at 9-10.) They, along with Intervenors, contend, however, that the Anderson-Burdick test is the proper framework for analyzing the law. (DNC Doc. 53 at 11; VL Doc. 54 at 10; VL Doc. 52 at 16 n. 12; VL Doc. 51 at 9-10.) Under this test, regulations that impose a severe burden on the right to vote must be "narrowly drawn to advance a state interest of compelling importance." Burdick, 504 U.S. at

434 (quoting <u>Norman v. Reed</u>, 502 U.S. 279, 289 (1992)).  Non-severe burdens, by contrast, are subject to <u>Anderson</u>–<u>Burdick</u>'s more flexible balancing standard, under which this court must

> weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

<u>Id.</u> (quoting <u>Anderson</u>, 460 U.S. at 789).  Within <u>Anderson</u>–<u>Burdick</u>'s balancing standard, the "rigorousness of [the court's] inquiry into the propriety of a state election law depends" upon the severity the burden imposed.  <u>Id.</u>  Accordingly, <u>Anderson</u>–<u>Burdick</u> balancing operates on a sliding scale: the greater the burden imposed, the more important a state's justification must be.  <u>Id.</u>

Voto Latino contends that applying <u>Anderson</u>-<u>Burdick</u> to this case would improperly extend a test fashioned for equal protection claims to procedural due process claims.  (<u>VL</u> Doc. 59 at 19.)  To be sure, <u>Anderson</u> was an equal protection-based right-to-vote case.  460 U.S. at 783, 786 n.7 (reviewing finding of equal protection violation and relying on cases that apply the "'fundamental rights' strand of equal protection analysis").  <u>Crawford v. Marion County Election Board</u>, 553 U.S. 181 (2008), too, which involved a challenge to Indiana's photo ID requirement, was an equal protection challenge, at least at the district court

47

level.  See Rokita, 458 F. Supp. 2d at 830-31.  While the Supreme
Court has never formally foreclosed the application of Eldridge in
the voting rights context, its cases have not cabined the Anderson-
Burdick analysis to equal protection rights under the Fourteenth
Amendment.  See, e.g., Burdick, 504 U.S. 428 (repeatedly referring
to rights under the "First and Fourteenth Amendments"); Crawford,
553 U.S. at 204 (Scalia, J., concurring) ("To evaluate a law
respecting the right to vote — whether it governs voter
qualifications, candidate selection, or the voting process — we
use the approach set out in Burdick v. Takushi[.]" (emphasis
added)); see also McIntyre v. Ohio Elections Comm'n, 514 U.S. 334,
345 (1995) (not applying Anderson-Burdick where the statute at
issue "[did] not control the mechanics of the electoral process").
Indeed, circuit courts have applied Anderson-Burdick to cases
across the election litigation spectrum.  See, e.g., Fusaro v.
Howard, 19 F.4th 357, 364 (4th Cir. 2021) (applying Anderson-
Burdick to Free Speech Clause claim where resident sought access
to list of registered voters); Weber v. Shelley, 347 F.3d 1101,
1105-07 (9th Cir. 2003) (analyzing a due process challenge to a
county's use of touch screen voting systems under the Anderson-
Burdick framework); Obama for Am. v. Husted, 697 F.3d 423, 430
(6th Cir. 2012) (concluding that Anderson-Burdick serves as "a
single standard for evaluating challenges to voting
restrictions"); Acevedo v. Cook Cnty. Officers Electoral Bd., 925

48

F.3d 944, 948 (7th Cir. 2019) (concluding that Anderson-Burdick applies "to all First and Fourteenth Amendment challenges to state election laws").

The right to vote is fundamental. See, e.g., Burdick, 504 U.S. at 433. "Other rights, even the most basic, are illusory if the right to vote is undermined." Wesberry v. Sanders, 376 U.S. 1, 17 (1964). The Constitution delegates to the states the manner of conducting elections, U.S. Const. art. I, § 4, cl. 1, and the Supreme Court has recognized that "[t]here must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." Storer v. Brown, 415 U.S. 724, 730 (1974). Acknowledging the importance of both sides of this balance, three circuit courts have recently stated that Anderson-Burdick is the proper framework even where a plaintiff in a voting rights case alleges a procedural due process violation under Eldridge. Richardson v. Tex. Sec'y of State, 978 F.3d 220, 233 (5th Cir. 2020) (on motion to stay preliminary injunction); Ariz. Democratic Party v. Hobbs, 18 F.4th 1179, 1195 (9th Cir. 2021) (on review of entry of preliminary injunction); New Ga. Project v. Raffensperger, 976 F.3d 1278, 1282 (11th Cir. 2020) (on motion to stay preliminary injunction). Moreover, the Ninth and Eleventh Circuits have suggested that Anderson-Burdick may "conceptually duplicat[e]" Eldridge to some extent. Raffensperger, 976 F.3d at

49

1282; _Hobbs_, 18 F.4th at 1195 ("To the extent that
the _Eldridge_ test would strike a different balance, we do not think
that the Supreme Court's extensive jurisprudence on challenges to
voting restrictions may be discarded merely by raising the same
challenge under the banner of procedural due process."); _see also_
_Rivera-Powell v. N.Y.C. Bd. of Elections_, 470 F.3d 458, 468-69 (2d
Cir. 2006) (Sotomayor, J.) (denying _Anderson_-_Burdick_ claim after
finding that state had provided adequate notice and opportunity to
be heard under Due Process Clause). _But see_ _Richardson_, 978 F.3d
at 235 (suggesting that _Eldridge_ would "inevitably result in
courts' 'weigh[ing] the pros and cons of various balloting
systems,' thereby 't[ying] the hands of States seeking to assure
that elections are operated equitably and efficiently'" (internal
citations omitted)).

The court finds the reasoning of these cases as to the
application of _Anderson-Burdick_ persuasive. _See also_ _Democratic_
_Nat'l Comm. v. Wisconsin State Legislature_, 141 S. Ct. 28 (Mem)
(2020) (Gorsuch, J., concurring) (expressing skepticism in
judicial intervention in election regulations because
"[l]egislatures enjoy far greater resources for research and
factfinding . . . than usually can be mustered in litigation
between discrete parties before a single judge"); _Crawford_, 553
U.S. at 210 (Souter, J., dissenting) (endorsing _Anderson_-_Burdick_
for its consideration of "the legitimacy of interests" in voting

50

rights and in election regulation).

To the extent district courts in this circuit have applied Eldridge in the election regulation context, this court is cognizant that some of those district courts did not benefit from the development of the circuit guidance that this court now enjoys, and those decisions were also at a preliminary stage. See Democracy N.C., 476 F. Supp. 3d at 226 (applying Eldridge to preliminarily enjoin absentee voting regulation and refraining from applying Anderson-Burdick); Andino, 497 F. Supp. 3d at 76–77 (applying both Eldridge and Anderson-Burdick on preliminary injunction); Brink, 599 F. Supp. 3d at 361 (applying Anderson-Burdick on preliminary injunction and rejecting application of Eldridge after analyzing Richardson, Raffensperger, and Hobbs).

Voto Latino Plaintiffs rely on three Fourth Circuit cases to support its argument for applying Eldridge, (VL Doc. 59 at 18), but none is on point. Barefoot v. City of Wilmington, 306 F.3d 113 (4th Cir. 2002), involved a land annexation dispute, not an election regulation. Id. at 124 ("Appellants do not have the right to vote on annexation."). The Fourth Circuit's observation that the Due Process Clause "requires fair and adequate procedures" for voting was set out in a footnote and was in reference to voting on annexation, not political elections. Id. at 124 n.5. In any event, the court did not discuss the appropriate test to apply. Id. Voto Latino Plaintiffs' other cases fare no better, as Kirk

51

v. Comm'r of Soc. Sec. Admin., 987 F.3d 314 (4th Cir. 2021), was an Eldridge case regarding the Social Security Administration's redetermination procedures for benefits, and Halcomb v. Ravenell, 992 F.3d 316 (4th Cir. 2021), was an Eldridge challenge to the procedural protections applicable to a prisoner's security detention hearing. Neither was an election case.

Consequently, the court will apply Anderson-Burdick to Plaintiffs' due process claims.[25]

### 2. Undeliverable Mail Provision

#### a. Likelihood of Success on the Merits

First, the court considers Plaintiffs' challenge to the undeliverable mail provision. Voto Latino Plaintiffs contend that a single address verification card is "inherently error-prone and not a reliable indicator of non-residency or ineligibility." (VL Doc. 45 at 20.) In particular, Voto Latino Plaintiffs note that errors beyond the fault of the voter, namely poll worker and U.S. Postal Service error, will result in erroneous disenfranchisement. (Id. at 21-26.) Voto Latino Plaintiffs also note that voters who move after casting a same-day ballot may risk erroneous disenfranchisement because that voter is entitled under § 163-55(a) to vote at a prior residence if relocation occurs within 30

---

[25] Though Anderson-Burdick is the test applied here, for the reasons stated below, the outcome of Plaintiffs' constitutional claims would not differ under Eldridge.

days of an election, but would not be reachable with a non-forwardable address verification card. (Id. at 25.)

Party Plaintiffs similarly argue that the single-card address verification process creates a substantial risk that an eligible SDR voter's ballot will be erroneously not counted. (DNC Doc. 7 at 17.) In particular, they argue that there is no notice or opportunity to be heard before a same-day registrant's ballot is removed from the count because, by definition, the card is not delivered to the voter. (Id. at 17-18.)

State Board Defendants acknowledge that it is a "close question" but maintain that the provision "passes muster" under Anderson-Burdick. (DNC Doc. 53 at 12; VL Doc. 54 at 11.) They argue that the burdens imposed by the undeliverable mail provision should be considered "holistically in light of other means by which voters may register." (DNC Doc. 53 at 13-14; VL Doc. 54 at 12.) The State's interest in the undeliverable mail provision, they argue, is "in ensuring only eligible ballots are counted in an election." (DNC Doc. 53 at 13.)

Legislative Intervenors argue that S. 747's use of a single card on which to preclude a ballot is justified because the limitation on time between SDR and the canvass precludes effective administration of a two-card system. (DNC Doc. 52 at 13.) Moreover, they argue that S. 747 "(1) preserv[es] the integrity of the election process; and (2) instill[s] confidence in the fairness

53

of the election." (DNC Doc. 52 at 17.) In this respect, they contend that the law "ensure[s] that registrant[s] live in the precinct within which they seek to vote." (Id. at 18.) They also argue that North Carolina has a "legitimate interest" in ensuring "that the card is returned before the end of the canvass" and that the undeliverable mail provision is designed to bring SDR voters into parity with other voters. (VL Doc. 52 at 14; VL Doc. 61 at 66:13-15.)

Party Intervenors argue that Plaintiffs have not shown a constitutional injury because, in their view, the alleged error of approximately 1 percent is not by design and thus "carries no constitutional significance." (VL Doc. 51 at 12-13.) Party Intervenors contend that the State's "compelling interest" is in "ensuring verification of each applicant's address, which is fundamental to determining a voter's eligibility," (DNC Doc. 51 at 7-8), and in "discouraging and preventing fraud," (VL Doc. 51 at 11).[26]

---

[26] Plaintiffs have _not_ argued that the undeliverable mail provision burdens voters by erroneously rejecting SDR voters' _registrations_. Voto Latino Plaintiffs seek an order "enjoining enforcement of the portion of § 163-82.6B(d) (the 'Undeliverable Mail Provision')" which provides that if an SDR voter fails address verification with a single card, "the county board shall not register the applicant and shall retrieve the applicant's ballot and remove that ballot's votes from the official count.'" (VL Doc. 44.) Whether "not register[ing] the applicant" creates an unconstitutional burden has not been briefed and is consequently not considered on these motions.

### i. Burden on the Right to Vote

The court must first determine whether Plaintiffs are likely to show that the alleged burdens are severe, minimal, or "in between these two extremes." Obama for Am., 697 F.3d at 429. Election regulations that impose a "severe" burden are subject to strict scrutiny. Pisano v. Strach, 743 F.3d 927, 933 (4th Cir. 2014). Such "severe" burdens are generally "invidiously" discriminatory and may be "irrelevant to the voter's qualifications." Crawford, 553 U.S. at 189 (Stevens, J.) (citing Harper v. Va. Bd. of Elections, 383 U.S. 663, 666-67 (1966)). By contrast, "'evenhanded restrictions that protect the integrity and reliability of the electoral process itself' are not invidious and satisfy the standard set forth in Harper." Id. at 189-90 (quoting Anderson, 460 U.S. at 788 n.9). There is no "litmus test for measuring the severity of a burden that state law imposes on . . . an individual voter, or a discrete class of voters." Id. at 191. The court must consider both the "character and magnitude" of the alleged burden on voting, Burdick, 504 U.S. at 434 (quoting Anderson, 460 U.S. at 789), and then "make the 'hard judgment' that our adversary system demands," Crawford, 553 U.S. at 190 (Stevens, J.). Courts generally evaluate the burden from the perspective of all affected voters, "within the landscape of all opportunities that [the State] provides to vote." Mays v. LaRose, 951 F.3d 775, 784-85 (6th Cir. 2020); see also Crawford, 553 U.S.

55

at 198-99 (Stevens, J.) (reviewing burden on "most voters" where photo ID law applied to in-person voters); Tully v. Okeson, 977 F.3d 608, 617 (7th Cir. 2020) (reviewing burden on voters who could not vote absentee in light of "Indiana's electoral scheme as a whole").

In Northeast Ohio Coalition for the Homeless v. Husted, 696 F.3d 580 (6th Cir. 2012) (per curiam), voters who went to the correct polling location and were sent — in error — to a different location by a poll worker, and consequently voted a provisional ballot that would go uncounted, suffered "systemic disqualification" without any notice. Id. at 593 (stating that Ohio rejected more than 14,000 ballots in 2008, 11,000 in 2010, and 1,800 in 2011). The district court found, and the Sixth Circuit affirmed, that this burden was "substantial" and held that the defendants had likely violated the Equal Protection and Due Process Clauses. Id. at 593-95, 598. In affirming the district court, the Sixth Circuit expressed reservations that "[t]he State would disqualify thousands of [] provisional ballots, where the voter's only mistake was relying on the poll-worker's precinct guidance." Id. at 599; see also Stewart v. Blackwell, 444 F.3d 843, 872 (6th Cir. 2006), superseded by 473 F.3d 692 (6th Cir. 2007)[27] (applying strict scrutiny where evidence showed voters in

---

[27] The Sixth Circuit subsequently granted _en banc_ review, thus vacating

56

counties using punch-card system rather than optical scan equipment were four times as likely not to have their votes counted due to factors out of voter's control).

In Democratic Executive Committee of Florida v. Lee, 915 F.3d 1312 (11th Cir. 2019), challengers argued that Florida's signature match regime for vote-by-mail and provisional ballots violated the First and Fourteenth Amendment. The district court preliminarily ordered the State to provide 48 hours for voters to cure their signature mismatch. Id. at 1315. The defendants moved to stay the injunction, but the Eleventh Circuit denied the request. The court agreed with the district court that Florida lacked "uniform standards for matching signatures" and "qualifications or training for those who engage in the job." Id. at 1319. Observing a "crazy quilt of enforcement," the court noted that errors by election officials and "innocent factors like the writer's body position, writing surface, [and] type of pen" could result in disqualification. Id. at 1320. Even after the State instituted a notice-and-cure process in response to a court order, many voters did not learn that their vote would not be counted "until it was too late to do anything about it." Id. at 1321. Focusing on the burden on vote-by-mail and provisional voters specifically, the

_____

the panel decision, and then vacated the judgment of the district court as moot after the defendants replaced the challenged voting equipment. 473 F.3d at 693-94.

57

court had "no trouble" finding that the burden was "at least []
serious." Id. (citing League of Women Voters of N.C. v. North
Carolina, 769 F.3d 224, 244 (4th Cir. 2014)).[28] Critically, before
the Eleventh Circuit heard an appeal of the injunction on the
merits, the State "significantly amended the signature-match
provisions at issue in th[e] case," after which the plaintiffs
voluntarily dismissed the lawsuit and appellants agreed the appeal
was moot. Democratic Exec. Comm. of Florida v. Nat'l Republican
Senatorial Comm., 950 F.3d 790, 793 (11th Cir. 2020) (per curiam).
The Eleventh Circuit did not vacate the motions panel opinion
because its "preliminary nature" precluded it "from having an
effect outside that case." Id. at 795.

In Andino, 497 F. Supp. 3d 59 (D.S.C. 2020), challengers
argued that South Carolina's signature matching regime violated
voters' procedural due process rights. The court granted the
motion for preliminary injunction in part and denied it in part.
On the one hand, voters who failed to sign the ballot altogether
had no right to notice and cure. Id. at 71 ("[T]he error of a
missing signature is the fault of the voter, not the government."
(citing Hobbs, 976 F.3d at 1086)). The court observed that there
was little risk of error where a signature was missing because a

---

[28] There was an extensive dissent, but its criticisms of the panel opinion
relate to the distinguishable factual record in that case and do not
suggest a different result under the facts of the present case.

58

blank line can be "observed objectively." _Id._ On the other hand, the court found that the burden was "significant" for voters who were disqualified by signature _matching_ — i.e., where election officials compared a provided signature against one on file. _Id._ at 76. In that court's estimation, the burden was significant because voters would be disqualified, without notice, on the basis of a "subjective judgment that the voter's signature does not match some sample relied upon by county election officials." _Id._

State Board Defendants and Intervenors cite one case that could support the proposition that fault-free errors that lead to disenfranchisement without notice and opportunity to be heard create a mere minimal burden.[29] In _Richardson_, 978 F.3d 220 (5th Cir. 2020), challengers won a preliminary injunction in the district court that required Texas to provide notice and an

---

[29] Party Intervenors also cite _Hutchinson v. Miller_, 797 F.2d 1279 (4th Cir. 1986), and several out-of-circuit cases cited in _Hutchinson_, for the proposition that "courts have 'uniformly declined' to find constitutional violations 'with respect to garden variety election irregularities.'" (_VL_ Doc. 51 at 13 (quoting _Hutchinson_, 797 F.2d at 1283).) In _Hutchinson_, three unsuccessful candidates for public office sued under 42 U.S.C. § 1983 and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964, for approximately $9 million in damages based on alleged election irregularities. Party Intervenors' quotation omits a critical phrase, wherein the Fourth Circuit observed that courts have "uniformly declined to endorse action under § 1983 with respect to garden variety election irregularities." _Id._ at 1283 (emphasis added). The court thus held that "federal courts do not sit to award post-election damages to defeated candidates," but observed that courts retain a role in providing equitable relief post-election in "rare and extraordinary circumstances," _id._ at 1287, and in "striking down state laws or rules of general application which improperly restrict or constrict the franchise or otherwise burden the exercise of political rights," _id._ at 1283 (citing _Anderson_, 460 U.S. 780 (1983)) (internal quotation marks omitted).

59

opportunity to be heard before a voter's absentee ballot could be rejected by an election official on the basis of a mismatched signature. The district court found that Texas's signature matching scheme imposed a severe burden on the right to vote because, in part, voters were notified that their absentee ballot was rejected only after the election and thus had no opportunity to contest the decision. Id. at 235-36. In an opinion staying the injunction pending appeal, the court found the burden imposed on voters to be only "minimal." Id. at 238. However, the court stayed the injunction on the alternative ground that the defendant was likely to prevail on her defense of sovereign immunity. Id. at 241. Concurring in the stay, Judge Patrick E. Higginbotham wrote that "this motions panel granting a stay settles no law" and "has no precedential force and is not binding on the merits panel, leaving it as a writing in water — made the more empty by pretermitting the jurisdictional requisites of sovereignty and the reach of Ex parte Young." Id. at 244 (Higginbotham, J., concurring in the stay). Indeed, the merits panel later vacated the preliminary injunction solely on the ground that the district court erred in finding that the defendant was the "proper defendant under Ex parte Young" — not because of the district court's Anderson-Burdick analysis. Richardson v. Flores, 28 F.4th 649, 655 (5th Cir. 2022); see also Andino, 497 F. Supp. 3d at 77 (rejecting Richardson at the preliminary injunction stage as an "outlier"

60

case reflecting an "extremely constricted view of liberty that does not include voting rights").

Though these cases are not binding on this court, one throughline of them is that election regulations that disenfranchise voters based on errors by governmental officials implementing them and over which the voter has no control, and which provide for no notice or opportunity to be heard to correct the error, may warrant closer inquiry under Anderson-Burdick. Put another way, "the precise interests put forward by the State as justifications for the burden imposed by its rule," Burdick, 504 U.S. at 434, must address why discarding an eligible voter's ballot due solely to government employee error and without an opportunity to correct it should be sustained.

Here, Plaintiffs are likely to show that the undeliverable mail provision of S. 747 imposes a substantial burden on SDR voters because it lacks notice and opportunity to be heard before removing the votes of a cast ballot from the count.

Voto Latino Plaintiffs provide several examples of 2022 SDR voters whose address verification cards were returned as undeliverable due to governmental errors wholly out of the control of the voter. For example, Plaintiff Mead's November 2022 address verification card was returned as undeliverable after a county board of elections official allegedly wrote "SAME" for her mailing address instead of writing out the actual address (which happened

61

to be the same as her residential address).  (<u>VL</u> Doc. 44-5 ¶ 7.)



(<u>Id.</u> at 8.)  After the address verification card was returned, another voter challenged Mead's registration under section 163-89 based only on the returned card.  (<u>Id.</u> ¶ 7.)  Ultimately, Mead's ballot was counted after Defendant Bell wrote a letter to the Watauga County Board of Elections ordering them to halt the challenges.  (<u>VL</u> Doc. 44-4 at 9-10.)  Voto Latino Plaintiffs contend, with some merit, that had the current system been in place, Mead's vote likely would not have counted.  (<u>VL</u> Doc. 45 at 22.)

Voto Latino Plaintiffs also point to other poll worker errors that resulted in address verification cards returned as undeliverable in 2022, including another voter whose address was

62

listed as "SAME," voters for whom the county board of elections appears to have written incorrect street numbers (e.g., "199 Wood Circle Dr.," rather than "190 Wood Circle Dr."), cards sent to an old address rather than an address updated at same-day registration, cards with missing apartment numbers, and cards sent to residential addresses rather than to different mailing addresses that were provided. (Id. at 22-23 (citing VL Doc. 44-4 ¶¶ 11-20).)

Voto Latino Plaintiffs also provided a declaration by a postman with forty years of experience that enumerates several reasons why mail may be returned as undeliverable, including faulty barcodes, illegible address information, lack of or damage to a mailbox or receptacle, sorting error, assignment to the wrong carrier for delivery, and temporary absence of the residence, none of which is pertinent to a voter's qualification to vote in the precinct. (VL Doc. 44-7 (Decl. Timothy Green).) Plaintiffs also cite a U.S. Postal Service Office of the Inspector General report from May 2015 that found that 4.3 percent of all mail was undeliverable as addressed, 23 percent of which was due to Postal Service error. (DNC Doc. 7 at 12 (citing Office of Inspector General, U.S. Postal Service, Strategies for Reducing Undeliverable as Addressed Mail, at 5 (May 1, 2015), at https://www.uspsoig.gov/sites/default/files/reports/2023-01/ms-ma-15-006.pdf (last accessed Jan. 3, 2024)); VL Doc. 45 at 24

(same).)  While these figures are nearly a decade old and possibly overstate the case in this context to some extent, they nevertheless are consistent with the limited record provided so far.

In the last four even-year elections, 1,799 out of 100,578; 696 out of 45,666; 2,151 out of 116,326; and 391 out of 34,289 same-day registrants have failed address verification.  NCSBE, Presentation to House Oversight and Reform Committee, supra, at 6. These numbers are based on the State's prior two-card system, however, and the court can reasonably infer that there would not be any fewer failures if State Board Defendants send only one mail card, as required by section 163-82.6B(d).  State Board Defendants and Intervenors, meanwhile, have provided no evidence at this stage that any of the several thousand same-day registrants who have failed address verification since its inception in 2008 was ineligible to vote on the ground of improper residency.  In fact, State Board Defendants represented at oral argument that they have "no way to know" if any voter who fails address verification does so because of ineligibility or because of error.  (VL Doc. 61 at 60:21.)

Plaintiffs are also likely to show that section 163-82.6B(d) deprives same-day registrants of notice and opportunity to be heard before their ballots are rejected through no fault of their own. State Board Defendants and Party Intervenors agree.  (VL Doc. 54

64

at 9-10 ("The State Board Defendants concede that the notice mailing process set forth under the new same-day registration regime does not provide for either of these protections [i.e., notice and opportunity to be heard]."); VL Doc. 51 at 19-20 (Party Intervenors: "To demand notice and a hearing based on postal error in these circumstances would be to expect too much from state officials[.]").) Legislative Intervenors, on the other hand, acknowledged in their brief that the undeliverable mail provision itself does not provide SDR voters with notice. (VL Doc. 52 at 18 ("Plaintiffs make much ado about the fact that voters who fail address verification do not receive notice[.]" (emphasis added).) At oral argument, counsel for Legislative Intervenors suggested, albeit without any legislative history in support, that "everybody assumed that the State Board would treat [the ballots of SDR voters who fail address verification] like the way they had treated one-stop absentee ballots and that 163-89 would continue to apply." (Id. at 108:21-25.)

Section 163-89 outlines a challenge procedure for absentee ballots that includes the right of the challenged voter to be heard. See N.C. Gen. Stat. § 163-89(e). In light of S. 747's reclassification of SDR ballots as "retrievable," rather than "retrievable absentee,"[30] State Board Defendants and Party

---

[30] Section 163-82.6B(c) states that a same-day registrant votes a

65

Plaintiffs disagree with Legislative Intervenors that section 163-89 applies to SDR voters. (VL Doc. 61 at 110:12-15; id. at 111:14-19; see also VL Doc. 55-5 at 6 (NCSBE Numbered Memo 2023-05 (Dec. 8, 2023)) (showing State Board's current understanding, and intent to enforce S. 747 accordingly, that if an SDR voter fails address verification, "[t]he county board shall not issue a challenge").)

Even if section 163-89 applied to SDR voters, however, neither it nor section 163-82.7 appears to require that notice be given to voters before the challenge hearing. N.C. Gen. Stat. § 163-82.7(g)(2) (authorizing challenges for absentee ballots under section 163-89, but not requiring notice); id. § 163-89 (outlining challenge procedure process for absentee ballots, but not requiring notice).

In summary, the express terms of section 163-82.6B(d) do not provide for notice and an opportunity to be heard; instead, they direct the retrieval and removal of a ballot upon failure of address verification. By all accounts, all parties agree — correctly it appears — that section 163-82.6B(d) at a minimum does

"retrievable ballot as provided in G.S. 163-166.45," while prior law considered SDR ballots to be "retrievable absentee ballot[s]," N.C. Gen. Stat. § 163-82.6A(c) (2012). There are at least eight instances where S. 747 replaces the phrase "one-stop absentee voting" with "early voting." Moreover, section 163-166.45 — which is cross-referenced in section 163-82.6B — now governs "Retrievable ballots," instead of its prior heading of "Alternate procedures for requesting application for absentee ballot; 'one stop' voting procedure in board office." See N.C. Gen. Stat. § 163-166.45 (previously codified as N.C. Gen. Stat. § 163-227.5) (emphasis added).

not provide for notice before a ballot of an SDR voter who fails address verification is removed from the count. Moreover, State Board Defendants, i.e., those responsible for the enforcement of the undeliverable mail provision, have represented that they do not intend to offer any notice or opportunity to be heard via 163-89 or any other provision, absent a court order or statutory change. (VL Doc. 61 at 49:5-11 (State Board Defendants stating, "given the way [S. 747] is written and the limitations of it, [] we would need a court order or some sort of legislative change" in order to provide notice and an opportunity to be heard); VL Doc. 55-5 at 6 (NCSBE Numbered Memo 2023-05 (Dec. 8, 2023)) (stating that if an SDR voter fails address verification, the county board must remove the ballot and "not issue a challenge").) Consequently, Plaintiffs have established a likelihood of success in showing that the undeliverable mail provision does not provide for notice and an opportunity to be heard.

Finally, State Board Defendants argue that the burden imposed by the undeliverable mail provision is nevertheless "reasonable" when viewed "holistically in light of the others means by which voters may register." (DNC Doc. 53 at 13-14 (emphasis added).) It is true that voters in North Carolina have various other ways to register before the early voting period and to cast a ballot. Compared to non-SDR voters, SDR voters are subject to additional burdens at registration (e.g., a HAVA-compliant document). But

67

the State, having offered SDR, must offer a process that is not unconstitutional. The undeliverable mail provision burdens SDR voters by directing the removal of a cast ballot without any notice or possibility of cure, not merely by cancelling registration, and the burden demonstrated here would likely be imposed by governmental error unknown to the voter. See Husted, 696 F.3d at 595 (requiring notice and opportunity to be heard where the law required voters to have "omniscience" of poll worker error and "have a greater knowledge of their precinct, precinct ballot, and polling place than poll workers").[31]

Based on recent elections, approximately 100,000 North Carolinians are projected to utilize same-day registration in 2024, starting with the primary. NCSBE, Presentation to House Oversight and Reform Committee, supra, at 6 (showing over 100,000 SDR voters in both 2016 and 2020).[32] Each of these voters' addresses will be tested by S. 747's address verification procedure, and Plaintiffs are likely to show that some number of

_____

[31] Party Intervenors liken an SDR voter's retrieved ballot due to failed address verification to a vote-by-mail ballot that gets lost in the mail, which they contend Plaintiffs view as unproblematic. (VL Doc. 51 at 14.) While the court has no record upon which to compare vote-by-mail to address verification, it is distinguishable at least because North Carolina provides a tracking system for mail ballots. See NCSBE, Ballot Tracking Available Again for Absentee-By-Mail Voters, supra.

[32] Neither State Board Defendants nor Intervenors argue that the presumably reduced number of voters anticipated for the upcoming primary election is a ground to not enter preliminary relief at this time.

first cards will be returned before the canvass deadline as undeliverable due to governmental error, rather than factors related to voter eligibility. By failing to provide voters with notice and opportunity to be heard, section 163-82.6B(d) creates an unacceptable risk that eligible voters' ballots will be erroneously removed and not counted. As shown by <u>Husted</u>, <u>Lee</u>, and <u>Andino</u>, as well as the record evidence before this court, Plaintiffs are therefore likely to succeed in showing that the undeliverable mail provision — because it fails to provide for notice and opportunity to be heard — will impose a substantial burden on SDR voters.[33]

### ii.    Balancing the State's Interests

The court turns next to the justifications for the law put forth by State Board Defendants and Intervenors.

States may prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I, § 4, cl. 1. The Supreme Court has therefore "recognized that States retain the power to regulate their own elections." <u>Burdick</u>, 504 U.S. at 433 (citing <u>Sugarman v. Dougall</u>, 413 U.S.

---

[33] Voto Latino Plaintiffs also point out that an SDR voter could vote and then move elsewhere in North Carolina under section 163-55(a), which permits a voter to vote at a prior residence within 30 days of relocation. (<u>VL</u> Doc. 45 at 25.) They contend that these voters could have their vote removed without any error occurring if they provide the Postal Service a forwarding address. (<u>Id.</u>) The court has no record of the magnitude of this issue and, given the court's ruling, need not consider it further at this stage.

634, 647 (1973); Tashjian v. Republican Party of Conn., 479 U.S. 208, 217 (1986)). "The Constitution provides that state legislatures — not federal judges, not state judges, not state governors, not other state officials — bear primary responsibility for setting election rules." Democratic Nat'l Comm., 141 S. Ct. 28 (Mem.) (Gorsuch, J., concurring). Indeed, to require a state to "halt the ongoing implementation of one of its duly-enacted statutes — a statute that, for now at least, has not been rendered invalid" is "a form of irreparable injury" the court must consider. League of Women Voters of N.C., 769 F.3d at 249 (Motz, J., dissenting) (quoting Maryland v. King, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)).

Under Anderson-Burdick, the court must identify "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiffs' rights." Burdick, 504 U.S. at 434 (internal quotation marks omitted). The "rigorousness" of the inquiry into the State's interests will be informed by the substantial burden imposed by the undeliverable mail provision. Id. (requiring courts to employ a sliding scale approach whereby the greater the burden imposed, the more important the state's justification must be).

State Board Defendants and Intervenors principally assert that the undeliverable mail provision is justified by the need to

preserve the integrity of the election process by ensuring that only eligible ballots are counted and that a registrant lives in the precinct within which he seeks to vote. (DNC Doc. 53 at 13 (State Board Defendants, "ensuring only eligible ballots are counted in an election"); DNC Doc. 52 at 17-18 (Legislative Intervenors, "preserving the integrity of the election process" and "ensure that a registrant lives in the precinct within which they seek to vote"); DNC Doc. 51 at 7-8 (Party Intervenors, "ensuring verification of each applicant's address, which is fundamental to determining a voter's eligibility"); VL Doc. 51 at 11 (Party Intervenors, "discouraging and preventing fraud").) They also assert the need to "level the playing field" between SDR and non-SDR voters, to ensure address verification cards return before the canvass, and to instill confidence in elections. (DNC Doc. 66:13-15; DNC Doc. 53 at 16; VL Doc. 52 at 19.)

North Carolina unquestionably has a legitimate and strong interest in ensuring the integrity of its elections, ensuring that only legitimate ballots are counted, and in preventing voter fraud. Purcell v. Gonzalez, 549 U.S. 1, 4 (2006). As to these interests, State Board Defendants and Intervenors need not present "elaborate, empirical verification of the weightiness of the State's asserted justifications." Timmons v. Twin Cities Area New Party, 520 U.S. 351, 364 (1997). Instead, the State may "respond to potential deficiencies in the electoral process with foresight

71

rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights." Munro v. Socialist Workers Party, 479 U.S. 189, 195-96 (1986). Indeed, the Crawford court found that deterrence of voter fraud was a "neutral and nondiscriminatory reason" to require photo ID, even though the record contained no evidence of actual in-person fraud. Crawford, 553 U.S. at 195-97 (Stevens, J.) (citing Building Confidence in U.S. Elections § 2.5 (Sept. 2005), a report of the Commission on Federal Election Reform, chaired by former President Jimmy Carter and Secretary of State James A. Baker, III); see also id. at 209 (Scalia, J., concurring) ("The universally applicable requirements of Indiana's voter-identification law are eminently reasonable."); cf. Brnovich v. Democratic Nat'l Comm., 141 S. Ct. 2321, 2346, 2348 (2021) (on a Voting Rights Act challenge to a law that imposed a "usual burden[] of voting," "a State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders").

Here, State Board Defendants contend that address verification ensures election integrity by acting as a "fail-safe" to test a voter's residency. (VL Doc. 61 at 45:16; see also id. at 88:25 (Party Intervenors likening address verification to "two-factor authentication").) The court accepts this; address verification may serve to disincentivize a registrant from providing a false address, to identify a registrant who erroneously

provides an improper address, and especially in the case of traditional registration before SDR, which can occur online or by mail and does not require a HAVA document, to deny the registration of someone who might claim to register as someone else. Indeed, that an SDR voter must present a current HAVA document that shows his residence address, along with a photo ID, and attest in-person under penalty of perjury that he is an eligible voter, may explain the 98-to-99 percent rate of confirmation of SDR registrants under the State's prior two-card system. NCSBE, Presentation to House Oversight and Reform Committee, supra, at 6. While these State interests justify the use of address verification generally, the question, however, is whether the undeliverable mail provision for SDR voters meets its justifications as a "fail-safe" as to residency sufficient to exclude a ballot without notice and opportunity to be heard where failure is based on reasons entirely outside the control of the voter.

By Legislative Intervenors' own concession, address verification is not a precise instrument for enforcing the interests they assert.[34] (DNC Doc. 62 at 63:13-24).) That is,

---

[34] To the extent Plaintiffs more broadly criticize the State's address verification process, the court declines to consider that question. Address verification predated the adoption of SDR in North Carolina, 1994 N.C. Sess. Laws, ch. 762, § 2, and appears to be used by other states as a legitimate component of the voter registration process. See, e.g., Common Cause of Colo. v. Buescher, 750 F. Supp. 2d 1259 (D. Colo. 2010). Legislative Intervenors argue that the State has no other effective means to verify addresses short of sending personnel to make

in part, because the statute provides that the card need not be sent to the registrant's residential address.  Rather, it must be sent to the <u>mailing</u> address the same-day registrant provides on his application, even if that address is outside the county of registration, (<u>id.</u> at 59:8-13), if the registrant does not receive mail at the residential address.  N.C. Gen. Stat. § 163-57(1)(c) ("Residence shall be broadly construed to provide all persons with the opportunity to register and to vote, including stating a mailing address different from residence address.").  The parties have presented no record as to how often same-day registrants' mailing addresses differ from their residential addresses — whether for students on campuses, individuals utilizing post office boxes, etc.  (<u>DNC</u> Doc. 62 at 45:11-14 (State Board Defendants stating that they do not have "statistics to back it up," but upon belief, "most people's residential address will be their mailing address").)  Address verification appears to work as intended for the vast majority of voters who receive mail at their residential address.  But State Board Defendants and Intervenors have presented <u>no</u> evidence that address verification has ever filtered out a single ineligible same-day registrant.  In fact, State Board Defendants concede that they have "no way" of knowing if an unreturned card truly demonstrates ineligibility because

---

home visits (<u>DNC</u> Doc. 62 at 63:13-21), and it is the province of the General Assembly to choose the process for verification.

they only know the card was returned as undeliverable, not why. (<u>VL</u> Doc. 61 at 60:20-21.)

Only Party Intervenors directly contend that the provision serves to deter SDR voter fraud. (<u>VL</u> Doc. 51 at 15-18.) Voto Latino Plaintiffs offer an expert, Dr. Martha Kropf, a political science professor, who concluded that the undeliverable mail provision for SDR registrants "has no discernible benefit in terms of preventing voter fraud." (Doc. 49-1 at 6.)[35] While Legislative Intervenors dispute her definition of fraud as "prohibitively narrow," (<u>VL</u> Doc. 52 at 9), their own expert, Dr. Andrew Taylor, also a political science professor, conceded that he had "no reason to question the methods or results" of Dr. Kropf. (<u>VL</u> Doc. 52-1 at 13; <u>VL</u> Doc. 59-2 at 67:7-11 (confirming Dr. Taylor's conclusion at deposition).)

The State's proffered justifications, in light of the lack of notice and opportunity to be heard for SDR voters, are inconsistent with its interest in counting eligible ballots to the extent ballots are rejected for errors unrelated to the voter's actual eligibility. <u>See</u> <u>Lee</u>, 915 F.3d at 1322. Such SDR voters' ballots would be removed, not because voters do not live where they claimed, but rather because a postal worker or county board of

---

[35] As Party Plaintiffs argued, someone who "falsely swears out an application [and] forges a HAVA document" may likely be clever enough to provide a mailing address where he can receive mail. (<u>DNC</u> Doc. 62 at 94:9-11.)

75

elections worker made an error that resulted in the return of a non-forwardable mail card. In fact, providing a chance to correct that error would appear to be consistent with section 163-57's call for "[r]esidence [to] be broadly construed to provide all persons with the opportunity to register and vote[.]" N.C. Gen. Stat. § 163-57(1)(c). Moreover, the State's interest in counting only eligible ballots is also mitigated to some extent by the fact that State Board Defendants concede they will continue to count the SDR ballots of voters whose single card returns as undeliverable <u>after</u> the canvass. (<u>VL</u> Doc. 61 at 54:1-6.)

Legislative Intervenors rely on the opinions of Dr. Taylor to support their view that the undeliverable mail provision ensures election integrity and instills confidence in the fairness of elections. (<u>See</u> <u>VL</u> Doc. 52 at 13, 17.) Dr. Taylor opines that the undeliverable mail provision will help ensure that the single card returns as undeliverable before the canvass. (<u>VL</u> Doc. 52-1 at 12.) While he opines that this "<u>may</u> increase North Carolinians' confidence" in elections, (<u>id.</u> at 17 (emphasis added)), he does not opine on whether the undeliverable card is probative of a voter's residence, and thus a voter's eligibility to vote. Instead, he states, "If the 23% of undelivered mail that is the result of USPS error represents an intolerable risk for SDR voters under S 747, it seems to me it should have represented an intolerable risk under the rules prior to S 747." (<u>Id.</u> at 11.)

76

Moreover, Dr. Taylor states that voter fraud can go undetected, that address verification is important, and that voters have reduced confidence in elections. (Id. at 13-15.) On this record, there is no reason to doubt these principles. But Dr. Taylor does not discuss how enforcing the undeliverable mail provision without notice and hearing addresses them. Additionally, Dr. Taylor opines that a voter who "cannot tolerate the possibility of their registration being canceled" can "register and later vote in-person or absentee as do around 97 percent of others" in North Carolina. (Id. at 16.) Whatever merit this argument might have if SDR voters' registrations alone were at issue, the State, having offered the option of voting during SDR, cannot discard their ballots due to governmental error and without notice and an opportunity to be heard simply on the ground that the voters should have known not to take such a risk. Cf. Common Cause of Colo. v. Buescher, 750 F. Supp. 2d 1259, 1264 (D. Colo. 2010) (noting that Colorado law allows voters who are informed on election day they failed mail verification to cure by voting a provisional ballot with an ID).

Legislative Intervenors also assert that the undeliverable mail provision was intended to "level the playing field" between SDR and non-SDR voters because SDR voters prior to S. 747 had a "whole panoply of protections" that "regular registrants" did not. (DNC Doc. 66:13-15.) But the statutory scheme does not bear this

out.  Chapter 163 appears to provide <u>more favorable</u> treatment to many non-SDR voters vis-à-vis SDR voters, particularly non-SDR voters who register just before the 25-day cut off for traditional registration.  First, unlike an SDR voter under S. 747, the statute directs county boards to treat "as a registered voter" any non-SDR voter who fails address verification <u>after</u> voting — e.g., someone who registers before the 25-day cutoff, votes early or on election day, and then fails address verification.  N.C. Gen. Stat. § 163-82.7(g)(3); <u>cf.</u> <u>id.</u> § 163-82.6B(d) (stating that a county board "shall not register" an SDR voter who fails address verification).  Second, a non-SDR voter may still vote in person, with some procedures for verifying address, if his registration was so close to the 25-day cutoff for traditional registration that his first address verification card is sent within 25 days of the election and returns as undeliverable — e.g., he votes after the first card is returned as undeliverable but before return of a second card.  <u>Id.</u> § 163-82.7(g)(2); <u>cf.</u> <u>id.</u> § 163-82.6B(d) (directing county board to remove SDR ballot from the official count upon failure of SDR voter's address verification based on a single card received by the day before the canvass).  Third, non-SDR voters cannot be denied the right to vote in person unless two cards are returned as undeliverable, and the statute only states that a challenge is "not preclude[d]" if that occurs after a non-SDR voter votes.  <u>Id.</u> § 163-82.7(g)(1); <u>cf.</u> <u>id.</u> § 163-82.6B(d)

78

(directing removal of ballot based on only one card for SDR voters). And fourth, a voter who casts an absentee ballot and whose address verification card is returned as undeliverable "after [the] person has already voted by absentee ballot" may have his ballot challenged, will be given notice of the challenge, and has a right to "appear before the board at the hearing on the challenge and present evidence as to the validity of the ballot." Id. § 163-82.7(g)(2); § 163-89(e); NCSBE Numbered Memo 2022-05 (Dec. 15, 2023 update), supra, at 3, 11 (requiring county board to provide notice and providing sample notice letter). Thus, while the court acknowledges the State's legitimate interest in verifying addresses for all registrants, S. 747 does not appear to level the playing field between SDR and non-SDR voters. Rather, as to address verification, it appears to tilt it against SDR voters by requiring that the ballot be removed from the count without notice and opportunity to be heard.

In addition, State Board Defendants assert an interest in ensuring that the address verification card returns before the canvass. As the Fourth Circuit has acknowledged, "these concerns are real." McCrory, 831 F.3d at 237. Indeed, when the repeal of SDR was previously challenged before this court, the plaintiffs in that case "d[id] not seriously dispute" the issues SDR caused for the implementation of the State's address verification system, including in cases where the second address verification card was

79

returned after the canvass and the SDR voter's ballot was nevertheless counted.  N.C. State Conf. of the NAACP v. McCrory, 182 F. Supp. 3d 320, 447 (M.D.N.C. 2016).[36]  However, while State Board Defendants and Intervenors here are likely to show that a card mailed to an SDR voter would be more likely to return before the canvass, they have not shown why the substantial burden of exclusion without notice and an opportunity to be heard is justified when the failure — at least on the present record — is likely caused in significant respect by the government's own errors.

    To the extent State Board Defendants and Intervenors argue that providing notice and an opportunity to be heard would impose an administrative burden, this argument is not adequately supported on this record.  County boards of elections plainly have an interest in "protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials."  Timmons, 520 U.S. at 364.  But the administrative burden of providing notice and an opportunity to be heard is limited in this context for at least three reasons.

    First, prior to January 1, 2024, Chapter 163 already provided for a challenge procedure for SDR ballots.  Until this year, SDR

---

[36] In precluding the elimination of SDR, the Fourth Circuit based its decision on a finding of discriminatory racial intent, not because the State was without power to eliminate SDR.  McCrory, 831 F.3d at 233.

ballots were treated as absentee ballots, and the statutory scheme provided a hearing for a challenge to the ballots of voters who failed address verification to be held by the county board of elections on the day set for the canvass. See N.C. Gen. Stat. §§ 163-82.6A (2012), 163-82.7(g)(2), 163-89.

Second, while S. 747 has reclassified SDR ballots as "retrievable," rather than "retrievable absentee," section 163-89 continues to apply to absentee ballots. See id. § 163-89 (as amended by 2023 N.C. Sess. Laws 140, § 15). Neither State Board Defendants nor Intervenors has provided any evidence that this challenge procedure generates any administrative burden. Given the number of projected address verification failures across North Carolina's 100 counties, State Board Defendants and Intervenors have not demonstrated that providing due process for those SDR voters who fail address verification would tally to an additional burdensome level for any county board of elections.

Third, State Board Defendants concede that they "stand ready to incorporate whatever additional procedural protections this Court deems necessary for such voters." (DNC Doc. 53 at 11; VL Doc. 54 at 10.) In fact, State Board Defendants appear to have already taken steps that begin to address Plaintiffs' concerns, including encouraging county boards to collect contact information from SDR voters. (VL Doc. 55-5 at 7 (NCSBE Numbered Memo 2023-05 (Dec. 8, 2023)) (recommending that county boards contact voters

81

before sending verification card if staff have "questions regarding the address"); VL Doc. 55-6 (demonstrating blanket notice county boards will display at early voting sites); see also VL Doc. 61 at 76:16-19 (expressing General Assembly's view that section 163-89 would provide an "appropriate mechanism" to administer notice and opportunity to be heard, if needed).) Accordingly, providing notice would not impose some new duty to affirmatively investigate voters' contact information; voters currently have the option to provide contact information on their voter registration application, and county boards are already being directed to recommend applicants do so. See North Carolina Voter Registration Application, Form 06W, supra (Question 10); (VL Doc. 55-5 at 7 (NCSBE Numbered Memo 2023-05 (Dec. 8, 2023)) ("[T]he election official assisting a same-day registrant must recommend that the voter provide their phone number and/or email address on the registration form.").)

In sum, Defendants and Intervenors are likely to show that they have strong and legitimate interests in protecting election integrity by ensuring that eligible voters vote in the proper precinct and that address verification supports that interest. However, after considering the extent to which those interests make it necessary to substantially burden same-day registrants' right to have a ballot counted once it is cast, the court finds Plaintiffs are likely to succeed on the merits of their

constitutional claim against the undeliverable mail provision because it does not provide notice and an opportunity to be heard.

### b.   Irreparable Injury

An infringement or abridgment of a constitutional right is an irreparable harm where monetary damages are inadequate or difficult to ascertain. Democracy N.C., 476 F. Supp. 3d at 236. "Courts routinely deem restrictions on fundamental voting rights irreparable injury." League of Women Voters of N.C., 769 F.3d at 247; see also Obama for Am., 697 F.3d at 436 ("A restriction on the fundamental right to vote . . . constitutes irreparable injury."); Williams v. Salerno, 792 F.2d 323, 326 (2d Cir. 1986) (holding that plaintiffs "would certainly suffer irreparable harm if their right to vote were impinged upon").

Here, the threatened injury of discounting an eligible SDR voter's ballot without notice and opportunity to be heard would constitute irreparable injury. Any court's intervention in the State's constitutional prerogative to set the manner of conducting elections, however, can constitute an irreparable injury to the State, especially in consideration of the preliminary nature of the motions before this court. Abbott v. Perez, 138 S. Ct. 2305, 2324 (2018) (emphasizing on motion to stay injunction that "[u]nless [a] statute is unconstitutional," enjoining a statute enacted by the legislature "would seriously and irreparably harm the State"). Legislative Intervenors argue that counting

"unverified applications where the mail verification fails" would create a "fraudulent result." (VL Doc. 52 at 21.) Accepting the legitimacy of the prophylactic purposes of address verification, however, giving notice and opportunity to be heard to SDR voters who fail address verification would not increase any potential for such an outcome; indeed, quite the opposite.

### c. Balance of the Equities and Public Interest

The balance of the equities and the public interest "merge when the Government is the opposing party." Miranda v. Garland, 34 F.4th 338, 365 (4th Cir. 2022) (quoting Nken v. Holder, 556 U.S. 418, 435 (2009)).[37] "By definition, '[t]he public interest . . . favors permitting as many qualified voters to vote as possible.'" Democracy N.C., 476 F. Supp. 3d at 237 (quoting League of Women Voters of N.C., 769 F.3d at 247–48).

As discussed above under consideration of the State's interest, the State's potential harm is outweighed by the equities in Plaintiffs' favor at this stage. In balancing the equities, the court notes that Chapter 163 authorizes challenge procedures already, and that State Board Defendants and Intervenors have not forecast any evidence of its administrative burden. See N.C. Gen. Stat. §§ 163-82.6A (2012), 163-82.7(g)(2), 163-89. Moreover,

---

[37] Though Party Intervenors are non-governmental, they, too, combine the balance of the equities and the public interest in their analysis. (DNC Doc. 51 at 18-19; VL Doc. 51 at 22-23 (arguing harm to the State militates against injunction).)

84

State Board Defendants concede that they "stand ready to incorporate whatever additional procedural protections this Court deems necessary for such voters" and have begun to do so already. (DNC Doc. 53 at 11; VL Doc. 54 at 10; VL Doc. 55-5 at 7 (NCSBE Numbered Memo 2023-05 (Dec. 8, 2023)) (recommending that county boards contact voters before sending mail card if staff have "questions regarding the address"); VL Doc. 55-6 (demonstrating blanket notice county boards will display at early voting sites); see also VL Doc. 61 at 76:16-19 (expressing General Assembly's view that section 163-89 would provide an "appropriate mechanism" to administer notice and opportunity to be heard, if needed).) The court thus finds that the balance of the equities and the public interest tip in Plaintiffs' favor.

*     *     *

In sum, the Winter factors weigh in favor of Plaintiffs as to the undeliverable mail provision. "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." Trump v. Int'l Refugee Assistance Project, 582 U.S. 571, 579-80 (2017). "The purpose of such interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." Id. at 580 (internal citation omitted). "In the course of doing so, a court need not grant the total relief

85

sought by the applicant but may mold its decree to meet the exigencies of the particular case." Id. (internal quotation marks omitted). Generally, a preliminary injunction is "intended to protect the status quo," Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017), which may "require a party who has recently disturbed the status quo to reverse its actions." League of Women Voters of N.C., 769 F.3d at 236 (internal quotation marks and citation omitted); see also Lee, 915 F.3d at 1328 (noting district court's "Goldilocks solution" of preliminarily requiring notice and opportunity to cure rather than striking down entirety of signature matching scheme).

A court considering an injunction close to an election should consider the risk of "voter confusion." Purcell, 549 U.S. at 4-5; Wise v. Circosta, 978 F.3d 93, 99 n.6 (4th Cir. 2020) (focusing Purcell inquiry on the extent to which "[v]oter behavior" would be "impacted by [the court's] decision"). Neither Defendants nor Legislative Intervenors have argued that proximity to the primary election counsels against an injunction. Party Intervenors claim that "[e]lection officials, candidates, campaigns, and voters will struggle to understand how [an] injunction interplays with S.B. 747, and with the broader election code, to the result of inconsistent rules across the state, [] and the potential denial of voting opportunities." (DNC Doc. 51 at 19 (internal citation omitted).) The court does not discern any risk that voters will

86

be confused, especially because S. 747 seeks to alter prior law, and State Board Defendants have assured the court that they "stand ready" to implement changes as required by this court. (DNC Doc. 53 at 11; VL Doc. 54 at 10.) At a status conference to set out a briefing schedule, moreover, State Board Defendants represented that they could administer a remedy for the primary election, so long as the order was entered around the start of early voting on February 15, 2024.

As to the scope of the injunction, Plaintiffs have agreed that they would accept notice and an opportunity to be heard as a remedy narrower than the broadest they have requested. (Compare DNC Doc. 62 at 98:18-22 ("[T]he remedy [Party Plaintiffs] respectfully suggest is for the Court to . . . direct the State Board for purposes of the primary election to, in fact, apply the notice and opportunity to be heard provision in [] 82.7(g)(2)[.]"), with DNC Doc. 7 at 19 (implying that the court should require two cards be returned before vote is discarded); compare VL Doc. 61 at 26:1-9 (Voto Latino Plaintiffs accepting "as an alternative remedy" ordering county boards to contact voters and "provide a mechanism by which they may further demonstrate that they are eligible voters and are properly residents"), with VL Doc. 44 (seeking to enjoin section 163-82.6B(d)).) (See also VL Doc. 1 (repeatedly alleging in the complaint the undeliverable mail provision's lack of notice and opportunity to be heard as a

87

defect); DNC Doc. 1 (same).)

As discussed above, the parties disagree as to whether section 163-89, the provision previously used to challenge SDR ballots for voters who failed address verification, applies in light of S. 747's reclassification of SDR ballots as "retrievable," rather than "retrievable absentee."

It is not the court's role to draft a precise remedy. That State Board Defendants construe — correctly it appears — the undeliverable mail provision to not contemplate notice and opportunity to be heard and intend to enforce it accordingly absent a court order, is sufficient to justify the injunction set out below. Though the parties offered proposed provisions at the hearing,[38] the court expresses no opinion on whether the State Board may exercise its authority under section 163-22.2 to "make reasonable interim rules and regulations with respect to the pending primary or election as it deems advisable" in light of the court's preliminary holding that Plaintiffs are likely to show

---

[38] Legislative Intervenors' counsel offered his belief that State Board Defendants could "graft into [§ 163-82.6B(d)] a notice and procedure" for voters to be heard without violating the statute (DNC Doc. 62 at 76:9-14), stating, without conceding the constitutional issue, that:

> We think that [State Board Defendants] can use the challenge process under 163-89 to accommodate this. We think between 747 and the existing statutes — my client believes, and I'm authorized to state, that we think that that's an appropriate mechanism, if one is even needed.

(DNC Doc. 62 at 76:15-19.)

that the undeliverable mail provision, as written, is unconstitutional. N.C. Gen. Stat. § 163-22.2. Any such interim rules and regulations, if promulgated, must not otherwise conflict with the provisions of Chapter 163. Id.; see Moore v. Circosta, 494 F. Supp. 3d 289, 326 (M.D.N.C. 2020) (finding NCSBE had "implemented a rule that conflicted directly with the statutes enacted by the North Carolina legislature" through invocation of section 22.2).

In sum, the "exigencies of the particular case" warrant the injunction as set out below, and nothing more. Int'l Refugee, 582 U.S. at 579-80.

### 3. Ineligible Voter Notice

Party Plaintiffs alone challenge another aspect of S. 747. Focusing on the county board of elections' statutory duty to tentatively determine voter eligibility (by checking driver's license number, social security number, etc.) before embarking on address verification, N.C. Gen. Stat. 163-82.6B(d), they claim that the law unconstitutionally fails to prescribe a mechanism for notifying same-day registrants of an adverse eligibility determination or the ground(s) of rejection, or provide an opportunity to contest the adverse eligibility determination. (DNC Doc. 7 at 16.) Party Plaintiffs contend that the silence in the statute allows "any election official [to] unilaterally deny a person his or her right to vote without due process." (Id.)

89

State Board Defendants agree that S. 747 does not explicitly state the process for rejecting a same-day registration based on an ineligibility determination. (DNC Doc. 53 at 8.) However, they read the statute to require a same-day registrant whose application is rejected due to ineligibility to receive the same challenge process under section 163-89 as a same-day registrant currently would receive, even though SDR ballots are no longer considered "absentee ballots." (Id. at 7-8.) Indeed, NCSBE Numbered Memo 2023-05 further demonstrates the State Board plans to utilize the challenge provision of section 163-89 "because the county board is authorized to 'pass upon the legality of disputed ballots' during canvass.'" (DNC Doc. 60-1 at 6 n.9 (NCSBE Numbered Memo 2023-05 (Dec. 8, 2023)).)

Legislative Intervenors and Party Intervenors argue that Party Plaintiffs misread the statute to find that there is no process for same-day registrants who are found ineligible. (DNC Doc. 52 at 12; DNC Doc. 51 at 3-6.) They do not agree with State Board Defendants that there should be a challenge procedure under 163-89. Instead, they contend that section 163-82.7 applies, which is the same notice and opportunity to be heard afforded non-SDR applicants whom a county board determines to be ineligible. Under this provision, the SDR voter would receive a notice in the mail that informs him that his registration has been denied and outlines the method of appeal under 163-82.18, which provides for a public

90

hearing and appeal to a North Carolina Superior Court. Intervenors contend that this process suffices because this is the same process that non-SDR applicants receive. (DNC Doc. 52 at 12-13; DNC Doc. 51 at 4.)

Whether Defendants' or Intervenors' interpretation of the statute is correct, Party Plaintiffs have not demonstrated that they are likely to "suffer irreparable harm in the absence of preliminary relief." Winter, 555 U.S. at 20. Party Plaintiffs conceded as much, stating that they are not irreparably harmed if State Board Defendants are entitled under the law to apply its interpretation. (DNC Doc. 62 at 19:4-23 ("For purposes of a preliminary injunction, I don't think we need anything more from this Court other than the acknowledgement.").) By all accounts, State Board Defendants have represented in their briefing and in a public memorandum that they intend to fill any perceived silence in the statute with the notice and opportunity to be heard that Party Plaintiffs seek. (DNC Doc. 53 at 8; DNC Doc. 60-1 at 6-7 (NCSBE Numbered Memo 2023-05 (Dec. 8, 2023)).) And even if Intervenors' reading controlled, Party Plaintiffs have not shown that the notice provided under sections 163-82.7 and 163-82.18 would be constitutionally inadequate process. Wolf v. Fauquier Cnty. Bd. of Supervisors, 555 F.3d 311, 323 (4th Cir. 2009) ("Procedural due process provides merely 'a guarantee of fair procedures — typically notice and an opportunity to be heard.'"

91

(citation omitted)); N.C. Gen. Stat. §§ 163-82.7, 163-82.18 (providing for notice and hearing before county board of elections with appeal to superior court). Accordingly, Party Plaintiffs' motion to preliminarily enjoin the enforcement S. 747's notice procedure as to SDR voters determined ineligible following the verification process to be conducted within two business days of registration will be denied.

## III. CONCLUSION

For the reasons stated, State Board Defendants and Intervenors have shown valid State interests in the use of address verification by non-forwardable mail for confirming a voter's eligibility to vote — a process that has been in place for several decades, albeit employing two cards. These include undeniably legitimate interests in ensuring the integrity of elections, ensuring that only ballots of eligible voters are counted, preventing voter fraud, and instilling confidence in elections. Nevertheless, Plaintiffs have demonstrated a likelihood that the undeliverable mail provision in S. 747, codified as N.C. Gen. Stat. § 163-82.6B(d), will impose a substantial burden on same-day registrants who cast a ballot because, under the law's express terms, they will face a non-trivial risk of being erroneously disenfranchised by failing address verification due to governmental error, rather than factors related to their eligibility to vote, without any notice and opportunity to be

92

heard.

Plaintiffs have shown that the State's precise interests asserted in this case likely do not outweigh the substantial burden on the rights of same-day registrants who cast a ballot. Burdick, 504 U.S. at 434 (requiring courts weigh "the character and magnitude of the asserted injury" against "the precise interests put forward by the State," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights"). On this record, State Board Defendants and Intervenors have presented no evidence that any of the several thousand same-day registrants who have failed address verification since its inception in 2008 was in reality ineligible to vote on the ground of improper residency. For SDR voters, the lack of notice and opportunity to be heard is inconsistent with the State's interest in counting all eligible voters' ballots. Moreover, given the lack of showing of an administrative burden on county boards of elections, the risk of irreparable injury, the balance of equities, and the public interest all weigh in favor of requiring notice and an opportunity to be heard.

IT IS THEREFORE ORDERED that Defendants and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, are HEREBY ENJOINED from utilizing the procedures of N.C. Gen. Stat. § 163-82.6B(d) to remove from the official count the votes of the ballot of any voter

93

who has provided contact information in the registration process and whose first notice required under N.C. Gen. Stat. § 163-82.7(c) is returned by the Postal Service as undeliverable before the close of business on the business day before the canvass, without first providing such voter notice and an opportunity to be heard, and, only to this extent, Voto Latino Plaintiff's motion (VL Doc. 44) and Party Plaintiff's motion (DNC Doc. 6) are GRANTED. This injunction shall remain in force until such time as a procedure for notice and opportunity to be heard is implemented in accordance therewith.

IT IS FURTHER ORDERED that Voto Latino Plaintiff's motion (VL Doc. 44) and Party Plaintiff's motion (DNC Doc. 6) are, in all other respects, DENIED.

/s/   Thomas D. Schroeder
United States District Judge

January 21, 2024